IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 21-CR-439-CVE |
| KEITH DUANE PARNELL, | |
| Defendant. | |

## Trial Brief of the United States of America

The United States of America respectfully submits its brief for trial in this case.

### Status of the Case

**Trial Date:**  January 18, 2022, at 9:00 a.m., before the Honorable Claire V. Eagan, United States District Judge.

**Estimated Time for Trial:**   2-3 days. The government anticipates that its case-in-chief will take approximately one to two days.

**Defendant's Status:**   Out of Custody.

**Waiver of Trial by Jury:**   None.

**Interpreter:**   None required.

**Potential Witness List:**  An anticipated witness list is provided below. The government will provide a final witness list to the Court as soon as possible. Due to potential scheduling complications, the government cannot guarantee the precise order in which witnesses will be called.

1. K.B., Victim
2. J.P., Victim
3. Detective Justin Allen, Pryor Police Department
4. Stephanie Hendrickson

5. Kayla Parnell
6. Branden Parnell
7. Jennifer Parnell
8. Brenda Cunningham
9. Taylor Vanhorn
10. Carlie Jones
11. Rebecca Hendrickson
12. Carrie Marsh
13. Hannah Perry
14. Chassey Mefford
15. CAFI expert witness

**Exhibit List:** An anticipated exhibit list is provided below. The government will provide a final exhibit list to the Court as soon as practicable.

1. Image of home – 904 S.E. 22nd Street, Pryor
2. Image of home – 501 N. Taylor Street #135, Pryor (Green Country Mobile Home Park)
3. Image of home – 116 S. Indianola Street, Pryor
4. Image of home – 729 E. 460 Road, Pryor
5. Image of home – 1925 N. 4364 Road, Pryor
6. Images of cell phone text conversation between Kayla Parnell and Keith Parnell
7. Images of cell phone text conversation between Taylor Vanhorn and Keith Parnell
8. Kayla Parnell recorded interview
9. Jennifer Parnell recorded interview
10. K.B. Facebook Post "I AM FREE"
11. K.B. sexual abuse story
12. J.P. sexual abuse story
13. Carlie Jones recorded interview
14. Jennifer Parnell Facebook post
15. Recorded phone calls from Pryor Police to Keith Parnell
16. Carrie Marsh recorded interview

**Requested Time for Opening Statement:** The government respectfully requests 20 minutes for its opening statement.

## Statement of Facts

Twin sisters K.B. and J.P. were sexually abused by their biological father, Keith Duane Parnell, from approximately the ages of five to fifteen. The twins are now 28.

K.B. and J.P. grew up poor. Their mother, Jennifer, was a waitress, and their father, Parnell, worked electrical jobs at an industrial park. The twins had three additional siblings: Kayla Parnell (11 months younger than the twins); Brice Parnell, and Branden Parnell. Their mom was often away from the house and the children were often alone with Parnell. Through their childhood, the family moved often from house to house, but always lived in Pryor, Oklahoma. Over the course of approximately ten years, Parnell sexually assaulted the twin girls in five different homes in Pryor, Oklahoma: 904 S.E. 22nd Street; 501 N. Taylor Street #135 (Green Country Mobile Home Park); 116 S. Indianola Street; 729 E. 460 Road; and 1925 N. 4364 Road.

### K.B.

In 1998, at the approximate age of five, the twins' lives changed forever, when their father began sexually abusing them. At about the time the twins started at Washington Elementary, K.B. experienced her first sexual memory: Parnell lying next to her sister, J.P., kissing her with his tongue, and "making out" with J.P. Parnell asked K.B. if she wanted to try it and motioned her to him, where Parnell had her lay down next to him and kissed her on the mouth, neck, and ears. K.B. thought it must not be bad if daddy said it was ok.

Over the next ten years, Parnell continued and escalated his sexual abuse of his daughters. He convinced the girls he had a "boo boo" that needed healing from his twin girls' kisses and told K.B. to get on her knees. While on her knees and despite K.B. telling Parnell that something kept "poking her," Parnell placed K.B.'s hand on

his erection and told her to "just keep kissing, it hurts." Parnell later pulled K. B. aside and told her "What we do together is our secret. You can't tell anybody okay?" When K.B. asked, "why?," Parnell told her that she would never see momma or him again if she told someone. K.B. apologized and said she wouldn't tell anyone. The sexual abuse continued. When K.B. was six years old, Parnell taught her a "new way" to kiss his "boo boos" and had her perform oral sex on him.

When the girls were between the ages of 7 and 8, Parnell paused his sexual abuse towards K.B. and directed his sexual aggression towards her twin sister, J.P., instead. However, he eventually resumed his abuse of K.B. When K.B. was about 9 or 10 years old, and in second or third grade, the family lived in a brown two-bedroom trailer with a fenced-in dirt yard. The twins and their three other siblings shared one room, sleeping with one blanket and used trash bags full of clothes as pillows. Once, K.B. fell asleep on the couch alone, wearing her underwear and a Mickey Mouse t-shirt. Parnell walked next to the couch, got on his knees, told K.B. that he wanted to show her something, pulled the covers back, pulled down her underwear, wrapped her small legs around his head, and performed oral sex on her. Parnell stopped and asked K.B. if she liked it, but she didn't reply. When her mom came into the room, Parnell leaped up from the couch and told her he was kissing K.B. goodnight. K.B. cried herself to sleep.

When K.B. was 10 or 11 years old, and in the third or fourth grade, the family lived in a white, two-bedroom house near Pryor Jr. High. All five children again shared a room, with twin mattresses lined up next to one another. One night, K.B.

awoke to Parnell spitting on her vagina, using his finger to rub her clitoris, and bringing K.B. to orgasm. Whenever Parnell would perform sexual acts on her, K.B. would close her eyes and pretend she was asleep. Sometimes Parnell stopped, but other times he would continue. Having to wake up every other night to Parnell abusing her, K.B. would be exhausted at school.

One night, when her mom was away from the house working her paper route, K.B. awoke with her underwear off and Parnell between her legs. K.B. felt his penis touching her vagina, ready to put it inside her. K.B. began to bawl and Parnell asked what was wrong. K.B. came up with a lie that she was having a bad dream in order to escape to the bathroom and get away. K.B. was afraid her virginity would be taken by her father. Fortunately, her lie worked and she was able to go to bed. The next day, K.B. discovered a "hickie" on her neck from Parnell and was forced to use her mother's cover up.

When K.B. was approximately 10 to 11 years old, the family traveled to a nearby lake. While at the lake, Parnell took K.B. aside and rubbed her clitoris. After the family returned to their home from the lake, Parnell sat in K.B.'s room while she was half naked, complimenting her body and "V shaped" waist. Parnell was later kicked out of the house due to his affair with his sister-in-law.

Parnell moved into a house not far from where the twins lived with their mother. The kids had to stay with Parnell sometimes and K.B. dreaded it. One night, Parnell made the kids create pallets on the hardwood floor of his empty living room but told Kayla Parnell and K.B. to sleep in his bed. That same night, Parnell used his fingers

to play with K.B.'s clitoris. Eventually, Parnell and their mom reconciled, and the family was under one roof again.

At age 14, K.B. told her twin sister, J.P., that she was being molested by Parnell. J.P. was furious and threatened Parnell saying "if you ever touch US again." At this time, K.B. believed she was taking all the sexual abuse from Parnell, so her other siblings would not be abused. In fact, Parnell was sexually assaulting both J.P. and K.B. for years without either knowing about the other.

The family moved again when K.B. was about 14 or 15 years old, this time into a white house near Mayes Street. One night, K.B. returned home from drinking with friends. When she got home, she fell asleep and awoke to Parnell rubbing his hand between her breasts. K.B., starting to realize only she could save herself, told Parnell to leave her alone. Parnell became upset and went back to his room. A week before her 16th birthday, K.B. could not live with the abuse anymore and attempted to kill herself.

Soon after K.B.'s suicide attempt, Parnell discovered J.P. was sexually active with her boyfriend. In a jealous rage, Parnell put his hands around J.P.s throat, lifted her up, pinned her against the wall, and strangled her. K.B. attempted to stop Parnell, but to no avail. Their mom kicked K.B., Parnell, and Kayla out of the home on New Years' Eve of 2011. K.B. was 16. Parnell and Kayla moved to a hotel together, but Parnell did not allow K.B. to stay with them at the hotel. Once Parnell obtained a home, he allowed Kayla to live at the home, but not K.B. Instead, K.B. moved in with Parnell's sister, Stephanie Hendrickson.

Both K.B. and her high school friend, Taylor Vanhorn, lived with Stephanie Hendrickson. One night, K.B. told Hendrickson and Vanhorn that she was sexually assaulted by Parnell. Hendrickson took K.B. into a room where they spoke outside the presence of Vanhorn. After privately speaking, Hendrickson wanted to call police. But, out of shame, fear, and concern for hurting the family, K.B. was too afraid to report the abuse to police. Instead, to prevent Hendrickson from calling the police, K.B. told her the sexual assault claims were lies. However, Vanhorn, who was present at the time, later told police that it was clear K.B. was only stating she "lied" out of fear that Hendrickson would contact police. A short time later, Parnell got back together with his wife and the family moved into a white, double wide trailer by Osage schools. In the house, their mom stayed in a separate bedroom, while Parnell shared a second bedroom…with Kayla. The remaining kids shared rooms with one another. As time progressed, Parnell became increasingly "close" to Kayla. Parnell provided Kayla with a truck, while none of other siblings had cars. Parnell did not allow the kids to drive the truck because it was Kayla's truck. Parnell became extremely jealous of Kayla's boyfriends and would harass them until they broke up with her. According to Vanhorn, as a teenager she observed Kayla sleeping in Parnell's bed. Eventually, Parnell moved out and Kayla moved in with him. According to one of Kayla's children, when Kayla and her children visit Parnell, Kayla will sometimes sleep in the same bed as Parnell.

### J.P.

Parnell's abuse of J.P. began even earlier and progressed even further. When J.P. was about five years old, the family lived in a blue house. J.P. walked to Parnell's room and saw him looking at pornography on his computer. At the time, J.P. didn't know exactly what the pornography was, but knew it wasn't for someone her age because it made her uncomfortable seeing it. Parnell told J.P. it was ok and to come closer to him. J.P. walked into the room and laid on her stomach next to Parnell as he pressed "play." The video was two women, naked, performing oral sex. J.P. remembers wanting to stop watching.

After the blue house, family next moved into a white house together. J.P. was doing dishes when Parnell came up to her from behind and used his fingers to rub her clitoris while saying, "does that feel good?". The entire time, Parnell stood behind J.P. asking her if it felt good and whispered in her ear. Another time, while at the same house, J.P. was napping on the couch with a brown blanket. Parnell crouched down next to J.P., slid his hand under the brown blanket and rubbed her clitoris. Again, Parnell asked J.P. if she liked it and if it felt good.

The family moved again, this time into a house near neighbors Chuck and Lisa. In that house, J.P. experienced the worst of her sexual abuse from Parnell. He would sneak next to J.P. at night and play with her clitoris. Every now and then Parnell would digitally penetrate J.P., always asking her if it felt good. It was uncomfortable and J.P. wanted to run away. One night, J.P. woke up due to a bad dream and went to her parents' room. Parnell volunteered to help her get back to sleep. But instead,

he viewed the moment as an opportunity to touch her again. He placed his hand under the covers rubbed her clitoris until J.P. climaxed. J.P. recalled "so many" nights where she would wake up to Parnell using his fingers on her vagina. When J.P. was approximately 12 or 13 years old, Parnell called her into his bedroom. By this time in her life, J.P. had her period. Parnell told her to perform oral sex while Parnell obtained an erection. J.P. performed oral sex until Parnell told her to turn around, placed her on her hands and knees, and used his penis to penetrate her anus. Parnell told J.P. to roll on her back where he then used his penis to penetrate her vagina. J.P. felt disgusted and wished it was over. Parnell ejaculated onto J.P.'s stomach, retrieved a towel, and wiped his sperm off of J.P.'s body. Parnell had taken his daughter's virginity. After Parnell vaginally and anally raped his daughter, J.P. asked her father if she would have a baby because of sex.

Parnell was panicked and began making excuses. He initially told J.P. to say that she had sex with a random boy and got pregnant by him, but decided against that idea. Parnell settled with the excuse that he "beat off" on a towel, J.P. used the towel after showering, and that's how she became pregnant. About one week later, J.P. had her period and developed the courage to tell Parnell she never wanted to do any of that again. He said, "ok." Mortified and humiliated, J.P. struggled to cope with the sexual assaults and slit her wrists in an attempt to kill herself. She survived, but the scars remain on her body today.

Soon after Parnell raped J.P., K.B. told J.P. that Parnell had sexually assaulted her as well. This was the first time the twin girls realized their father had sexually

assaulted both of them. But the difference between the twins' sexual abuse was that Parnell forced J.P. to endure anal and vaginal penetration of his penis. The twins confronted Parnell and told him he would never sexually assault them again. One day, while Parnell was driving his semitruck to another state with J.P. inside the truck, he pulled over into an abandoned gas station and begged her to have sex with him one last time. Parnell tried to bribe J.P. with whatever she wanted him to buy or with money. J.P. refused and Parnell cried and apologized. Parnell told J.P. that he didn't know why he was so "f—ked up in the head," but not before asking her to have sex with him one more time.

## Charges in the Indictment and Statutes

1. *Indictment*

Parnell is charged with ten counts of aggravated sexual abuse of a minor under 12 in Indian Country and sexual abuse of a minor in Indian Country for the acts he performed on both K.B. and J.P. Counts One through Five relate to his abuse of K.B. and Counts Six through Ten to his abuse of J.P.

2. *Statutes*

**Title 18, United States Code, Section 2241(c) prohibits Aggravated Sexual Abuse of a Minor, and provides, in relevant part:**

> (a) Whoever, in the special maritime and territorial jurisdiction of the United States… knowingly causes another person to engage in a sexual act— (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.
> (c) Whoever …in the special maritime and territorial jurisdiction of the United States …, knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with

another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging…., or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life.

**Title 18, United States Code, Section 2243(a) prohibits Sexual Abuse of a Minor, and provides, in relevant part:**

(a) Whoever, in the special maritime and territorial jurisdiction of the United States …, knowingly engages in a sexual act with another person who —
   (1) has attained the age of 12 years but has not attained the age of 16 years; and
   (2) is at least four years younger than the person so engaging;
or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

**Title 18, United States Code, Section 1151 provides:**
Except as otherwise provided in sections 1154 and 1156 of this title, the term Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

**Title 18, United States Code, Section 1153 provides:**
Any Indian who commits against the person or property of another Indian or other person any of the following offenses… a felony under chapter 109A… within the Indian Country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

## Legal and Evidentiary Issues

### 1. Protection of the victims' identities

The victims' full names should be withheld to protect them from potential harassment, undue embarrassment, and other adverse consequences that may result from the nature of their anticipated testimony. *See* the Victims' Protections and Rights Act, 18 U.S.C. § 3509(d)(3); and the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8). This protection addresses the victims' right to be treated "with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(a)(8).

Referring to victims only by initials or first name is common in cases involving sex abuse. *See, e.g., Willoughby*, 742 F.3d at 232 (Sixth Circuit case referring to child sex trafficking victim by initials only); *United States v. Daniels*, 653 F.3d 399, 405 (6th Cir. 2011) (same); *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (adult sex trafficking case rejecting defendant's argument that the district court erred by permitting witnesses to testify by first name only and protecting witnesses' addresses and employment details from disclosure); *Anderson*, 139 F.3d 291, 301-02 (1st Cir. 1998) (referring to child sex trafficking victims by first names only).

Whenever the victims' and witnesses' full names are used, the government requests the Court order that the transcript reflect only their initials.

### 2. Cross-examination of Parnell's character witnesses

The United States anticipates that Parnell may call character witnesses during his case-in-chief. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by

testimony in the form of an opinion. Fed. R. Evid. 405(a). If Parnell elects to call character witnesses, on cross-examination, the government may inquire into specific instances of Parnell's past conduct relevant to the character trait at issue. Fed. R. Evid. 405(a); *United States v. McHorse*, 179 F.3d 889, 901-902 (10th Cir. 1999). However, Parnell's character witnesses may not be asked about specific instances of conduct on direct examination. Fed. R. Evid. 405(a).

3. *Government's Exhibits and Stipulations*

The United States will timely provide Parnell with a proposed exhibit list consistent with this Court's order. Government counsel will seek to pre-admit all exhibits to facilitate the efficient presentation of evidence where no objections exist as to the chain-of-custody, relevance, or prejudicial nature of the evidence.

After speaking with defense counsel, Parnell agrees to a stipulated agreement regarding his Indian status and jurisdiction as to Indian County and Northern District of Oklahoma. The parties will continue to discuss stipulations as to exhibits and foundation.

4. *Defendant's Exhibits and Stipulations*

The United States objects to Defendant's proposed exhibits 1 through 34, as all proposed defense exhibits are not relevant under Fed. R. Evid. 401 and their probative value is substantially outweighed by its unfair prejudicial effect, confuses the issues, and will mislead the jury under Fed. R. Evid. 403. Additionally, the proposed exhibits will certainly cause a minitrial on matters completely irrelevant to any substantive issue in the case under Fed. R. Evid. 608(b), 611(a).

   5. *Notice of 404(b) and 414 Information*

The United States provides notice of its intent to offer evidence of other instances of abuse by the defendant aginst the victims, and inappropriate sexual comments by the defendant toward the victims. Additionally, during intial discovery disclosure, defense counsel was made aware of a strangulation during which Parnell strangled J.P. when she was approximately 16 years old.

   6. *Rule 412 Evidence*

Defense counsel has not stated they intend to proceed with Rule 412 evidence. However, in an abudnance of caution the United States moves the Court to preclude Parnell from offering evidence of, or questioning witnesses about, K.B. or J.P.'s pas sexual behavior, including any prior allegations of rape.

"In sexual-offense cases, evidence of the victim's sexual behavior is generally inadmissible." *United States v. Willis*, 826 F.3d 1265, 1277 (10th Cir. 2016). In cases involving allegations of sexual misconduct, Rule 412 prohibits the admission of evidence offered to prove that a victim engaged in other sexual behavior or offered to prove a victim's sexual predisposition. Fed. R. Evid. 412(a).

Rule 412 aims to safeguard the victim's privacy and protect the victim from potential embarrassment. Fed. R. Evid. 412, Advisory Committee Notes (1994). "By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders." *Id.* The Rule accomplishes these objectives by "barring evidence relating to the alleged victim's sexual behavior or alleged sexual predisposition, whether

offered as substantive evidence *or for impeachment*, except in designated circumstances in which the probative value of the evidence significantly outweighs possible harm to the victim." *Id.* (emphasis added). "Evidence, which might otherwise be admissible under Rules 402, 404(b), 405, 607, 608, 609, or some other evidence rule, must be excluded if Rule 412 so requires." *Id.*

Rule 412 provides three exceptions. A court may admit: (1) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence; (2) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by prosecutor; and (3) evidence that would violate the defendant's constitutional rights if excluded. Fed R. Evid. 412(b)(1)(A-C). The 1994 Advisory Committee Notes provide that "[e]vidence offered to prove allegedly false prior claims by the victim is not barred by Rule 412. However, the evidence is subject to the requirements of Rule 404."

If a court intends to admit evidence under one of the exceptions, it must have an in-camera hearing and give the victim and the parties a right to be heard. *See* Fed R. Evid. 412(c)(2). As of today, defense counsel has not provided such discovery or evidence, if it intends to use any at trial.

## Conclusion

This trial brief is offered to acquaint the Court with factual and legal issues which may arise at trial.

Respectfully submitted,

CLINTON J. JOHNSON
United States Attorney

*/s/ Niko Boulieris*
Niko Boulieris, MN Bar No. 0397389
Assistant United States Attorney
110 West Seventh Street, Suite 300
Tulsa, Oklahoma 74119
(918) 382-2700

## Certificate of Service

I hereby certify that on the 10th day of January 2022, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to counsel for the defendant.

Theodore Hasse
*Attorney for the Defendant*

*/s/ Niko Boulieris*
Niko Boulieris
Assistant United States Attorney