1          UNITED STATES DISTRICT COURT FOR THE
                NORTHERN DISTRICT OF OKLAHOMA
2

3
UNITED STATES OF AMERICA,        )
4                                )
                 PLAINTIFF,      )
5                                )
vs.                              )   Case No. 21-CR-439-GWC
6                                )
                                 )
7  KEITH DUANE PARNELL,          )
                                 )
8                 DEFENDANT.     )
                                 )
9

10

11

12          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
        BEFORE THE HONORABLE GEOFFREY W. CRAWFORD
              UNITED STATES DISTRICT JUDGE
13                 ON MARCH 8, 2022
                     VOLUME II
14

15

16

17              A P P E A R A N C E S

18
FOR THE PLAINTIFF:
19
REAGAN V. REININGER and CHANTELLE DIAL, Assistant United
20 States Attorneys, 110 West 7th Street, Suite 300, Tulsa, OK
   74119
21
FOR THE DEFENDANT:
22
THEODORE M. HASSE, Wirth Law Office, 500 7th Street, Tulsa, OK
23 74119

24

25  Transcribed by:  Laura Griffin, RPR, CRR, Laura_Griffin@oknd.uscourts.gov

## <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| Kelsey Blaylock | |
|    Cross By Mr. Hasse | 145 |
|    Re-Direct By Ms. Reininger | 160 |
| Jasmine Parnell | |
|    Direct By Ms. Reininger | 169 |
|    Cross By Mr. Hasse | 232 |
|    Re-Direct By Mr. Reininger | 269 |
|    Re-Cross By Mr. Hasse | 271 |
| Jennifer Parnell | |
|    Direct By Ms. Dial | 273 |
|    Cross By Mr. Hasse | 301 |
| Stephanie Hendrickson | |
|    Direct By Ms. Dial | 309 |
|    Cross By Mr. Hasse | 347 |
|    Re-Direct By Ms. Dial | 356 |
| Carlie Jones | |
|    Direct By Ms. Reininger | 357 |
|    Cross By Mr. Hasse | 368 |

1                              MARCH 8, 2022

2                    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

3    OUTSIDE THE PRESENCE AND HEARING OF THE JURY:)

4                    THE COURT:  Do we have Ms. Blaylock?

5                    MS. REININGER:  She's out in the hallway, Your

6    Honor.

7                    THE COURT:  She can come on in and take a seat and

8    we'll call in the jury, unless you want to take something

9    up.

10                   MS. REININGER:  I think we do have an issue we want

11   to take up before we --

12                   THE COURT:  All right.

13                   MR. HASSE:  Your Honor, I just informed the

14   Assistant U.S. Attorneys that I have a brief line of

15   questioning that I anticipate could be sensitive in wrapping

16   up with Kelsey Blaylock.

17                   THE COURT:  Right.

18                   MR. HASSE:  Specifically I would like to ask her if

19   she's ever been the victim of sexual abuse or sexual assault

20   by an individual other than Keith Parnell.  And the only

21   follow-ups is how many people and if that ever happened in

22   high school.

23        The relevance in this case is I believe some jurors may

24   find it very credible that in fact she is -- appears to be

25   somebody who was traumatized by sexual assault or sexual

1  abuse.

2          THE COURT:  Right.

3          MR. HASSE:  We simply want to adduce the minimum

4  amount of evidence so that we could argue that that can be --

5  that can really be true without it being true that the source

6  of that and the reason of that is Keith Parnell.

7          THE COURT:  Is there some basis for thinking that

8  her answer is going to be yes?

9          MR. HASSE:  Yes, there is in fact.  My good faith

10 basis for believing that if she answers truthful it would be

11 yes is that she, multiple times, according to Stephanie

12 Hendrickson, came home and reported during high school that

13 she had been the victim of sexual abuse and sexual assault.

14     You may recall yesterday she described an incident very

15 in detail about somebody nearly taking her virginity.  It is

16 possible that that entire incident in fact happened but the

17 person wasn't Keith Parnell.

18     My concern is that, you know, in a vacuum where they have

19 a witness that is seriously indicating in a credible way that

20 she's experienced abuse and trauma, that they may conclude,

21 well, there's no other explanation than the one person being

22 accused.

23     I don't want to, you know, drag this in in a direction

24 that it would in any way indicate or even bring up the

25 possibility that she was engaging in any voluntary or

1  consensual sex at any point, I just want to ask about sexual

2  assault and sexual abuse.

3          THE COURT:  All right.

4      Take your time.

5          MS. DIAL:  Thank you, Your Honor.  If I could have

6  just a moment.

7          THE COURT:  Sure.

8          MS. DIAL:  Your Honor, the government would object

9  to that line of questioning as improper and not relevant.  The

10  defense has the opportunity to cross her, has the opportunity

11  to ask if she's certain that it was Keith Parnell, but this is

12  the first time that the government has heard of any other

13  possible abusers.

14      Turning to Rule 412, which goes to sex offense cases and

15  the victim's sexual behavior predisposition, just at the start

16  procedurally to raise this now is improper.  The rule requires

17  that if a party intends to offer evidence under Rule 412 that

18  the party has to file a motion specifically describing the

19  evidence and stating the purpose for which it's to be offered

20  at least 14 days beforehand, but just addressing it anyways in

21  the moment, this type of questioning, this line of

22  questioning, is improper under Rule 412 which states that

23  the -- that evidence offered to prove that a victim engaged in

24  other sexual behavior or evidence offered to prove a victim's

25  sexual predisposition is not admissible except -- and then

1    there's a couple of exceptions.

2        I think for this case what we're probably focusing on is

3    evidence offered to prove that a victim engaged in other

4    sexual behavior.  There has been no discovery suggesting

5    stuff -- suggesting such.  The government hasn't received any

6    witness statements from defense about other possible sexual

7    behavior, so this is new information that doesn't fit into any

8    of these exceptions.

9        Specifically Rule 412 goes on to say that it can be

10   allowed if offered to prove that someone other than the

11   defendant was the source of semen, injury or other physical

12   evidence.  That's not the line of questioning.  It's not a

13   question of semen, injury or other physical evidence.

14       It can be allowed if evidence of specific instances of a

15   victim's sexual behavior with respect to the person accused

16   can be allowed if the defendant is trying to prove consent.

17   That's not the case here.

18       Or the final exception is evidence whose exclusion would

19   violate the defendant's constitutional rights, and that's not

20   being alleged here.  And any concern about the defendant's

21   constitutional rights can still be addressed through the line

22   of questioning pressing the victim on, are you sure it was

23   Keith Parnell.

24       To call in to question other -- to bring up other sexual

25   acts which the government has not had any evidence of, which

1    there's nothing to support, is frankly just revictimizing and

2    traumatizing a victim and punishing her in this moment for

3    speaking out and now trying to shift the blame when there's

4    nothing to support that and the rule doesn't permit it.

5            MR. HASSE:  Your Honor.

6            THE COURT:  I think -- I'll give you a chance in a

7    second.  The first thing I would like to start with for the

8    sake of the record is a clear proffer from you of exactly what

9    it is that you expect to elicit.  Another high school boy or

10   some other man, kind of -- so we all know exactly what the

11   factual basis for the line of questioning is.

12           MR. HASSE:  Yes, Your Honor.  Let me clearly state

13   what I expect her answer to be is that, yes, she had been

14   sexually assaulted or sexually abused by at least one other

15   boy in her life and that at least one of those occurred during

16   high school.

17      I don't have any of the details of precisely what

18   happened.  I do know that she came home and reported that to

19   Stephanie -- Stephanie Hendrickson while she was living with

20   her Aunt Stephanie Hendrickson.

21      I don't want to elicit any other details and so I

22   personally haven't delved in.  I don't at all expect for her

23   to have the opportunity when asked those questions to get

24   in -- and again as I mentioned, it's not the intention to

25   elicit any testimony about consensual or predisposition or

1    anything.  I agree with the Assistant U.S. Attorney that if

2    Rule 412 is applicable to this line of questioning, then

3    it's -- we can't do it because procedurally there -- as she

4    points out, there's a notice requirement.

5         There is no notice requirement if it's relevant.  The

6    fact that they're saying -- the government is claiming that

7    they didn't know about this before, each of us had an equal

8    opportunity to conduct discovery going into this.  I don't

9    think that's relevant.

10        With regards to relevance, I think -- I don't hear a

11   dispute about the relevance.  It sounds like one of the other

12   objections here is that it may be retraumatizing or

13   victimizing or something like that.  I disagree.  I don't

14   think those basically three specific questions will cause

15   trauma or victimize or be somehow improper, but I think most

16   importantly in responding to the government's objections, Rule

17   412 does not apply because I am not seeking admission of

18   evidence to prove that the victim engaged in other sexual

19   behavior.  I'm simply going to ask whether she was sexually

20   assaulted or sexually abused, whether she was victimized

21   before by another man, not that she ever engaged in any

22   consensual behavior with somebody else or any behavior.

23             THE COURT:  All right.  Not to put too fine a point

24   on it, your proffer is that she was raped at the high school

25   during her high school years by another student and that she

1    told this to her aunt?

2            MR. HASSE:   I -- I don't know that it went all the

3    way to penetrative rape.  I know there was -- there was -- she

4    went to her aunt and gave an account that, I was sexually

5    assaulted by a boy from high school.

6            THE COURT:  Okay.

7            MS. DIAL:  Your Honor, could I just briefly respond?

8            THE COURT:  Sure.  Of course.

9        I want to make sure -- I asked you some questions.  Did

10   you have more that you wanted to add?

11           MR. HASSE:  No, Your Honor.  I -- I think what is

12   at the center of our disagreement here is whether 412 applies.

13   I don't believe 412 applies.  I will concede if 412 applies,

14   that it shouldn't be admitted.  I don't believe it applies and

15   I don't see any reason that those limited three questions,

16   which are very relevant to our theory of the case, would be

17   traumatizing or improper.

18           MS. DIAL:  Actually the government does challenge

19   the relevancy of this.  I believe that Mr. Hasse said that we

20   all agreed it was relevant.  We do not.  The credibility of

21   the witness is essentially what he's calling into question.

22   This is not a child who is six years old and may have been

23   confused, this is an adult woman who is saying on the stand

24   that -- and has said on the stand that it was her father that

25   did these acts.

1      So to bring in another possible sexual assault when we

2  don't know who the boy is, we don't know what the allegations

3  are, there are no specifics, the only reason we even know

4  about it is hearsay from the aunt who is saying that this

5  victim told her that, so to confront her with the aunt's

6  hearsay is improper.  It's not relevant.  It does not -- it

7  creates confusion over the issues.  It's misleading.

8      This case is about whether or not this victim should be

9  believed in what she is saying.  And so the relevancy of this

10  is just not -- not there for an adult victim who hasn't

11  wavered on what she says the defendant did to her.

12          THE COURT:  All right.  I'll exclude this line of

13  questioning for reasons similar to what the government has

14  said on relevance grounds.  At most, the proffer is that

15  Ms. Blaylock may have been subjected to some form of sexual

16  assault or harassment, we don't really know any details at

17  all, that she complained to her aunt about something that a

18  boy had done to her at high school.

19      This is not a damages hearing.  In other words, we aren't

20  looking for the cause of her -- of her trouble and suffering,

21  this is a criminal case about whether Mr. Parnell committed

22  particular offenses or not, and the possibility that at

23  another time, at another location, some other man, likely a

24  high school student, acted improperly towards Ms. Blaylock is

25  not relevant to her credibility in describing her father's

1  conduct, the defendant's conduct, or doesn't make it more

2  likely or less likely that her testimony about the defendant's

3  conduct is accurate.

4     So I'm most concerned that this comes up in the middle of

5  the trial.  If the conduct qualifies as sexual misconduct

6  under 412, and I can't really tell because none of us know

7  what it is, it would be subject to a notice requirement and

8  some kind of in limine hearing beforehand in which we really

9  would understand what the facts proposed by the defense are.

10     We're deprived of that opportunity because it comes up in

11  the middle of cross-examination.  That would be a second

12  reason for excluding it, but the primary reason is a separate

13  and a different act by some third party is irrelevant to the

14  charges in this case.  All right.  Appreciate it.

15       MR. HASSE:  Relatedly, Your Honor, I want to

16  confirm you're excluding it also for questions to Stephanie

17  Hendrickson who is being called by the prosecution?  I would

18  propose that I would ask her whether Kelsey Blaylock had ever

19  come home to her and reported that she had been sexually

20  assaulted or sexually abused by somebody other than Keith

21  Parnell.

22       THE COURT:  I don't want to get too far out over my

23  skis.  Likely the same ruling, but let's take it up in

24  connection with Ms. Hendrickson's testimony because there's no

25  need to make rulings about people that aren't here yet; okay?

1        We'll give you the same opportunity outside of the

2    presence of the jury to raise the issue if we get there.  I

3    don't know who is going to testify.

4             MR. HASSE:   Thank you, Your Honor.  And one last

5    thing, I just want to give you just that the --

6             THE COURT:  Skis are kind of a Vermont reference.

7    Not too familiar in Oklahoma.

8             MR. HASSE:   Completely understood.  I've seen it on

9    TV.

10       I have went over your jury instructions and as requested,

11   I have --

12            THE COURT:  Oh, thank you.

13            MR. HASSE:  -- one proposed change.  I didn't find

14   much to improve but I just have one.

15            THE COURT:  We'll take an hour at 4:00 to go over

16   it, but I appreciate that very much.

17       All right.  Ready for the jury?

18            MS. REININGER:  Your Honor, may I bring the witness

19   in before?

20            THE COURT:  Let's bring her in and I'll remind her

21   she's under oath.

22       Good morning.  Good to see you again.  Do you have a

23   water?  Okay.  I see you have it.  Great.

24       I just remind you that you remain under oath.

25            THE WITNESS:  Okay.

1        THE COURT:  You can bring in the jury.

2        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

3    THE PRESENCE AND HEARING OF THE JURY:)

4        DEPUTY COURT CLERK:  We're back on the record in

5    case number 21-CR-439-GWC, United States of America versus

6    Keith Duane Parnell.

7        Counsel, would you please make your appearances.

8        MS. REININGER:  Assistant United States Attorney

9    Reagan Reininger and Chantelle Dial on behalf of the

10   government.

11       MR. HASSE:  Theodore Hasse on behalf of Keith

12   Parnell.

13       THE COURT:  We'll continue with Ms. Blaylock's

14   examination.

15   I appreciate your patience coming in a few minutes late.

16   I had a little more -- the lawyers were all here.  I had a

17   little work with them before we got going and I'm grateful to

18   you for showing up so early.  Thanks.

19   Sir.

20                    KELSEY BLAYLOCK,

21   having been previously sworn, was recalled as a witness and

22   testified as follows:

23                CONTINUED CROSS-EXAMINATION

24   BY MR. HASSE:

25   Q.  Ms. Blaylock, I would like to ask you a few questions

1    about testimony you made regarding other individuals in your

2    family.

3        First of all, you testified yesterday that your dad's

4    brother Anthony Parnell told you not to talk about abuse; is

5    that correct?

6    A.   Yes.

7    Q.   It was your testimony that this conversation happened at

8    your Aunt Stephanie Hendrickson's home; is that correct?

9    A.   Yes.

10   Q.   You testified yesterday that Brad -- Brad -- Branden

11   Parnell told you he saw your sister Kayla Parnell naked with

12   your father Keith Parnell; is that right?

13   A.   I said that he saw her without her underwear on but he

14   didn't say if she was naked or not.

15   Q.   At that time you had a conversation with Branden Parnell

16   about that; is that correct?

17   A.   Yes.

18   Q.   Okay.  You testified yesterday that Stephanie Hendrickson

19   was like a mom to you; is that right?

20   A.   Yes.

21   Q.   You testified yesterday that Stephanie Hendrickson said it

22   was too late to do anything about the abuse; is that correct?

23   A.   Yes.

24   Q.   Now, in your previous statement that you gave to police,

25   isn't it true you said that she was the only one that believed

1  you?

2  A.  Yes.

3  Q.  And you also testified that Stephanie Hendrickson kicked

4  you out of her home?

5  A.  Yes.

6  Q.  With regards to Kayla Parnell, you said you saw her abused

7  by your father; is that right?

8  A.  Yes.

9  Q.  And you discussed that with your sister Kayla Parnell, 11

10 months younger than you, and she was defensive about it I

11 think you said; is that right?

12 A.  I didn't discuss what I had seen, I just asked her if he

13 had been doing things to her.

14 Q.  Thank you.

15 A.  And she got defensive.

16 Q.  Thank you for clarifying.  And then finally with regards

17 to Jennifer Parnell, who is your mother, did you ever tell

18 your mom you were abused?

19 A.  Yes.  After I told Stephanie.

20 Q.  And what did your mother say?

21 A.  She didn't say anything, she just left.

22 Q.  What did she do later?

23 A.  I found out that she went to his house and questioned him

24 about it.

25 Q.  Okay.  Did your mother call police?

1  A.   No.

2  Q.   Okay.  One thing I wanted to clarify from yesterday.  You

3  had mentioned in your testimony a wet willie.  Not everybody

4  may know what that is.  Can -- can you try to describe what a

5  wet willie is?

6  A.   A wet willie is where you lick your finger and stick it in

7  someone's ear, but he was licking my ears.  He was kissing my

8  ears and my neck.

9           MR. HASSE:   Objection.  Objection withdrawn.

10  Q.   (BY MR. HASSE) So just to be clear, you described a wet

11  willie, you mentioned a wet willie.  You're saying that you

12  experienced something that wasn't a wet willie but you know

13  what a wet willie is; is that right?

14  A.   Yes.

15  Q.   And a wet willie, you said, is where somebody licks their

16  fingers and sticks it in an ear?

17  A.   Yes.

18  Q.   You testified to receiving, I think in your words, was

19  positive feedback from your post on Facebook where you alleged

20  that you were sexually abused; is that right?

21  A.   Yes.

22  Q.   When you say "positive feedback," what do you mean by

23  that?

24  A.   People that -- friends, coworkers, people that I grew up

25  around reached out and apologized and said they were praying

1    for us and the police reached out as well.

2    Q.   Reactions on Facebook as well, "likes" I think they're

3    called on Facebook; is that right?

4    A.   Yes.

5    Q.   Likes on the post?

6    A.   Well, it wasn't originally a post.  Like I didn't write

7    the story to Facebook, they just had to go to a link and it

8    took them to another website.

9    Q.   But it was linked in a post?

10   A.   Correct.

11   Q.   On Facebook; is that right?

12   A.   Correct.

13   Q.   And I know that you may see where I'm going with some of

14   these, if you could just allow me to finish the question for

15   the court reporter so that we don't talk over each other.

16   A.   Okay.

17   Q.   There was a post on Facebook and people were able to give

18   feedback to that post on Facebook; is that right?

19   A.   Yes.

20   Q.   Some of those -- some of that feedback -- let me start

21   that over.  Some of the feedback to your Facebook posts were

22   likes, thumbs up; is that right?

23   A.   Yes.

24   Q.   And everybody could see that feedback; is that correct?

25   A.   Yes.

1  Q.  So somebody could see as the number went up day after day

2  how many likes you got on the post.  Is that accurate?

3  A.  Yes.

4  Q.  Clarifying the first incident that you described yesterday

5  where you said that you saw Keith Parnell kissing your sister

6  Jasmine Parnell, I believe you said that Kayla Parnell may

7  have been in the room for that; is that correct?

8  A.  Yes.

9  Q.  There was a point in which in your testimony you said, I

10 believe your words were, "every other day there was abuse".

11 A.  Yes.

12 Q.  I would like to ask about what period of time you were

13 referring to when you said "every other day".

14 A.  From five years old to the last time that I was 15, 16.

15 Q.  When you say "every other day," I want to point out there

16 can be more than one meaning for every other day.  In one

17 instance somebody may mean every other day other than the day

18 we're talking about, and sometimes someone may mean every

19 other day like one day it happens, one day it doesn't, one day

20 it happens, one day it doesn't.

21     Can you clarify for us what you meant by "every other

22 day" when you made that statement?

23 A.  The one day it happens and one day it doesn't.

24 Q.  I see.  So from age five to you said 15?

25 A.  Uh-huh.  Yes.  Sorry.

1    Q.  About half of the days you were being abused is your

2    testimony; is that right?

3    A.  Yes.

4    Q.  Now, it was your testimony that at one point you told your

5    sister Jasmine Parnell that you were abused; is that right?

6    A.  Yes.

7    Q.  And you -- you claimed that she confronted your dad Keith

8    Parnell; is that right?

9    A.  Yes.

10   Q.  And that she was 14 years old; is that right?

11   A.  Yes.

12   Q.  I believe in your statement you said something about a

13   14-year-old scaring a man out of abusing someone, something

14   like that?

15   A.  Yes.

16   Q.  You did describe another incident after age 14 yesterday

17   in your testimony; right?

18   A.  Yes.

19   Q.  But if my impression is that the abuse stopped after your

20   sister confronted Keith Parnell, would that be an accurate

21   impression for the most part?

22   A.  Can you put that a different way?

23   Q.  Was there abuse every other day after that confrontation?

24   A.  No, it just happened one more time after that.

25   Q.  So just to clarify then, really your testimony then is it

1    was every other day from age five to age 14; is that right?

2    A.   Yes.

3    Q.   Not age five to 15?

4    A.   Yes.

5    Q.   Okay.  Now, what does your father Keith Parnell do for a

6    living?

7    A.   The last I knew of he drove trucks.

8    Q.   He drove trucks for a good part of your childhood; is that

9    right?

10   A.   Yes.

11   Q.   Do you know if -- what kind of truck driver he was?

12   A.   No.

13   Q.   Have you heard of a long-haul truck driver?

14   A.   No.

15   Q.   Would it surprise you to hear that sometimes Keith Parnell

16   drove out of town and drove to other states in his truck?

17   A.   No.

18   Q.   It would not surprise you?

19   A.   No, it wouldn't.

20   Q.   It wouldn't surprise you because in fact you had gone on

21   trips with him before as part of his work; is that right?

22   A.   No.

23   Q.   You never were taken with him on a trip to Arkansas?

24   A.   Not that I remember.

25   Q.   Okay.  Did Keith Parnell ever take your siblings on trips

1  with him long haul to other states?

2  A.  I remember he took my brothers.

3  Q.  I see.  Was your father ever out of town on trips as part

4  of his job as a trucker?

5  A.  Yes.

6  Q.  Sometimes for several days at a time?

7  A.  Yes.

8  Q.  Sometimes most of the week he was gone; isn't that true?

9  A.  If you count a couple of days as a week, then, yes.

10  Q.  Well, it varied, is that fair to say?  There was some

11  weeks where he was gone a lot of days and some weeks where

12  there were a few days?

13  A.  I only remember a few days.

14  Q.  Okay.  And -- well, in fairness we're talking about a long

15  period of time.  Maybe we can narrow it down to specific time

16  periods.  You gave testimony yesterday about a time period

17  where you were not living every day with your dad; is that

18  correct?

19  A.  Yes.

20  Q.  There was a period where your mother Jennifer Parnell and

21  your father Keith Parnell were split up; is that correct?

22  A.  Yes.

23  Q.  And I think we left off there yesterday.  I had asked

24  whether or not during one of those separations if your mother

25  was very angry with Keith Parnell your father.

1  A.  Yes.

2  Q.  She was very angry?

3  A.  Yes.

4  Q.  And she shared that with you?

5  A.  She didn't share it with me but she expressed her -- her

6  demeanor.

7  Q.  I see.  So it's your testimony that Jennifer Parnell did

8  not say in your presence that she was very angry with Keith

9  Parnell?

10  A.  No.

11  Q.  That is not your testimony?

12  A.  No.

13  Q.  So she did in your presence express that she was very

14  unhappy with Keith Parnell?

15  A.  The way she acted, yes.

16  Q.  Okay.  Was -- was it your impression at those times that

17  she would not be open to you sharing with her that you had

18  been sexually abused?

19  A.  No.

20  Q.  That may have been confusing the way I asked that.  You

21  did not share with her at those times that you had been

22  sexually abused; is that right?

23  A.  Correct.  Yes.

24  Q.  Correct.  That you did not share with her at those times.

25      There was one other incident that I wanted to clarify

1  with you, Ms. Blaylock.  This is house number six from Exhibit

2  6.  You had described being 14 or 15.  You had done some

3  drinking and had come home.  Do you recall giving that

4  testimony?

5  A.  Yes.

6  Q.  Okay.  You had mentioned your dad was working on

7  something.  Do you recall testifying?

8  A.  Yes.

9  Q.  I wasn't clear on that.  What did you mean by he was

10  working on something?

11  A.  I remember he was sitting in the living room and he had

12  tools but I don't remember exactly what he was working on.

13  Q.  Okay.  Well, it was also your testimony that you didn't go

14  to your room that night because you were afraid of getting

15  caught; is that correct?

16  A.  Yes.

17  Q.  So you fell asleep on the couch in the living room?

18  A.  Yes.

19  Q.  But your father was already there in the living room with

20  his tools?

21  A.  Yes.

22  Q.  Is it true that you were close with your father Keith

23  Parnell before your sister came to you in 2020 and told you

24  that he had raped her?

25  A.  No.

1    Q.  You were not close with Keith Parnell?

2    A.  No.

3    Q.  Do you recall on June 16th of 2019 having posted a Happy

4    Father's Day post to Facebook addressed to Keith Parnell?

5    A.  I don't remember it but I'm sure I did.

6    Q.  Do you remember what you said in that post to Keith

7    Parnell?

8    A.  No, I do not.

9    Q.  I believe you still have binders in front of you.  There

10   should be a defense exhibit binder.  I would ask that you turn

11   to Exhibit 31.

12   A.  The black one?

13   Q.  Yeah, I think it's the black one.  Would you please read

14   that to yourself.

15   A.  Okay.  I read it.

16   Q.  Okay.  Do you see the date on that post?

17   A.  Yes.

18   Q.  And it's June 16, 2019?

19   A.  Yes.

20   Q.  And you see you -- you're not surprised to hear you posted

21   Happy Father's Day to your dad.  You're not surprised by that;

22   right?

23   A.  No.

24   Q.  Do you recall now after seeing it that you said that your

25   father has a big heart and is quick to forgive and he would do

1    anything for the kids?

2           MS. REININGER:  Objection, Your Honor.  May we

3    approach?

4           THE COURT:  Sure.

5       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

6    THE PRESENCE AND HEARING OF THE JURY:)

7           MS. REININGER:  Your Honor, I think that him reading

8    the statement to the victim of what she said is not only

9    hearsay but it's improper impeachment.  She hasn't said she

10   didn't say it, so him reading the statement to her I think is

11   an improper way.

12          MR. HASSE:  I'm not seeking to impeach her, Your

13   Honor, I'm trying to establish the fact that she had a close

14   relationship with her father all the way up until 2020 when

15   her sister made these allegations.  These are her words.  I'm

16   not -- it's not hearsay.  I'm not offering it as -- for the

17   proof of the matter asserted.

18          MS. REININGER:  You're reading her statement.

19          MR. HASSE:  Excuse me, if I may finish.

20      I'm reading her -- yeah, it's an out-of-court

21   statement.

22          THE COURT:  Talk to me; okay.

23          MR. HASSE:  It's an out-of-court statement not

24   offered for the truth of the matter asserted.  I'm not trying

25   to prove that he has a big heart or that he's quick to forgive

1  or that he would do anything for the kids or that she in many

2  ways is thankful for him, I'm trying to establish the fact

3  that this was their relationship, that she was publicly

4  posting like this.  I think it's relevant to the jury.  They

5  would want to hear it.

6          THE COURT:  Okay.  The testimony is fine.  She --

7  you appropriately refreshed her recollection because she said

8  she didn't remember.  She's now read it, so I think the next

9  question is having refreshed your recollection, what do you

10  recall telling your dad on June 16, 2019.

11          MR. HASSE:  Okay.

12          THE COURT:  If -- we'll have a different problem if

13  she says, I never wished him Happy Father's Day, but the -- I

14  think it's probably -- well, I read it.  I remember what she

15  testified to.

16      And you'll be fine.  If her testimony is inconsistent,

17  we'll deal with it then, but I don't understand what you're

18  tending to offer with the post itself.  That's the evidence;

19  right?

20          MR. HASSE:  No, I understand that the prosecution

21  doesn't want this going back to the jury.  That's fine.  I'm

22  not seeking to publish this to the jury, I'm trying to

23  establish through one post, what many posts over these 15

24  years look like.

25          THE COURT:  Just ask her and she'll tell you now

1  that she's read it and is reminded.

2      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT WITHIN

3  THE PRESENCE AND HEARING OF THE JURY:)

4  Q.  (By Mr. Hasse) Ms. Blaylock, now that you've read the post

5  and been reminded, do you recall what you said in the post?

6  A.  Yes.

7  Q.  Can you tell me what you said in the post?

8  A.  I said, "you have a big heart, you're quick to forgive and

9  do anything for us kids."

10 Q.  Did you say anything else in the post directed towards

11 Mr. Parnell?

12 A.  I said, "the older I get, I realize I'm like you in many

13 ways and I'm thankful."

14 Q.  Did you say anything else in that post about --

15 A.  And that me and my kids love him.

16 Q.  You told the FBI in January 2021 that you wanted Keith

17 Parnell to go to prison for the rest of his life; isn't that

18 right?

19 A.  Yes.

20 Q.  Before you posted to Facebook in 2020 your allegations,

21 you texted Keith Parnell; is that right?

22 A.  Before my allegations?

23 Q.  So let me be clear.  You posted to Facebook in August of

24 2020 accusations against your father Keith Parnell that he had

25 sexually molested you and your sister; is that right?

1   A.   Yes.

2   Q.   Shortly before you posted that, you sent text messages to

3   Keith Parnell accusing him of abusing your sister, your twin

4   sister; is that right?

5   A.   Yes.

6   Q.   And you told him to stay away from you and your family; is

7   that right?

8   A.   Yes.

9   Q.   You were -- you were very angry at that time; is that

10  right?

11  A.   Yes.

12  Q.   You did that because Jasmine Parnell, your twin sister,

13  told you that Keith Parnell took her virginity and made her

14  look at pornography at age five; isn't that right?

15  A.   No.   She just told me that he took her virginity.

16  Q.   When she told you that, you were very angry, weren't you?

17  A.   Yes.

18  Q.   Because you believed your twin sister, didn't you?

19  A.   Yes.

20  Q.   You would do anything for your twin sister; isn't that

21  right?

22  A.   Yes.

23          MR. HASSE:   No further questions.

24                      REDIRECT EXAMINATION

25  BY MS. REININGER:

**United States District Court**

1   Q.  Kelsey, I believe yesterday counsel asked you if you had

2   ever talked to your brothers about the allegations that you've

3   made against your father.  And again about the sexual abuse

4   that had happened to you.

5       I think if I could recall correctly, your two brothers

6   are younger than you?

7   A.  Yes.

8   Q.  Brice is how much younger than you?

9   A.  Two years.

10  Q.  And Branden is how many years younger?

11  A.  Four.

12  Q.  So when you were five years old, according to your

13  testimony, they would have been one and three years of age;

14  correct?

15  A.  Yes.

16  Q.  And when you were living with Aunt Stephanie, you were

17  around 17 years old; is that correct?

18  A.  Yes.

19  Q.  And where were Branden and Brice at that time?

20  A.  I'm not sure.

21  Q.  Did they live back with your mother or your father?

22  A.  I think they were living with my mother.

23  Q.  And they would have been about 13 and 15 years old?

24  A.  Yes.

25  Q.  Okay.  And at -- well, at 17 years old did you talk to

1   your brothers about your -- your body parts?

2   A.  No.

3   Q.  Did you talk to your brothers about sexual activity that

4   you would have experienced as a child?

5   A.  No.

6   Q.  And in fact I believe from your testimony you said one of

7   your brothers is autistic; is that correct?

8   A.  Yes.

9   Q.  Without giving me some like expert testimony, is he a

10   functioning individual?

11   A.  Yes.

12   Q.  Okay.  Does he go to school?

13   A.  He went to school.

14   Q.  And have a job?

15   A.  No.

16   Q.  Do you know where he lives today?

17   A.  The last I knew of he was living with his girlfriend.

18   Q.  Okay.  I think -- I want to just clarify for the record a

19   little bit, I think counsel asked you yesterday about you

20   talking -- telling Stephanie.  There were two times that you

21   told your Aunt Stephanie about things that had happened;

22   correct?

23   A.  Yes.

24   Q.  When was the first time?

25   A.  When I was five.

1  Q.  And what was your allegation at that point?  What did you

2  tell her at that point?

3  A.  I said that Daddy was licking my ears.

4  Q.  The term "wet willie," where did that come from?

5  A.  He came up with that.

6  Q.  So at age five you didn't know what a wet willie was?

7  A.  No.

8  Q.  And the second time that you told your Aunt Stephanie, how

9  old were you?

10  A.  Seventeen.

11  Q.  There was some testimony that you had told your Aunt

12  Stephanie to tell -- to say that you made it up; is that

13  correct?

14  A.  Yes.

15  Q.  Do you recall having that conversation with your Aunt

16  Stephanie?

17  A.  Yes.

18  Q.  And can you explain to the jury why you told your Aunt

19  Stephanie to tell everyone that you made it up?

20  A.  Because people kept calling her, asking her about it, and

21  nothing was done and it was just stirring up trouble.

22  Q.  When you say "stirring up trouble," what do you mean?

23  A.  It was making family members mad.

24  Q.  At you?

25  A.  Yes.

1  Q.  How did that affect you in your life at that time?

2  A.  It bothered me because I felt alone.

3  Q.  Why did you feel alone?

4  A.  Because they all wouldn't talk to me anymore.

5  Q.  You had your Aunt Stephanie?

6  A.  Yes.

7  Q.  Who you testified was like your mother?

8  A.  Yes.

9  Q.  You had your own mother?

10  A.  Yes.

11  Q.  Yet you still felt alone?

12  A.  Yes.

13  Q.  There was some testimony at the end of the day yesterday

14  and I just -- it was news to me, something about a horse in a

15  window.  Can you tell me about this story?

16  A.  Yes.  I was three or four and I remember telling my

17  parents from that time to an adult that I remember we lived

18  in -- all I remembered was we lived in a house and a horse

19  stuck its head through the window and they laughed about it

20  and said I was goofy.

21  Q.  And this occurred before all of the sexual abuse began

22  occurring to you; correct?

23  A.  Yes.

24  Q.  In a house before Government's Exhibit Number 1?

25  A.  Yes.

1  Q.  You recall being about three or four?

2  A.  Yes.

3  Q.  And do you recall telling anyone other than your parents

4  about this horse in a window story?

5  A.  Yeah.  I told my entire family.  It was something they

6  laughed about.

7  Q.  Do you still talk about the horse in the window?

8  A.  Yes.

9  Q.  Is it a funny story to you?

10  A.  Yes.

11  Q.  And looking back on it now do you believe that there was a

12  horse in the window?

13  A.  Yeah.  I still believe it.

14  Q.  There was some testimony yesterday that your Aunt

15  Stephanie had told you that it was too late for anything to be

16  done.  When she told you this, was that when you initially had

17  disclosed to her?

18  A.  Yes.

19  Q.  At 17?

20  A.  Yes.

21  Q.  And you told this jury that she believed you?

22  A.  Yes.

23  Q.  When did she kick you out?

24  A.  It was a couple of years later.

25  Q.  So for a couple of years you still lived with her and she

1    still took care of you as her -- you as her -- she as your

2    mother?

3    A.  Yes.

4    Q.  Helping you with school and getting ready to graduate from

5    high school?

6    A.  Yes.

7    Q.  Kelsey, when you posted the link to the statement on your

8    Facebook page, there's been some testimony about "likes."  Did

9    you post this to see if you could get some likes on your

10   Facebook page?

11   A.  No.

12   Q.  To get some followers?

13   A.  No.

14   Q.  And I want to be clear, you testified that this happened

15   every other day.  But then when we talked yesterday

16   extensively in court, you recall I think approximately about

17   ten times that something had happened to you.

18   A.  Yes.

19   Q.  So from the age of five to about the age of 15, you're

20   only telling this jury about ten times that you remember

21   something happening?

22           MR. HASSE:  Objection, leading.

23           THE COURT:  No, I'll allow it just to set up the

24   question.

25   Q.  (BY MS. REININGER) Is that correct?

1  A.  Yes.

2  Q.  Can you explain why you don't remember other instances?

3  A.  I -- I guess because it happened so many times and maybe

4  those were the more traumatic ones.

5  Q.  I think counsel asked you if your sister had come to you

6  in 2020 and told you about her abuse.  Does -- is that about

7  the timeframe of when you recall your sister Jasmine coming to

8  you?

9  A.  Yes.

10  Q.  Why did you post Happy Father's Day on Facebook in 2019?

11  A.  Because I was trying to make life normal.  Nothing could

12  be done at -- or so I thought.

13  Q.  And in 2019 did you still have a relationship with your

14  father?

15  A.  Not really.  We talked every four or five months.

16  Q.  Is posting on Facebook for life events like birthdays,

17  Christmas, Father's Day, is that normal typical behavior for

18  you?

19  A.  Yes.

20  Q.  And I think you had said something in your Facebook post

21  about being like your dad?

22  A.  Yes.

23  Q.  Can you explain to me how you feel like you are like your

24  dad?

25  A.  As I was growing up, my -- he was more understanding than

1    my mother and he was not as cruel to us as our mother was but

2    he was -- she was cruel in a physical and verbal way and he

3    was just cruel in a sexual way.

4    Q.  You love your sister Jasmine?

5    A.  Yes.

6    Q.  You would do anything for her?

7    A.  Yes.

8    Q.  Would you come into court and lie for her?

9    A.  No.

10   Q.  You love your dad?

11   A.  Yes.

12   Q.  Even after everything that you've told this jury that he's

13   done to you throughout your childhood, you still love your

14   dad?

15   A.  Yes.  He's my dad.

16           MS. REININGER:  I have no further questions.

17           THE COURT:  Anything further?

18           MR. HASSE:  Nothing further.

19           THE COURT:  All right.  Ms. Blaylock, we'll excuse

20   you.  Thank you.

21           MS. REININGER:  Your Honor, at this time the

22   government would call Jasmine Parnell.

23           DEPUTY COURT CLERK:  Ms. Parnell, if you'll come up

24   here, I'll swear you in.  Thank you.  Would you please raise

25   your right hand.

 1    (WITNESS SWORN)

 2          THE WITNESS:  Yes.

 3          DEPUTY COURT CLERK:  Thank you.  You can go ahead

 4    and have a seat at the witness stand and adjust the

 5    microphone, please.

 6          THE COURT:  Good morning.  Thank you for coming in.

 7    There's some water there for you.

 8          THE WITNESS:  Thank you.

 9                      JASMINE PARNELL,

10    having been called as a witness, after being first duly sworn,

11    testified as follows:

12                    DIRECT EXAMINATION

13    BY MS. REININGER:

14    Q.  Good morning.  Could you please state your name for the

15    record?

16    A.  Jasmine Parnell.

17    Q.  Jasmine, we've heard the testimony of your sister Kelsey

18    Parnell who just testified before you; is that correct?

19    A.  Yes.

20    Q.  Can you identify for the jury where you live?

21    A.  Adair, Oklahoma.

22    Q.  And have you always lived in Adair, Oklahoma?

23    A.  No.

24    Q.  Where did you live before Adair?

25    A.  Pryor.

170

1  Q.  Who did you grow up with?

2  A.  Kelsey, Kayla, Brice, Branden.

3  Q.  Let's take those one at a time pretty slow, okay, because

4  she's going to write down everything that you say.

5  A.  Okay.

6  Q.  When were you born?

7  A.  January 28, 1993.

8  Q.  You have a twin sister?

9  A.  Yes.

10  Q.  Are you the oldest of the siblings?

11  A.  No, Kelsey is 21 minutes older than me.

12  Q.  And after you and Kelsey, what's your next oldest sibling?

13  A.  It's Kayla.

14  Q.  And how old is Kayla or how much younger is she than you?

15  A.  She's 11 months younger than us.

16  Q.  And other than Kayla, what's the next sibling that's

17  oldest?

18  A.  Brice.

19  Q.  How much younger is he?

20  A.  I would have to sit and think about it.  About two years

21  maybe.

22  Q.  And other than Brice who is your other sibling?

23  A.  Branden.

24  Q.  How much older -- how much younger is Branden than you?

25  A.  Two to three years.  I don't know the exact age.

**United States District Court**

1  Q.  Did you grow up living with your mom and dad?

2  A.  Yes.

3  Q.  What's your mom's name?

4  A.  Jennifer Parnell.

5  Q.  What about your dad?

6  A.  Keith Parnell.

7  Q.  Do you know how old your mom is?

8  A.  42, 43.

9  Q.  And do you know how old your dad is?

10  A.  He's one or two years older than her maybe.

11  Q.  Do you see your dad Keith Parnell in the courtroom

12  today?

13  A.  Yes.

14  Q.  Can you identify what he's wearing and where he's sitting?

15  A.  Behind you, to the left of you.

16  Q.  Can you identify what color of shirt he's wearing?

17  A.  Black or navy blue.  I can't tell.

18  Q.  What color tie?

19  A.  Multi-colored tie, silver and maroon.

20          MS. REININGER:  Your Honor, I would ask that the

21  record reflect identification of the defendant.

22          THE COURT:  Yes, it does.

23  Q.  (BY MS. REININGER) Jasmine, where did you remember growing

24  up?

25  A.  In Pryor.

1  Q.  Where in Pryor?

2  A.  Are you wanting where it started?

3  Q.  Where is the first house that you remember living in?

4  A.  The house over by the old Sam and Ella's in Pryor.  I

5  don't know the address.

6  Q.  Okay.  How old were you when you were living in that

7  house?  Do you remember?

8  A.  Around five years old.

9  Q.  I'm showing you what has been marked as Government's

10  Exhibit 1.  Does this house appear familiar to you?

11  A.  Yes.

12  Q.  Was this the house that was by Sam and Ella's?

13  A.  Yes.

14  Q.  Again, how old were you when you lived in this house?

15  A.  About five.

16  Q.  When did you leave this house?

17  A.  I don't remember when we moved.

18  Q.  Okay.  Can you explain to the jury how this house appears

19  differently in this photo than how it was when you were living

20  there?

21  A.  I remembered it to be blue, like a light blue.

22  Q.  Okay.  Any other difference?

23  A.  Not that I remember.  I -- it happened in the room to the

24  right of the door though.

25  Q.  Okay.  Who all was living in this house with you?

1   A.   My brothers and sisters, my mom and dad.

2   Q.   All seven of you?

3   A.   Yes.

4   Q.   Do you remember how many bedrooms there were?

5   A.   I recall two bedrooms.

6   Q.   Do you remember what grade you were in when you were going

7   to this -- living in this house?

8   A.   I believe it was kindergarten.

9   Q.   What was life like in this house when you were growing up?

10  A lot of kids in a two-bedroom house?

11  A.   Yeah.   We all five shared a room.

12  Q.   And my math is we've got basically two little babies and

13  some -- three toddlers; right?

14  A.   Uh-huh.

15  Q.   And some five year olds.   Was life good in this house?

16  A.   There were good moments, I'm sure, but there was also bad.

17  Q.   Okay.   Do you remember some bad things happening in this

18  house?

19  A.   Yes.

20  Q.   What was the first thing you remember bad happening in

21  this house?

22  A.   I walked into my parents' room while we were all supposed

23  to be taking a nap.   I couldn't fall asleep.   And my mom was

24  gone but my dad was in that room and he was laying on his

25  stomach watching pornography.

1    Q.  Do you know where your mom was at?

2    A.  I'm guessing work.

3    Q.  Did your mom work a lot?

4    A.  When we were younger, it seemed that she was always gone,

5    yeah.

6    Q.  Did your dad work?

7    A.  Honestly I don't remember him working until we were older.

8    Q.  When you say "older," do you remember about what age your

9    dad was when he started working?

10   A.  I can't really give an accurate age.

11   Q.  Do you remember your dad working when you lived in this

12   house?

13   A.  No.

14   Q.  Okay.  You said everyone was napping.  Where did everyone

15   take naps?

16   A.  We were in our room.

17   Q.  And can you kind of explain where the bedrooms were based

18   off of this picture?

19   A.  You walked in, the living room was the first window to the

20   left of the door.  The kitchen was to the left of that window.

21   When you walked in, I remember it being straight back from the

22   door.  There was a room back in the back and that was our

23   room.

24   Q.  And where was your parents' room?

25   A.  The second window to the right.

1    Q.   Okay.  So this big, long window on the left was about the

2    kitchen area?

3    A.   That's what I remember it to be, yes.

4    Q.   When you were five years old and you couldn't sleep, you

5    went in to see your dad?

6    A.   Yes.  To see if I could get up without getting in

7    trouble.

8    Q.   And could you explain what happened when you walked in the

9    room?

10   A.   I went to walk out and he said, no, it's okay, come

11   here.

12   Q.   What happened next?

13   A.   He told me he wanted to show me something.

14   Q.   What did you think was going on?

15   A.   I didn't know what was going on, I just remember feeling

16   like I shouldn't be in there.

17   Q.   What did you see?

18   A.   His pornography that he was watching.  It was two women.

19   One swam across some lagoon, pond or lake or something, there

20   was a waterfall falling, they both swam to a rock and the

21   other girl was laying on the rock and the other girl began to

22   go down on her.

23   Q.   What happened after that?  With you?

24   A.   He kissed me on the mouth.

25   Q.   What did you think?

1  A.  I didn't like it but I didn't feel like I had a choice.

2  Q.  Did you tell him to stop?

3  A.  No.  I was scared.  I was five.

4  Q.  Had your dad kissed you before?

5  A.  Not like that.

6  Q.  When you say "not like that," can you explain what you

7  mean?

8  A.  It was on the mouth and more with like tongue or something

9  like that.  Like a French kiss.

10  Q.  So did you tell him to stop?

11  A.  No.  I was five.

12  Q.  And then what did you do?

13  A.  I just kind of stood there and my sister walked in on him

14  doing it to me.

15  Q.  And what happened?

16  A.  He told us not to tell.

17  Q.  When did he tell you not to tell?

18  A.  After she had walked in.

19  Q.  Do you recall him doing anything to your sister?

20  A.  I don't remember.  I only remember what he did to me.

21  Q.  Do you recall your mom coming home after that?

22  A.  No.

23  Q.  Did you ever tell your mom about what had happened?

24  A.  No.

25  Q.  Did you and your sister ever talk about what had happened?

1    A.   No.

2    Q.   Do you remember or have a memory of anything bad happening

3    in this house other than your dad kissing you and watching

4    porn?

5    A.   Sexually?

6    Q.   Yes.

7    A.   No.

8    Q.   At some point do you move from this house to another

9    house?

10   A.   Uh-huh.

11   Q.   Do you recall -- and you shook your head.  Was that a yes?

12   A.   Yeah.  We've moved around a lot.

13   Q.   Okay.  When you moved away from this house, where did you

14   move to?

15   A.   I don't remember if it was the next house that we lived in

16   or if it was just the next house that I remember him doing

17   things to me in.  I don't know if there's a house in between

18   when it happened at this house and when it happened in the

19   next house.

20   Q.   Okay.  I'm showing you what's been marked as Government's

21   Exhibit 2.  Does this house look familiar to you?

22   A.   Yes.

23   Q.   Do you remember about when you lived in this house?

24   A.   I want to say I was in like first or second grade maybe.

25   Q.   Did you live in this house again with all your siblings

1   and your mom and dad?

2   A.   Yes.

3   Q.   Does the way that the house is shown in this picture, is

4   that how you remember the house when you were living there?

5   A.   I remember there being a carport.   Other than that, I

6   mean, it looks like the same crappy trailer we lived in.

7   Q.   Do you remember how many bedrooms there were?

8   A.   I remember there being two.

9   Q.   Did you share bedrooms with all four of your siblings?

10  A.   Yes.

11  Q.   And did your parents sleep in the other bedroom?

12  A.   Yes.

13  Q.   Do you know what town this house was in?

14  A.   Pryor.

15  Q.   Do you recall any abuse occurring in this house to you?

16  A.   No.

17  Q.   I'm showing you what has been marked as Government's

18  Exhibit 3.   Do you remember this house?

19  A.   Yes.

20  Q.   Can you identify where this house is located?

21  A.   I couldn't tell you the road.   I'm terrible at roads,

22  but...

23  Q.   Can you tell me the town?

24  A.   Pryor.

25  Q.   Do you recall where this house might have been near

1    something?

2    A.   Yes.  If you go to the stop sign to the left or the right,

3    you pull out on the main road and then the junior high is

4    across the street.

5    Q.   Do you remember about how old you were when you lived in

6    this house?

7    A.   I would have to sit and calculate what life events are

8    going on.  I can't give you an exact age.

9    Q.   Do you recall if you lived in this house immediately after

10   the trailer that we just discussed?

11   A.   That's the next house I remember.

12   Q.   Okay.  Do you remember about how many bedrooms this house

13   was?

14   A.   Honestly, no.

15   Q.   Does the house appear to you to be in the same condition

16   that how you remember living there?

17   A.   I remember it being white but -- I could tell you where

18   the living room and the kitchen were.

19   Q.   When you walked into the doors, can you kind of walk me

20   through where the rooms were?

21   A.   When you walk into the doors, that was the living room.

22   We had a couch up against the wall, like facing like that,

23   like vertically along with the door up against that wall.  And

24   then you keep walking and then you go into the kitchen.

25   Q.   What was the room that was behind the window?

1    A.   The living room.

2    Q.   And what's the room that's behind the other side of the

3    house with no window?

4    A.   I don't remember.

5    Q.   Okay.  Do you remember where you went to school when you

6    lived in this house?

7    A.   Not really, no.  I remember we had a neighbor named Mandy

8    that was my parents' friend.  We would go over to her house.

9    And there was another neighbor to the other side of us and

10   they would have pizza parties and we would go over there for

11   that.

12   Q.   Do you have good memories from this house?

13   A.   Honestly the only memory -- I have two memories.  I

14   remember -- I remember he had torn his ACL playing church

15   softball and I remember him laying in the floor having to

16   rehabilitate his knee.  He had to put it on like this thing

17   that like went up and down.  And then the other memory I have

18   is when he sexually abused me again.

19   Q.   When -- can you explain to me when that occurred?  What do

20   you remember about that?

21   A.   There were two times.

22   Q.   Let's talk about the first.  When do you remember the

23   first time happening?

24   A.   I was in the kitchen doing the dishes.  He came up behind

25   me and slipped his hand down my underwear.

1  Q.  Do you remember about how old you were?

2  A.  I would have to sit and calculate it.

3  Q.  Were you a teenager?

4  A.  Not yet, no.

5  Q.  Where were your siblings?

6  A.  I don't know.  They weren't in the house because he kept

7  turning around to make sure nobody was coming in.  I remember

8  somebody coming in, though, whenever he was doing it and he

9  had stopped and pretended like he was just standing there next

10 to me while I was doing the dishes.

11 Q.  Were you in the kitchen all by yourself when he walked in?

12 A.  Yes.

13 Q.  And when he walked in, you said he walked up behind you.

14 Did he say anything to you?

15 A.  I don't remember him saying anything.

16 Q.  Do you recall what you were wearing?

17 A.  No.

18 Q.  You said that he slid his hands down your pants?

19 A.  Yes.

20 Q.  Was it one hand or two?

21 A.  One.

22 Q.  Do you recall if you were wearing underwear?

23 A.  Yes.

24 Q.  And when he slid his hand down your pants, was he -- did

25 he also slide his hand between your underwear and your body?

1   A.   Yes.

2   Q.   His skin was touching your skin?

3   A.   Yes.

4   Q.   When he put his hands into your underwear, can you tell me

5   where he was touching?  Do you know what body parts that he

6   was touching?

7   A.   My female genital parts.

8   Q.   Do you have any particular name for female genital parts

9   that are below your waist?

10  A.   I have the definition of them.  I don't call them anything

11  other than what they are.

12  Q.   Okay.  Will you tell me what you call them?

13  A.   He started rubbing my clit.

14  Q.   Okay.  And can you describe how he was rubbing your clit?

15  A.   Circular motions.

16  Q.   And do you recall him saying anything to you or doing

17  anything else during this time?

18  A.   No.  But he was standing to the left of me with his arm

19  around the right of me so that if somebody walked in, nobody

20  would see what he was doing, and that way he would have time

21  to pull his hand out.

22  Q.   How long did this go on for?

23  A.   Until I orgasmed.

24  Q.   How long do you think that was?

25  A.   I don't even know.  I remember a weird feeling coming up

1    my legs and then throbbing but I didn't know what that was at

2    the time, I just remember it feeling weird.

3    Q.   What were you thinking during this time?

4    A.   That I wish he would stop.

5    Q.   Jasmine, did you try to make it stop?

6    A.   No.  What was I going to do?  Tell my dad no?  He had been

7    grooming me since five.  I didn't know that I could say no at

8    the time.

9    Q.   Did he say anything to you during this time?

10   A.   I don't remember him saying anything.  He would usually

11   ask if that felt good after he did what he did to us.

12   Q.   After he was done and removes his hand, do you remember

13   what he did?

14   A.   Went on about his day.

15   Q.   What did you do?

16   A.   Finished the dishes and acted like nothing happened.

17   Q.   How did it make you feel?

18   A.   Disgusting.  Guilty like I did something wrong.

19   Q.   And during this entire time no one else was in the

20   kitchen?

21   A.   No.

22   Q.   You said that someone came into the kitchen?

23   A.   Yeah, but I don't remember who it was.  I remember

24   somebody coming in because he stopped real quick and pretended

25   like he wasn't doing anything and then when they walked out,

184

1   he continued.

2   Q.   Did you look to see who it was?

3   A.   No.

4   Q.   Did you tell anyone about what had happened to you in the

5   kitchen?

6   A.   No.

7   Q.   Why not?

8   A.   I was scared to.  I felt ashamed like I had done something

9   wrong.  And it was embarrassing.

10  Q.   You said that you remember it happening twice.  When was

11  the second time that you remember something happening?

12  A.   I was taking a nap on the couch.  I remember I was

13  covering up with this -- those old like wooly blankets.  It

14  was brown, more like a tan color, and it had like a brown like

15  silk top to it.

16  Q.   Blanket that might be on a bed?

17  A.   It was like an old-school blanket.  It was like one of

18  those itchy blankets.

19  Q.   You were on the couch in the living room?

20  A.   Yeah.

21  Q.   Who else was around?

22  A.   No one.

23  Q.   And what do you remember happening?

24  A.   He came and knelt down next to the couch and put his hand

25  underneath the blanket.

185

1   Q.  And when he put his hand underneath the blanket, what

2   happened?

3   A.  He put his hands down my underwear and started rubbing my

4   clitoris with his fingers in a circular motion until I

5   orgasmed.

6   Q.  Was this skin to skin?

7   A.  Yes.

8   Q.  Okay.  Do you know about how long it was that he was

9   rubbing on your body?

10   A.  No.  I was just laying there wishing it was over.

11   Q.  Did you tell him to stop?

12   A.  No.

13   Q.  Why not?

14   A.  I didn't think I could.

15   Q.  Did anyone ever come into the room while you were in there

16   like they had in the kitchen?

17   A.  I don't remember coming -- anyone coming in at that time.

18   Q.  Do you remember what you were wearing besides your

19   underwear?

20   A.  No.

21   Q.  Would it have been unusual for you to just have underwear

22   on?

23   A.  No, I'm sure I was wearing shorts or something.  I was a

24   tomboy when I was younger.

25   Q.  Did he say anything to you when he was rubbing on your

1   body?

2   A.   He always asked if it felt good.

3   Q.   What were you thinking when he was rubbing on your body?

4   A.   That I wish he would stop.

5   Q.   About how much longer after he had touched you in the

6   kitchen did the incident in the living room on the couch

7   happen?

8   A.   I can't give you a definite time.

9   Q.   Okay.  Can you give me an idea if it was months or days or

10  years later?

11  A.   Not days and not years.  Like maybe weeks.

12  Q.   Do you know what made him stop?

13  A.   I can't recall if somebody walked in or not but he did

14  make me orgasm so it would have been after I orgasmed that he

15  had quit.

16  Q.   Do you know where your mom was at the time?

17  A.   No.

18  Q.   Do you know where your siblings were at the time?

19  A.   No.

20  Q.   Would you have ever been at home at the house with --

21  alone with your dad?

22  A.   I'm sure we were left alone with him.

23  Q.   Were you ever left alone without siblings at home with

24  your dad?

25  A.   I'm sure I was, yeah.

1   Q.  Did you tell anyone about the incident that occurred on

2   the couch?

3   A.  No.

4   Q.  Why not?

5   A.  I was scared to.

6   Q.  Do you remember about what time of day this happened?

7   A.  I just remember it being daytime.

8   Q.  I want to show you what has been marked as Government's

9   Exhibit 4.  Do you recognize this house?

10  A.  Yes.

11  Q.  Where do you recognize this house to be located at?

12  A.  It was like around 430 Road or something like that,

13  that -- I remember it being out by a church called Coo Y Yah.

14  Q.  What town?

15  A.  Pryor.

16  Q.  Did you live in this house?

17  A.  Yes.

18  Q.  Who did you live in the house with?

19  A.  My four siblings and my mom and dad.

20  Q.  Does the house appear to you in this photo how you

21  remember it as a child or do you remember it looking

22  different?

23  A.  It looks the same.

24  Q.  The red truck that's here to the left of the house, was

25  that your family's truck or does that not belong to --

1   A.   No, none of this stuff is ours.   Whenever we got this

2   house, I'm pretty sure it was brand new.   It was our first

3   actual home.

4   Q.   Do you remember about how old you were when you and your

5   family moved into this house?

6   A.   I want to say around fourth grade.   My mom moved us to

7   Osage so that we could play basketball, and then in the sixth

8   grade she moved us back to Pryor so that we could start on the

9   Pryor team because we wouldn't get to if we didn't.

10  Q.   Is Osage a junior high school or elementary school?

11  A.   It's an elementary school that goes up to I want to say

12  like seventh or eighth grade.

13  Q.   And you guys went to Osage Elementary in this house?

14  A.   Uh-huh.

15  Q.   And --

16  A.   Also we were in junior high in this house.

17  Q.   So you stayed in this house for a number of years?

18  A.   Uh-huh.

19  Q.   And you said that you played basketball for Osage

20  Elementary when you were living in this house?

21  A.   Yes.   It's also the same house that we lived in when his

22  dad died from leukemia.

23  Q.   Okay.   How many bedrooms did the house have?

24  A.   Three.

25  Q.   Can you explain the sleeping arrangements inside this

1    home?

2    A.   Us three girls shared a room, my brothers shared a room,

3    and then my mom and dad shared a room.   My mom and dad gave us

4    the biggest room that had the bathroom built in because we

5    were starting to get older and there were three girls.

6    Q.   And then they shared a bathroom with the two boys?

7    A.   Yes.   It had two bathrooms in the house.

8    Q.   When you lived in this house, did you -- were you allowed

9    to date?

10   A.   My parents were very, very controlling.   In the fourth

11   grade when I got a boyfriend, my dad cussed me out for it and

12   told me I was going to break up with him.

13        When I dated a guy named Robbie in junior high, they

14   controlled me and followed me because they didn't like him

15   because they said he was a trouble-maker and they controlled

16   my every move with him.   And then I had a boyfriend named

17   Isidro that I dated for a couple of years and he didn't like

18   that because he was Hispanic.

19   Q.   While you were living in this house?

20   A.   Yes.

21   Q.   When you moved into this house, did you -- did the abuse

22   continue?

23   A.   Yes.

24   Q.   Do you have memories of abuse occurring in this house?

25   A.   Yes.

1   Q.   I want to talk to you about the first memory that you

2   have.  Do you remember when that happened?

3   A.   In the middle of the night.

4   Q.   Do you remember any -- how old you were when this

5   occurred?

6   A.   I was probably in fourth or fifth grade.

7   Q.   What happened in the middle of the night?

8   A.   I had had a bad dream because we were watching movies

9   about werewolves and so I went into my parents' room because I

10  was scared and he volunteered to take me back to sleep, and

11  when he did, he used it to take advantage of me.  He knelt

12  down beside the couch, put his hand down my pants skin to

13  skin, rubbed my clitoris until I orgasmed.

14  Q.   Okay.  I want to back up.  You woke up in your bedroom; is

15  that right?

16  A.   No.  I was in the living room.

17  Q.   Okay.  Thank you.  When you woke up -- what were you

18  wearing when you woke up from your dream?

19  A.   I don't remember.  I probably had a t-shirt and shorts on.

20  Q.   And you went into your parents' bedroom to tell them that

21  you had had a bad dream?

22  A.   Yes.  And at this time they had the big bedroom.

23  Q.   Did you guys move bedrooms frequently inside the house?

24  A.   A few times, yes.

25  Q.   So you and your sisters didn't always stay in the big

191

1  bedroom?

2  A.  No.

3  Q.  When you guys got older, you ended up taking the big

4  bedroom?

5  A.  Yeah.  They thought that we needed more room with us being

6  older.

7  Q.  So this time that you're recalling, you and your brothers

8  were sleeping in the smaller bedrooms with your sisters and

9  your parents were sleeping in the master bedroom?

10  A.  Yes.

11  Q.  Okay.  And so you went into your parents' bedroom and what

12  did you do when you went into your parents' bedroom after your

13  bad dream?

14  A.  I stood at the end of the bed trying to wake them up.

15  Q.  And did someone wake up?

16  A.  He did.

17  Q.  Did your mom wake up?

18  A.  I think she kind of -- a little bit but went back to sleep

19  because he volunteered to get up.

20  Q.  When he got up with you, what happened?  Where did you

21  guys go?

22  A.  Back to the living room.

23  Q.  Was there anyone else in the living room when you guys

24  went back there?

25  A.  I remember Kelsey sleeping in the chair that we had.

1  Q.  Was it like an office chair?  Can you describe the chair?

2  A.  Like a big, like, love seat sofa chair.

3  Q.  Was it a recliner?

4  A.  No.

5  Q.  Okay.  But it was big enough for a fourth grader to sleep

6  on?

7  A.  No.  We fell asleep watching movies.  She was laying

8  across it sideways.

9  Q.  Okay.

10  A.  I only remember that because I remember when I woke up in

11  my dream, I thought she was turning into a werewolf.

12  Q.  And when your dad took you back into the living room, were

13  you -- was Kelsey still there?

14  A.  Yes.

15  Q.  Do you remember where your brothers were?

16  A.  I want to say we were all in the living room.

17  Q.  Including your sister Kayla?

18  A.  Yes.  All of us.

19  Q.  And were you the person that got to sleep on the couch?

20  A.  That's just where I fell asleep.

21  Q.  Do you remember where your other siblings were?

22  A.  Kelsey is the only one that I remember exactly where she

23  was.

24  Q.  Was there anyone else on the couch besides you?

25  A.  No.

1  Q.  So when you went back to the couch, did you lay back down

2  on the couch?

3  A.  Yeah.

4  Q.  And what did your dad do then?

5  A.  He talked to me and told me that it was okay and then he

6  started in with his freaking stuff that he did to us again.

7  Q.  What do you mean by that?

8  A.  Sexually abusing us.  Me.

9  Q.  Where -- how was he sitting or standing?  How was he

10  positioned?

11  A.  He was kneeling down beside the couch.

12  Q.  What did he do when you laid down on the couch?

13  A.  He slipped his hand underneath the blanket and put his

14  hand down my pants in my underwear.

15  Q.  And did he start touching your vaginal area?

16  A.  Yes.

17  Q.  Did he say anything to you?

18  A.  Asking me if it felt good like he always did.

19  Q.  Did he touch the outside of your body or did he ever touch

20  the inside of your body?

21  A.  That time he slipped a finger in for a second but he quit.

22  Q.  Do you know why he quit?

23  A.  Because it hurt.

24  Q.  Did you tell him that it hurt?

25  A.  I kind of wiggled and said "ow."

194

1    Q.   Was he talking to you during this time?

2    A.   Just asking if it felt good.

3    Q.   What were you thinking when this was going on, Jasmine?

4    A.   That I wish it would stop.

5    Q.   How did it make you feel?

6    A.   Disgusting, violated.

7    Q.   How long did it last?

8    A.   Maybe a few minutes.  I don't know.

9    Q.   You've previously testified that he had caused you to

10   orgasm every time.  Do you recall orgasming this time?

11   A.   Yes.  Yes.

12   Q.   Do you know what made him stop touching you?

13   A.   I had orgasmed and then I was still scared because I

14   didn't want him to come back in there after he went to bed, so

15   I went to my mom's side of the bed and made a pallet in the

16   floor so that he couldn't do it again.  Then I had another

17   nightmare.

18   Q.   Can we back up just briefly so I make sure I understand

19   what we're talking about.  After he was done touching you,

20   what did he do?

21   A.   Went back to bed.

22   Q.   And then you decided to get back up and go back into the

23   bedroom?

24   A.   Yes.

25   Q.   And why did you go back into the bedroom?

1  A.  Because I was -- I was scared and I didn't want him to

2  come back in there and do it again.

3  Q.  And so you made a pallet next to your mom?

4  A.  Yes.

5  Q.  Can you explain why you thought making a pallet next to

6  your mom would keep him from doing it again?

7  A.  Because she was on that side of the bed and I -- there was

8  a computer desk up against the wall, so it was the desk and

9  then me and then my mom, and so laying there I felt safe.

10  Q.  Did you tell your mom about what had happened?

11  A.  No.  She only knew about the bad dreams.

12  Q.  When you woke up the next morning, did you tell anybody

13  else what had happened?

14  A.  No, not about the sexual abuse.

15  Q.  Did you have any other memories of sexual abuse in this

16  house?

17  A.  Yes.

18  Q.  When was the next time you remember something happening?

19  A.  I was a little bit older.

20  Q.  What happened?

21  A.  It started out behind the bedroom door because he had

22  closed it and he asked me to put himself in my mouth.

23  Q.  What were you doing prior to going into the bedroom?

24  A.  I don't really remember.

25  Q.  And --

1  A.  I remember being in the bedroom and him coming in there

2  and me thinking -- just feeling dread because I knew what was

3  about to happen.

4  Q.  Why did you think something was about to happen?

5  A.  Because you could kind of tell whenever he was about to do

6  something.  He was always nice about it.

7  Q.  What do you mean "he was nice about it"?

8  A.  He would just like act like he was being sweet to us like

9  loving on us and stuff, almost to make you feel like you could

10  trust him, and then he would end up doing what he did.

11  Q.  So this time that he came into the bedroom, were you by

12  yourself?

13  A.  Yes.

14  Q.  Was it your bedroom?

15  A.  I can't remember if it was our bedroom or their bedroom at

16  the time.  On the other side of that porch you can see two

17  windows.  The bed was up against the windows.  It was just a

18  mattress.  We had bunk beds in that room but at the time it

19  was the mattress that was up against the windows so I'm not

20  sure if they gave us that mattress or if we had the bunk beds.

21  Q.  Do you remember about how old you were?

22  A.  It was after I had started my period.

23  Q.  Do you remember when you started your period?

24  A.  Fourth grade.

25  Q.  Do you remember what time of day it was?

1   A.   It was during the day.

2   Q.   And can you explain what happened?

3   A.   When it began, he asked me to put his penis in my mouth

4   and perform oral sex on him.

5   Q.   Do you recall if anyone else was home at the time?

6   A.   I don't remember anyone being there.

7   Q.   Do you remember when you went into the bedroom what you

8   were wearing?

9   A.   No.

10  Q.   Do you remember when you went into the bedroom what your

11  dad was wearing?

12  A.   No.  That's not what I was focused on.

13  Q.   When you went into the bedroom, what did he say to you?

14  A.   I don't remember exactly what he said, I just remember him

15  asking me if he -- if I would lick him down there.

16  Q.   Was this the first time that he had ever asked you to lick

17  him down there?

18  A.   It's the first time that I remember.

19  Q.   Okay.  When he asks you to lick him down there, was that

20  how you remember him asking?

21  A.   Yes.

22  Q.   What did you do?

23  A.   I did what he asked.

24  Q.   And --

25  A.   I don't -- it didn't last long, though, because I didn't

1  want to do it and he could tell that I didn't want to.

2  Q.  How -- where were you in the bedroom when you licked him

3  down there?

4  A.  Behind the door.

5  Q.  Had you closed the door or did he?

6  A.  He closed the door.

7  Q.  And where was he standing in relation to the door?

8  A.  I remember his back being to the door.

9  Q.  And then you were facing him?

10  A.  Yes, on my knees.

11  Q.  Did you get on your knees or did he put you on your knees?

12  A.  He just asked me to put himself in my mouth and so

13  naturally, I guess, I just knelt down because he asked me to

14  do that so...

15  Q.  You said -- we've talked about "down there" and "himself."

16  What do you call that area or that body part?

17  A.  For him?

18  Q.  Yes.

19  A.  His penis.

20  Q.  And he put his penis into your mouth?

21  A.  Yes.

22  Q.  What were you thinking during that time?

23  A.  It was disgusting.

24  Q.  How did it make you feel?

25  A.  Gross.

1    Q.  Did you tell him to stop?

2    A.  I didn't know I could.

3    Q.  After he put his penis in your mouth, you said that it was

4    for a short time.  What happened next?

5    A.  He asked me to lay on the bed.

6    Q.  So what did you do?

7    A.  I laid on the bed.

8    Q.  Do you remember what you were wearing at this time?

9    A.  No.

10    Q.  What happened after you laid on the bed?

11    A.  I remember him crawling onto the bed and I don't remember

12    exactly what he said.  I tend to blackout whenever that kind

13    of happens but he put -- he decided this time he was going to

14    put his penis into my vagina for sex.

15    Q.  And were those the words that he used?  Do you remember

16    what he said to you?

17    A.  I don't remember.  I just remember him talking me into it

18    but I don't remember exactly what it was he said word for

19    word.

20    Q.  And so what do you remember happening next?

21    A.  He moved forward in and out a few times and then he wanted

22    to take it out and put it in my -- my anus.

23    Q.  Were you still on your back when he did this?

24    A.  Yes.  And it hurt and so I told him it hurt.

25    Q.  How long do you think that his penis was inside of your

1    body?  In your vagina?

2    A.   I couldn't tell you.  It felt like forever.

3    Q.   And when he took it out -- and did he actually -- was he

4    able to insert his penis into your anus?

5    A.   Yes.

6    Q.   Were you still laying on your back when he did that?

7    A.   Yes.

8    Q.   And how long did he have his penis in your anus?

9    A.   Not very long because it hurt.

10   Q.   Did you tell him that it hurt?

11   A.   Yeah.

12   Q.   Did you tell him to stop?

13   A.   I just told him it hurt so he took it back out and put it

14   back in my vagina.

15   Q.   And what happened after he put it back in your vagina?

16   A.   He did it until he pulled out and orgasmed on my

17   stomach.

18   Q.   Do you remember what you were wearing at this time?

19   A.   I don't remember wearing anything at that point.  After he

20   got done, we both went to the bathroom and I got in the shower

21   because I just wanted to wash it off.  And he was in the

22   bathroom and he peed real quick and then took the towel that

23   he had used to clean me off with and he kind of started

24   panicking because he said, what if I get pregnant.

25        And he started trying to come up with excuses.  One of

1  the excuses was he was just going say that I hooked up with

2  some random boy.  And then I remember saying, but they'll know

3  that it was yours.

4      And he said, well, I'll just say that you used the towel

5  that I came onto to wipe yourself and that's how you got

6  pregnant.

7  Q.  You said you had to go into the bathroom to take a shower

8  to wash it off.  What did you have to wash off?

9  A.  The guilt.  The just disgusting feeling that I felt.  The

10  body fluids from him doing that to me.

11  Q.  Jasmine, did you feel like you could have told him no?

12  A.  I wanted to but I was scared to.

13  Q.  Why were you scared?

14  A.  Because he was my dad and I didn't know how to.  He had

15  started when we were younger.

16  Q.  Did he physically hold you down or force you to -- to

17  allow him to do this to your body?

18  A.  No.  He was always nice about it.  He took advantage of

19  our trust for him.

20  Q.  Was this the first experience that you had had with

21  vaginal intercourse?

22  A.  Yes.

23  Q.  Was this is the first experience that you had had with

24  anal intercourse?

25  A.  Yes.

1    Q.  After this had occurred, do you remember what you did

2    after taking a shower and cleaning up?

3    A.  We just went our separate ways like usual, pretended like

4    nothing happened.

5    Q.  Eventually do you remember people being in the house?

6    A.  Yeah, eventually.

7    Q.  At any point did you tell your mom that this had happened?

8    A.  No.  I remember waiting for my period after that happened,

9    though, because I was so scared that I was going to be

10   pregnant.

11   Q.  Did your period eventually come?

12   A.  Yeah, like a week later.

13   Q.  And after your period came, did you ever talk to your dad

14   about this experience again?

15   A.  We never talked about it after he did it.  We just

16   pretended like it didn't happen.

17   Q.  Did you ever tell your siblings or anyone at school or

18   someone you could have trusted about what had happened to you?

19   A.  I didn't trust anybody.  I didn't tell anybody.

20   Q.  Why not?

21   A.  I was scared we would get in trouble.  I was scared that I

22   had done something wrong.  I was scared that if I told, we

23   would be taken away and we would be separated, because we were

24   all really close.

25   Q.  Jasmine, you said you were about fourth grade when this

1    happened?

2    A.  It was about fourth or fifth grade whenever he did that.

3    Q.  Do you remember how old you were in fourth or fifth grade?

4    A.  I would have to sit and calculate it.  When I wrote my

5    report, I had to sit down and calculate it.

6    Q.  Do you remember having to come up with how old you were at

7    this time when you wrote your report?

8    A.  Yes.

9    Q.  Would reviewing that report, would that help your memory?

10   A.  Yes.

11          MS. REININGER:  Your Honor, may she be permitted?

12   Q.  (BY MS. REININGER) Jasmine, there's a white notebook

13   that's to your right.  If you would, go to tab Number 11 and

14   if you'll go to page 33, it's down at the bottom right-hand

15   corner numbered.  And if you could, just read the top portion

16   of that page.

17          THE COURT:  To yourself please.

18   A.  What am I reading for?

19   Q.  (BY MS. REININGER) Do you -- now that you've reviewed

20   that, do you recall how old you were when you were -- after

21   you had started your period?

22   A.  Maybe 12 or 13.

23   Q.  Okay.  Does 12 or 13 sound about the time that you would

24   have been in the fourth grade?

25   A.  No.  It probably would have been the fifth grade.

1    Q.   Okay.

2    A.   Because we got held back in first grade.

3    Q.   You had to repeat first grade again?

4    A.   Yes.

5    Q.   So about the time you were 12 or 13, you would have been

6    in fifth grade?

7    A.   I guess, yeah.

8    Q.   To your recollection do you remember being in the fourth

9    or fifth grade when this incident that you're describing

10   occurred?

11   A.   At the moment I can't --

12   Q.   Okay.  The statement that you are reading and reviewing,

13   was that a statement that you wrote to law enforcement after

14   you had met with the Pryor Police Department?

15   A.   Yes.

16   Q.   And when you wrote this statement, did you have an

17   opportunity to sit down and reflect back on what you recalled

18   about these incidents?

19   A.   Yes.  I sat in a room by myself.

20   Q.   And when you wrote the statement, were you honest about

21   what you wrote?

22   A.   Yes.

23   Q.   Okay.  So if you wrote in the statement that you were

24   about 13 -- or 12 or 13 years old, would you have --

25   A.   I said maybe 12 or 13.

1    Q.   Could you have been older?

2    A.   It was a possibility but I can't give you the exact age,

3    that's why I said maybe 12 or 13.

4    Q.   Okay.  Could you have been younger?

5    A.   No.  I can't give exact ages.  I go off of what was going

6    on in my life.  Like I started my period in fourth grade.  I

7    started dating my boyfriend in junior high and then at that

8    same house I also started dating another guy in that same

9    house.

10   Q.   Okay.  The time that we're talking about in the bedroom,

11   did that occur before you started dating your first

12   boyfriend?

13   A.   I can't remember if it was before or after, but it was

14   before I started dating my next boyfriend.

15   Q.   Okay.  What was your second boyfriend's name?

16   A.   Isidro Chavoya.

17   Q.   When did you start dating him?

18   A.   I was either a sophomore or junior and he was -- no, I'm

19   sorry, I was either in seventh or eighth grade and he was a

20   sophomore in high school.

21   Q.   Do you remember how old you were at that time?

22   A.   I was 15.  And I know it was before I started dating him

23   because whenever the first time that he and I had had sex, he

24   questioned me on whether I had done this before or not.

25   Q.   Jasmine, I want to talk to you about what's bean marked as

1    Government's Exhibit 5.

2            THE COURT:  Why don't we give the jury a break since

3    we're moving to a different topic.

4        I'll let you step down for ten minutes.

5        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, OUT OF

6    THE PRESENCE AND HEARING OF THE JURY:)

7            THE COURT:  Just a quick question.  I'm doing my

8    best to follow along as best I can.  The incident that we just

9    discussed, the vaginal intercourse incident, is that

10   charged -- you will remind me, is that charged as under 12 or

11   12 to 16?

12           MS. REININGER:  It's charged 12 to 16.

13           THE COURT:  Thanks.  Okay.  I appreciate it.

14           MS. DIAL:  Count 10, Your Honor.

15           THE COURT:  That's Count 10.  Okay.  Thanks.

16      (RECESS WAS HAD)

17           THE COURT:  Ready for the jury?

18           MS. REININGER:  Yes, Your Honor.

19      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

20   THE PRESENCE AND HEARING OF THE JURY:)

21   Q.  (BY MS. REININGER) Jasmine, during the break you told me

22   that you had remembered some facts a little bit different than

23   how you had told the jury; is that correct?

24   A.  Yeah.  Whenever I said that --

25   Q.  Can I ask you to pull the microphone down just a little

1    bit.  Thank you.

2        Was this in relation to the incident that occurred at the

3    house that's depicted in Government's Exhibit 4?

4    A.  Yes.

5    Q.  And was this in relation to the incident that you just

6    described that occurred in the bedroom?

7    A.  Yes.

8    Q.  Can you describe for me what you recalled that you need to

9    let the jury know is different?

10   A.  I had said that he put it in my behind while I was on my

11   back, but I remember he flipped me over to my stomach and then

12   it hurt so he flipped me back over to my back.

13   Q.  So at some point you were on your stomach and then were

14   back onto your back?

15   A.  Yes.

16   Q.  Okay.

17   A.  And that's when he finished on my stomach.

18   Q.  Okay.  During that incident that you've recalled, did

19   you -- at any point did he ever touch you with any other part

20   of his body besides his penis?

21   A.  I remember he would try and kiss me but I wouldn't really

22   kiss back so he would quit.

23   Q.  This time did he ever try to use any other part of his

24   body like his hands?

25   A.  To restrain me?

1   Q.   Just to touch you.

2   A.   Yeah.   I mean he would hold onto me like while he was

3   having sex.

4   Q.   Do you recall ever telling law enforcement anything

5   different?

6   A.   I'm being put on the spot right now.   It's really hard

7   to --

8   Q.   Do you remember making a statement about this incident in

9   your written report that you gave to law enforcement?

10  A.   Yeah, I remember.

11  Q.   And if reading that report, would that refresh your memory

12  about what you told law enforcement had happened that night?

13  A.   Yes.

14  Q.   I'm going to ask you to look at Government's Exhibit 11

15  again.   It's in the white notebook.   And if you again will go

16  to page 33, and about 8 lines down, the sentence that starts

17  "we were in the master bedroom."   If you could read that

18  sentence, please.

19       After reading this do you recall ever telling law

20  enforcement that you -- that he had done something additional?

21  A.   Yes, but that was so minor to him having sex with me that

22  I didn't bring it up whenever you asked previously.

23  Q.   Do you recall him ever doing something to you other than

24  touching your body with his penis?

25  A.   Yes.

1    Q.  What do you recall him doing?

2    A.  Rubbing my clit and sticking his finger inside my

3    vagina.

4    Q.  When this happened -- did this happen before or after he

5    had put his penis in your mouth?

6    A.  Before.

7    Q.  I'm sorry, what?

8    A.  Before.

9    Q.  So just so I'm clear, you recall going into the bedroom?

10   A.  Yes.

11   Q.  And he touched your body with his hands or his fingers

12   before he put his penis in your mouth?

13   A.  Yes.

14   Q.  Do you remember about how long that lasted?

15   A.  I didn't orgasm.

16   Q.  Do you recall how long it -- was it minutes, seconds,

17   hours?

18   A.  Maybe seconds.

19   Q.  And then when he was done, was that when he put his penis

20   in your mouth?

21   A.  Yes.

22   Q.  At some point, Jasmine, you guys move away from this house

23   that's depicted in Government's Exhibit 4; is that correct?

24   A.  Do what?

25   Q.  Well, at some point, let me ask you, does -- who all is

1  living in this house, does that change?

2  A.  Yes.

3  Q.  What happened or can -- do you remember who moved out of

4  the house?

5  A.  My mom kicked him out because he was having an affair with

6  her brother's wife.

7          MR. HASSE:  Objection, Your Honor.

8          MS. REININGER:  Your Honor, may we approach?

9          THE COURT:  Sure.

10      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

11  THE PRESENCE AND HEARING OF THE JURY:)

12          MS. REININGER:  I did advise the witness yesterday

13  that she was not to bring up this topic, so this testimony

14  today was not intended as --

15          THE COURT:  Yeah.  I understand.

16          MR. HASSE:  She's -- this is a real problem, Your

17  Honor.  We didn't get to -- as part of voir dire and jury

18  selection we didn't get to ask jurors whether this would be

19  inflammatory.  I don't see how we can take it back with just

20  an instruction.

21      I'm surprised and I just have to get my impression, Your

22  Honor, that this is willful if she was directed not to and she

23  seemed eager to get it out there.

24      I'm not sure what -- if it's right to move for a

25  mistrial.  I'm not sure -- I think we need to get through the

1    testimony and then we have to cure this in some way.  I think

2    at this point an instruction to the jury and --

3                    THE COURT:  Let me --

4                    MR. HASSE:   -- instructions to the -- sorry, Your

5    Honor.

6          And anything you think would be appropriate.

7                    THE COURT:  Yeah.  I didn't mean to cut you off.

8          I'm happy to provide instruction to the jury that they

9    should disregard the answer to the question about the reason

10   for the marital discord.  That's not part of this case, not

11   proper for their consideration.

12         Would that address your concerns at least in part?

13                   MR. HASSE:  At least in part at this time.

14                   THE COURT:  I guess what I mean to ask you is would

15   you like for me to give that instruction?

16                   MR. HASSE:  Please do give that instruction.

17                   THE COURT:  Is that acceptable?

18                   MS. REININGER:  Yes, Your Honor.  I would also ask

19   if I could have a moment to briefly advise the witness one

20   more time to not mention the topic that was part of the

21   Court's order.

22                   THE COURT:  Do you want to take her outside of the

23   courtroom and talk to her?

24                   MS. REININGER:  Do you mind if I just advise her, I

25   mean, not in the presence of the jury but just briefly if I

1    could approach the witness --

2              THE COURT:  Sure.

3              MS. REININGER:  -- and advise her again.

4              THE COURT:  That's fine.

5              MS. REININGER:  Thank you.

6              THE COURT:  All right.

7        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

8    THE PRESENCE AND HEARING OF THE JURY:)

9              THE COURT:  All right.  I have spoken with the

10   attorneys.  Any marital issues between Mr. and Ms. Parnell,

11   Sr., are not part of this case.  I ask that you disregard and

12   I'll strike that portion of the witness's answer that relates

13   to the marital discord between the parents.  That's not an

14   issue in our case and we had all previously -- I previously

15   ruled that that's out of the case and is not for your

16   consideration.  That's other people's business, not a part of

17   this criminal prosecution in any way.  Okay.  Thanks.

18             MS. REININGER:  Thank you, Your Honor.

19   Q.  (BY MS. REININGER) Jasmine, at some point your father

20   moves out of this family home that's depicted in Government's

21   Exhibit 4; is that correct?

22   A.  Yes.

23   Q.  Do you recall where he moved to when he moved out?

24   A.  It wasn't too far away from this house.

25   Q.  I'm showing you what's been marked as Government's Exhibit

6.   Does this residence appear to you to be familiar?

A.   Yes.

Q.   And how do you remember this house?

A.   That was his house.

Q.   Did you visit at this house?

A.   I went over there maybe a few times.

Q.   Do you recall any incidents of abuse occurring at this house against you?

A.   No.

Q.   Did you enjoy going to this house?

A.   I don't recall having any, like, good memories, no.

Q.   When you would go to this house, would you stay for the day or would you stay overnight?

A.   No, I only go over there -- I only went over there like a few times and it wouldn't be for very long.

Q.   When you say "not very long," are we talking just for a couple of hours?

A.   Maybe like an hour or two.

Q.   Do you ever recall staying overnight at this house?

A.   No.

Q.   At some point does your father move back into the house depicted in Government's Exhibit 4?

A.   I don't remember if he moved back in after he had already moved out to that house.

Q.   At some point does your sister Kelsey ever talk to you

1   about things that had happened to her?

2   A.   Whenever we lived in this house, yes.

3   Q.   Do you remember about how old you were?

4   A.   Maybe 13, 14, maybe.

5   Q.   As -- or in response to what Kelsey told you happened,

6   what did you do?

7   A.   They were at my best friend's house talking to her parents

8   and I called him and I told him that he needed to come home.

9   And he asked if it could wait and I said, "no, and you need to

10  come alone."

11       And whenever he came back to the house, I confronted him

12  about what Kelsey had told me he had been doing, and I

13  threatened him that if he did it again or I found out that he

14  was continuing to do it, that I would tell.

15  Q.   Who would you tell?

16  A.   I don't know, I just -- I was hoping he would believe me.

17  Q.   Why did you think at this point, because you've heard that

18  it was happening to Kelsey, did you confront him?

19  A.   Because I thought he was only doing it to me.  I didn't

20  know he was hurting her too.

21  Q.   You never confronted him when he was abusing you; is that

22  correct?

23  A.   (SHAKES HEAD SIDE TO SIDE)

24  Q.   Was that a no?

25  A.   I'm sorry.  No.

1  Q.  So why confront him now?

2  A.  Because she's my twin sister and I wanted to protect her.

3  Q.  But why wouldn't you confront him when he was abusing you?

4  A.  I was scared to and it was my normal.  He had been doing

5  it for so long it just -- I guess I just endured it.

6  Q.  Turning to Government's Exhibit 6.  Does this residence

7  depicted in Government's Exhibit 6 look familiar to you?

8  A.  Yes.

9  Q.  Do you know where this house is located?

10  A.  On Mayes Street in Pryor.

11  Q.  And the way that the house is depicted in Government's

12  Exhibit 6, is that how you remember the house appearing when

13  you lived there?

14  A.  No.  It didn't have a roof over the porch and the porch

15  was like a long-like ramp for like wheelchair access and then

16  it had steps to the side of it.

17  Q.  So this -- you said this roof right here was not there?

18  A.  No.

19  Q.  But the rest of the house had a roof?

20  A.  Yes.

21  Q.  Who all lived in this house?

22  A.  All of us.  All -- all four -- all five including myself,

23  kids, and my mom and dad.

24  Q.  Do you remember how many bedrooms were in this house?

25  A.  Three.

1    Q.   And which bedroom did you live in?

2    A.   On the other side of the fence there's a window and it was

3    that room on the left side of the house.

4    Q.   Showing you what's been marked as Government's Exhibit 7,

5    this is -- is this the fence that was a little bit closer up

6    than the last photo?

7    A.   Yes.

8    Q.   And can you describe for the jury where your bedroom was

9    in relation to the fence and the windows?

10   A.   It's the window in between the two doors.

11   Q.   Just so we're clear, are these the two doors right here?

12   A.   Yes.

13   Q.   So this window right here in the middle where I'm

14   indicating, is that the room -- or the window to your bedroom?

15   A.   Yes.

16   Q.   When you were living in this house, do you remember about

17   how old you were?

18   A.   We were old enough to drive so 16, 17.

19   Q.   Do you remember where you were at school?

20   A.   High school.

21   Q.   Was that Pryor High School?

22   A.   Yes.

23   Q.   And at this time were you in the same grade as not only

24   your sister Kelsey but also your sister Kayla?

25   A.   Yes.  We were in the same grade since first grade after

1   they held us back.

2   Q.   When you were living in this house, were you allowed to

3   date?

4   A.   I mean we were allowed to but they controlled it.

5   Q.   Did you in fact have a boyfriend in this house?

6   A.   Yes.

7   Q.   And at some point do you become sexually active with your

8   boyfriend?

9   A.   Yes.

10  Q.   Did your parents know that you were sexually active?

11  A.   With Isidro I felt like they knew but didn't say anything,

12  and then with my boyfriend Matt, that's when they officially

13  found out that, yes, I was.

14  Q.   And what was their reaction?

15  A.   Rage.

16  Q.   Do you remember the time when they did find out?

17  A.   Yes.

18  Q.   Do you remember what time of day it was?

19  A.   It was during the day, maybe a little bit closer to

20  evening.

21  Q.   What happened?

22  A.   We were arguing.

23  Q.   Do you remember what you were arguing about?

24  A.   Because I was having sex with my boyfriend and I don't

25  remember exactly what I said but my dad grabbed me by my

1    throat and started strangling me and pushing me back onto the

2    bed and he was strangling me and I blacked out and I remember

3    trying to fight him off and whenever I finally fought him off,

4    I kind of came to and I jumped up and I -- that window that I

5    said was ours was open and so I got about halfway out of it

6    when him and my mom drug me back into the house and sat on top

7    of me until they told me that I had to calm down.

8    Q.  Do you remember anyone else being in the room during this

9    time besides your mom and your dad?

10   A.  My brothers and sisters were outside of the room and my

11   mom shut them out because they were all screaming for him to

12   stop.

13   Q.  What was your dad doing when you said that he was

14   strangling you?

15   A.  He was strangling me.  I literally had hand bruises on

16   both sides of my neck.

17   Q.  Was he using one hand or both?

18   A.  I don't remember if it was one or two.  It had to have

19   been two because I remember having two bruises on both sides

20   and blacked out whenever he did it though.

21   Q.  At some point after this occurred, you said that you had

22   blacked out, you came to.  Can you describe for me what you

23   did when you came to?

24   A.  I got off the bed and away from him somehow and I ran to

25   the window and got about halfway out of it.

1  Q.  Well, at some point you said that they pulled you back in;

2  is that right?

3  A.  Yes.

4  Q.  And they told you that you were going to have to calm

5  down.  Did you calm down?

6  A.  Not at first.  But it wasn't -- it was a normal reaction

7  to being strangled.  I just wanted to get out of there.

8  Q.  Did you eventually get out of there?

9  A.  My cousin Maria had a Halloween carnival at her school and

10 they were taking the boys, and I don't know if Kelsey and

11 Kayla went with them or not, but they knew what they did was

12 wrong because my mom said that "we're going to go to this

13 carnival and we hope you're here when we get back."  Because

14 they knew I had called my best friend and I asked her to come

15 get me.

16 Q.  And did you leave the house?

17 A.  Yeah.  I took all of my clothes that I had and I went to

18 her house.

19 Q.  And was that the last time that you lived at your parents'

20 house?

21 A.  Until after high school I had moved -- when I was 17, I

22 was bouncing around from house to house and then I moved back

23 in with my mom.

24 Q.  Okay.  When you left the house that night, who did you go

25 stay with?

1  A.  My best friend and her parents.

2  Q.  And how long did you stay there?

3  A.  About a month.

4  Q.  And after a month, where did you live?

5  A.  I went to Stephanie's.

6  Q.  Is that your Aunt Stephanie?

7  A.  Yes.

8  Q.  And how long did you stay with your Aunt Stephanie?

9  A.  Maybe a month.

10 Q.  And after living with your Aunt Stephanie for a month,

11 where did you go?

12 A.  I moved in with my mom.  No, wait, I'm so sorry.  After I

13 moved in with my Aunt Stephanie, I had stayed at my friend

14 Miranda and Eric's house for maybe three weeks and then I got

15 pregnant and I moved in with my mom.

16 Q.  And is that when -- you continued staying with your mom

17 for how long?

18 A.  I didn't ever like officially move out, I just stayed at

19 her house and Matt's house and I was pregnant so eventually I

20 just didn't go back, I just kind of moved in with him.

21 Q.  During this time did you maintain a relationship with your

22 dad?

23 A.  At that point I don't believe we had spoken.

24 Q.  At some point -- at some point you graduate from high

25 school; is that right?

1   A.   Uh-huh.   May of 2012.

2   Q.   And what did you do after you graduated from high school?

3   A.   I took care of my daughter.

4   Q.   And what's your daughter's name?

5   A.   Serenity.

6   Q.   When was Serenity born?

7   A.   April 9, 2012.

8   Q.   Did you work after you graduated?

9   A.   No.   When I had her, I stayed home and Matt supported us.

10  Q.   When you were living -- after having graduated from high

11  school, you're raising your daughter Serenity, you're living

12  with your boyfriend Matt, he's taking care of you, did you

13  feel safe?

14  A.   Yes.

15  Q.   At that point did you tell anyone about the abuse that you

16  had endured during your childhood?

17  A.   At that point like when Serenity was little?

18  Q.   Yeah.

19  A.   No.

20  Q.   Can you explain to me why you never told your mom?   As an

21  adult now why you don't ever tell your mom?

22  A.   As an adult now, when I was a kid, I was just afraid to,

23  but as an adult she went through sexual abuse so she should

24  have known the signs and I feel like she overlooked them and

25  she failed us.   She didn't protect us how she was supposed to

1    protect her daughter.

2    Q.  Why didn't you tell her what was happening?

3    A.  I didn't think she would do anything.

4    Q.  You don't think that your mom would have done anything to

5    protect you or make it stop?

6    A.  I feel like she had to have known.  She says she didn't

7    know but there were signs.

8    Q.  Why did you -- now that you've moved out of your house and

9    you're away from your dad, why didn't you go to the police?

10   A.  I didn't know that that was really an option.  I mean I

11   knew I could, but I didn't -- I didn't think that I could.  I

12   didn't think anything would be done about it.

13   Q.  You didn't think that police officers or law enforcement

14   would do anything about the things that you could have told

15   them?

16   A.  I didn't think that they would believe us or take us

17   seriously.  I didn't trust anybody.

18   Q.  Did you trust your Aunt Stephanie?

19   A.  I thought she was a safe place whenever I moved into her

20   house.

21   Q.  Did you tell your Aunt Stephanie?

22   A.  No, I didn't.

23   Q.  Why did you not tell your Aunt Stephanie about what had

24   happened to you?

25   A.  About the sexual abuse?

1   Q.   Yes.

2   A.   I didn't want to at that point.  It was embarrassing and I

3   just wanted to forget about it because it wasn't happening

4   anymore and I wasn't in that environment anymore so I felt

5   like I was safe at that point.

6   Q.   When Serenity was born, did you -- was your father around?

7   A.   Yes.  At that point we had tried to start having a

8   relationship again.

9   Q.   Why would you start trying to have a relationship again?

10  A.   I just wanted a normal life.

11  Q.   I'm showing you what's been marked as Defense Exhibit 2.

12  Do you recognize this photo?

13  A.   Yes.

14  Q.   And can you identify who these people are in this photo?

15  A.   Yes.

16  Q.   Who are the people in the back row?

17  A.   From left to right it's Kelsey, Kayla, me.

18  Q.   Who is in the front row?

19  A.   Brice, Paisley, my dad, Serenity and Branden.

20  Q.   And Paisley is the littlest baby?

21  A.   Yes.  And Serenity is the older one.

22  Q.   Okay.  Serenity is your daughter?

23  A.   Yes.

24  Q.   And Paisley is whose child?

25  A.   Kayla's.

1   Q.   When did your dad start coming around you again?

2   A.   It was like right before Serenity was born.

3   Q.   Were you okay with him coming around?

4   A.   We kind of just put it under the rug and didn't talk about

5   it.

6   Q.   Was that your decision or his?

7   A.   We just didn't talk about it.

8   Q.   Showing you what's been marked as Defense Exhibit 23.   Do

9   you recognize the individuals in this photograph?

10  A.   Yes.

11  Q.   Who do you recognize those people to be?

12  A.   Kayla and my dad and me.

13  Q.   And do you remember when this photograph was taken?

14  A.   I believe it was 2016 during Christmastime.   It might have

15  been -- no, it was 2015 or 2016.

16  Q.   And this is you on the right?

17  A.   Yes.

18  Q.   You appear pretty happy.

19  A.   I don't -- I was fine.

20  Q.   Why were you fine?

21  A.   I didn't live with my parents at that point.   I was in my

22  own home with my boyfriend.   I was safe.

23  Q.   How often would you be around your dad?

24  A.   Mostly whenever it was just birthday parties and stuff.

25  At first when Serenity was little we were around him a lot.

1    Q.   What types of events would you be around him with?

2    A.   Just whenever the whole family was together.

3    Q.   And was that holidays?

4    A.   Yeah.  And just day-to-day like every-day stuff.

5    Q.   If it was a family event, did you anticipate or expect

6    that your dad was going to be there?

7    A.   Yes.  At that point we had a relationship.  We were trying

8    to mend it.

9    Q.   I am showing you what has been identified as Defense

10   Exhibit Number 1.  This appears to be a social media post by

11   Jasmine Parnell.  Is that your social media?

12   A.   Yes.

13   Q.   Can you identify in this photograph what we're seeing?

14   A.   Serenity and my dad.

15   Q.   And do you remember where you guys were at?

16   A.   At the mall in Tulsa.

17   Q.   And who all was present the day that it was taken?

18   A.   My mom, I believe Matt was, and my sisters.

19   Q.   And you were okay with your dad being around you and your

20   child?

21   A.   Serenity was never left alone with him.  Whenever she was

22   born, I told him if he ever touched her, I would put a bullet

23   through his head because he wasn't going to hurt her the way

24   he hurt me.

25   Q.   Showing you what's been marked as Defense Exhibit Number

1   4.  Can you identify who the individuals are in this

2   photograph?

3   A.  Serenity and my dad.

4   Q.  This appears to be a photograph that was taken in October

5   of 2019.  Does that sound about right?

6   A.  Uh-huh.

7   Q.  So in 2019 you had a relationship continuing with your

8   father at that time?

9   A.  It was still really strained.  At that point we only saw

10   each other really when we had family birthday parties and

11   stuff like that.

12   Q.  And if you wanted to attend a family event, your father

13   was going to be there?

14   A.  Yes.

15   Q.  Showing you what's bean marked as Defense Exhibit Number

16   5.  Can you identify the individuals in that photograph?

17   A.  Serenity and my dad.

18   Q.  And then Defense Exhibit 6.

19   A.  Serenity and my dad.

20   Q.  Do you remember what event this would have occurred at?

21   A.  Her first birthday at the Pryor Park.

22   Q.  And Defense Exhibit Number 7.

23   A.  Serenity and my dad.

24   Q.  At any time that Serenity or any other of your children

25   were around your father, was he ever alone with them?

1  A.   No.

2  Q.   Did he ever babysit your children?

3  A.   No.   They always stayed with my mom but he would be around

4  if they were being babysat.   I never had him babysit though.

5  Q.   Were you ever alone with your dad once you became an

6  adult?

7  A.   There were a few times.

8  Q.   When did those times occur?

9  A.   One time we went to go pick up a truck that he had bought

10 and Serenity was with me.   And that's the one that sticks out

11 to me.

12     Other than that -- I'm sure there were other times but I

13 don't --

14 Q.   When -- when was the last time that you were around your

15 dad?

16 A.   The last time I recall being around him was Christmas of

17 2019.

18 Q.   And what was it about Christmas of 2019 that stands out to

19 you?

20 A.   Am I allowed to talk about that?

21 Q.   Well, let me -- let me rephrase that.

22     Is it your recollection that Christmas of 2019 that you

23 ceased communication with your dad?

24 A.   After that, yes.

25 Q.   Okay.

1  A.  But it wasn't because of that.

2  Q.  It wasn't because of what?  Christmas?

3  A.  Yeah.

4  Q.  Okay.  But it was around that time period that you were no

5  longer communicating with your father?

6  A.  Yes.

7  Q.  When was the next time -- well, what happened after

8  Christmas of 2019?

9      Don't answer that.  Let me rephrase a second.

10     When did you learn of Kelsey posting her allegations on

11 Facebook?

12 A.  2020.

13 Q.  Did you know that Kelsey was going to be posting her

14 allegations on Facebook?

15 A.  No.  My boyfriend called me and he said, "Jas, did you see

16 what Kelsey put on social media?"

17     And I said, "no."

18     And he said, "you need to go look."

19 Q.  So what did you do when your boyfriend called you?

20 A.  After he told me to go look, I went and looked, but I

21 didn't read a whole lot of it.

22 Q.  So around the time that Kelsey posted on Facebook, which

23 was in 2020, did you have a relationship with your father?

24 A.  No.  I had already cut off all communication.  I didn't

25 explain to anybody why.  I felt like he knew the reason.

1  Q.  At some point after Kelsey posted on Facebook, are you

2  contacted by the Pryor Police Department?

3  A.  Yes.

4  Q.  Can you explain what happened?

5  A.  We went up to the Pryor PD and he talked to us about what

6  Kelsey had posted and asked us to make reports.

7  Q.  Who all went?  Who is "we"?

8  A.  Kelsey and I.

9  Q.  Did anyone else go with you?

10 A.  Not that I remember.  Maybe our kids.

11 Q.  And do you remember who you spoke to when you went to the

12 police department?

13 A.  Justin was in there and Dustin was in there.

14 Q.  Are those Pryor police officers?

15 A.  Justin is the detective and Dustin is an officer.

16 Q.  Did you know the detective and the officer prior to going

17 into the police department that day?

18 A.  I didn't know the detective.  Dustin is kind of like way

19 down the line, like he kind of knew us because my mom was

20 friends with a family member of his.

21 Q.  Going into the police department on that day to talk with

22 Detective Justin Allen, you had no prior relationship with

23 him?

24 A.  No, I had never really talked to him before.

25 Q.  When you went into the police department that day, can you

1    explain to the jury what happened and what you did?

2    A.  He didn't ask us details but he asked about Kelsey's blog

3    that she posted and he asked for how long it was happening and

4    we told him.  And he said that he wanted us to go home and

5    write reports of what happened to us so that we could start

6    this whole process.

7    Q.  So what did you do?

8    A.  I went home and I wrote my report.

9    Q.  Did you talk to Kelsey about what you were going to write?

10   A.  No.  We never talked about anything like that.

11   Q.  And how long did it take you to write out your statement?

12   A.  A couple of hours.

13   Q.  When you were done writing your statement, what did you do

14   with it?

15   A.  I took it to Detective Allen.

16   Q.  And when you were writing your statement, did you write

17   down everything that you could remember?

18   A.  Everything that I could remember, yes.

19   Q.  And you gave that statement to Detective Allen?

20   A.  Yes.

21   Q.  And then what happened?

22   A.  I guess he turned them in.

23   Q.  At some point during the investigation do you have to talk

24   to several people about the allegations that you had included

25   in your statement?

1    A.   Yes.  Different detectives and FBI agents.

2    Q.   Has this been a fun experience for you, Jasmine?

3    A.   No.

4    Q.   Jasmine, are you on social media?

5    A.   Yes.

6    Q.   What social media accounts do you have?

7    A.   Facebook, Instagram and TikTok.

8    Q.   Can you explain to me what TikTok is?

9    A.   Just a bunch of different videos.

10   Q.   Do you follow people on TikTok or do you actually post

11   things on TikTok?

12   A.   Both.

13   Q.   What do you -- what sort of things do you post on TikTok?

14   A.   I've posted funny things.  I've posted things about my

15   journey.

16   Q.   What do you mean about your "journey"?

17   A.   About how it's okay to speak up if you're sexually abused,

18   that you don't have to be quiet.  I thought --

19   Q.   Why do you share this information on TikTok?

20   A.   If I would have known that we would have had you guys on

21   our side, we would have had all of the support that we've had,

22   I would have told.  I didn't know that we could do something

23   about it.  It was our normal.  And at that point it was just a

24   part of life.  It was something that happened.

25   Q.   Did you post on TikTok about coming to court?

1  A.  I said "I would see you at trial."

2  Q.  And what did that mean?

3  A.  It means I would get the chance to sit and talk about it

4  and him have to be held accountable for what he did to us.

5  Q.  After everything that you've told this jury you've been

6  through, do you still love your dad?

7  A.  The child in me does, yes.  I'll always long for that

8  relationship.  He robbed me of all of that.  We didn't get to

9  be around our grandparents and I wanted that for my kids so I

10 tried to make it work, but the longer that -- the older

11 Serenity got, the more of those memories started resurfacing

12 and I couldn't ignore it.

13    Because at one point I didn't -- I didn't want to be here

14 anymore.  I didn't want to die but I couldn't escape those

15 memories.

16 Q.  And the struggles that you have had, is that what you post

17 on TikTok?

18 A.  Yes.  I was quiet for about 20 years and I'm done being

19 quiet.

20         MS. REININGER:  Your Honor, I have no further

21 questions.

22         THE COURT:  All right.  Thanks.

23                    CROSS-EXAMINATION

24 BY MR. HASSE:

25 Q.  Ms. Parnell, you've answered a lot of questions about what

1  your relationship was like after you moved out from living

2  with your father today.  Is that fair to say?

3  A.  A little bit, yes.

4  Q.  Well, in answering those questions, would it be fair to

5  say that you've expressed that you've tried to minimize your

6  contact with Keith Parnell after you moved out of his home?

7  Is that -- is that fair?

8  A.  At the very end, yes.

9  Q.  When you say "at the very end," do you mean you tried not

10  to be around him at the end of the time that you lived with

11  him or do you mean there was another time where you tried not

12  to be around him?

13  A.  In 2020 I cut off all contact.  When Serenity was a baby,

14  I tried to let him have a relationship with her and so we were

15  around and then it just got to where it was less and less.

16  Q.  In 2020 you said you cut off all contact?

17  A.  Yes.

18  Q.  Isn't it true that the last time you saw Mr. Parnell, your

19  father, in person was at a Sunday dinner at your grandmother

20  Norma Parnell's home?

21  A.  I don't recall.

22  Q.  Do you recall at that home having an argument with your

23  father?

24  A.  No.  I've never had an argument with him.

25  Q.  So it's your testimony that you did not at her home have

1  an argument about Keith Parnell not coming over to your home

2  and visiting with you and your daughters enough?  That's never

3  happened?

4  A.  No.  That's not an argument.  We had a conversation about

5  it and it was a very heartfelt conversation.

6  Q.  When you say a conversation about "it," what do you mean

7  is "it"?  Was it a conversation about the fact that he wasn't

8  visiting with you and your kids enough?

9  A.  No.  He apologized for not being around enough.  He felt

10  really bad because he wanted a relationship with Serenity but

11  he didn't come around a lot.  And I told him that it was okay

12  but if he wanted her to know him, then he would just have to

13  come around more.

14  Q.  And at no point in that conversation that you're

15  describing did he say, "Jasmine, this is not the time?"

16  A.  No.  It wasn't an argument.

17  Q.  Thank you.

18      You went over a number of photos with the government's

19  prosecutor a moment ago.  This is one of the photos.  This is

20  marked as Defendant's Exhibit 1.  Would you again please for

21  the jury identify the people in that photo.

22  A.  Serenity and my dad.

23  Q.  About how old is Serenity in that photo?

24  A.  About one.

25  Q.  You were a senior in high school when she was born?

1  A.  Yes.  She was born April 9 and I graduated in May.

2  Q.  To be clear, your testimony today is when was the last

3  time that you were sexually abused by Keith Parnell?

4  A.  The last time I was abused by him was in the house out on

5  430 road.

6  Q.  That was when you were in high school?

7  A.  No.

8  Q.  Prior to high school?

9  A.  About fifth, sixth grade.

10  Q.  So you have not been -- it's your testimony today that the

11  last time you were sexually abused by Keith Parnell was in

12  fifth or sixth grade?

13  A.  Yes.  He tried to get me to do it one other time when I

14  went on a truck ride with him for his work and at that point I

15  had told him no.

16  Q.  Well, let's talk about -- let's talk about that.  Actually

17  we'll turn back to that, Ms. Parnell, this truck ride.  And to

18  be clear, how old were you when that truck ride happened?

19  A.  About fifth or sixth grade.

20  Q.  You went on a truck ride in fifth or sixth grade with

21  Keith Parnell and he tried to molest you; is that right?

22  A.  Yes.

23  Q.  And you did not go on a truck ride with him ever again to

24  Arkansas or anywhere else at any other time?

25  A.  No.  That's where we went whenever we did go on the truck

1   ride.

2   Q.   Did you go on a truck ride with him when you were 17 years

3   old, Ms. Parnell?

4   A.   No.

5   Q.   Now, turning back to this photo that's marked as

6   Defendant's Exhibit 1.   Who posted this photo?

7   A.   I don't remember to be honest.   It could have been me, it

8   could have been my mom, it could have been him.

9   Q.   Well, if it was you, why would you post this photo?

10  A.   Because it was my daughter.   We were trying to have a

11  relationship with him.   I wanted her to have her grandpa.

12  Q.   I'm sure you posted other photos of your daughter; is that

13  right?

14  A.   Yes.

15  Q.   Did you have other photos of your daughter you could post

16  that didn't have Keith Parnell in them?

17  A.   Yeah.

18  Q.   But you wanted to post this photo that has Keith Parnell

19  who you now say sexually abused you?

20  A.   Yes.

21  Q.   Did you post this photo in 2012?

22  A.   Yes.

23  Q.   Did you graduate from high school in 2012?

24  A.   Yes.

25  Q.   In fact, Ms. Parnell, isn't it true that your relationship

1   around this time -- and by "this time," I mean when you first

2   had your first daughter -- your relationship with Mr. Parnell

3   was very close?

4   A.   I wouldn't say very close but we started having a

5   relationship again, yes.

6   Q.   He -- the testimony that you just gave seemed to indicate

7   that you would see Mr. Parnell at family gatherings; is that

8   accurate?

9   A.   Yes.

10  Q.   So perhaps you felt like you didn't have a choice but to

11  see Keith Parnell because everybody was getting together for

12  Christmas or Easter or Thanksgiving; is that fair?

13  A.   Yeah.   He was there.

14  Q.   But there were other times that you saw Mr. Parnell, your

15  father, for example, he did come over to your home and see you

16  and your daughter; isn't that correct?

17  A.   Yeah.   We would see him every now and then.   And I don't

18  mean every now and then as like once in awhile.   We had a

19  relationship with him at one point.

20  Q.   Mr. Parnell was very excited to be a grandfather for the

21  first time.   Do you recall that?

22  A.   Yeah.   Everyone was.

23  Q.   So there ended up being a lot of photos?

24       Let me take that back.   This was a -- the birth of your

25  first daughter Serenity was a special time for your family,

1  was that fair to say?

2  A.  Yes.  She was the first grandchild.

3  Q.  Right.  And that was significant as you point out to

4  everybody; is that right?

5  A.  All of the grandchildren are significant, yes.

6  Q.  Certainly.  Every kid matters.  This -- we're talking

7  about this moment in time, though, this special time when

8  Serenity was born when your four siblings were becoming aunts

9  and uncles for the first time; is that right?

10  A.  Yes.

11  Q.  And your mother was becoming a grandmother for the first

12  time.

13  A.  Yes.

14  Q.  And your father was becoming a grandfather for the first

15  time.

16  A.  Yes.

17  Q.  I'm showing you -- right now on the screen, for the

18  record, I have Defendant's Exhibit 27 previously admitted.

19      I don't believe this image was shown to you -- strike

20  that.

21      Do you recognize this photo?

22  A.  Yes.  That's my dad and Serenity.

23  Q.  About how old do you think Serenity is there?

24  A.  About one.

25  Q.  So again this would probably be around 2012?

1    A.   Uh-huh.

2    Q.   Do you know where that photo was taken?

3    A.   I remember he was going to take her for a ride in the

4    semi-truck and she was super excited and I followed them.  We

5    went from point A to point B.

6    Q.   Isn't it true, in fact, that he was babysitting for you

7    that day?

8    A.   No, I don't recall that.  No.

9    Q.   So it was your testimony that although he was alone with

10   your daughter in the truck, you were following behind in your

11   car?

12   A.   Yes.  That's what I recall.

13   Q.   I think you were very clear in your testimony that

14   Serenity was never left alone with Keith Parnell; is that

15   accurate?

16   A.   Yes.

17   Q.   That's your testimony?

18        Sorry, I apologize.

19        I know you know where it's going, we just have to let me

20   get to the end of the question so we don't talk over each

21   other for the court reporter.

22        Let me start that again.  It was your testimony that you

23   never left Serenity alone with Keith Parnell; is that

24   accurate?

25   A.   Yes.

1   Q.  Okay.  And in fact you said today that you told -- told

2   him that you would put a bullet in his head if he ever hurt

3   your daughter Serenity, "he" being Keith Parnell?

4   A.  If he ever sexually abused her, yes.  And I meant it.

5   Q.  Now, you've never told law enforcement that before, have

6   you?

7   A.  Yes.  I said it in front of the FBI.

8   Q.  So there was a meeting where you've told an FBI agent that

9   you threatened to put a bullet in Mr. Parnell's head if he

10  ever abused your daughter?

11  A.  It wasn't a threat, but, yes.

12  Q.  I just want to be clear that this statement was made to a

13  law enforcement agent.  Did that happen in January of 2021?

14  A.  Yes, but I can't tell you which agent it was.  I don't

15  know their names.

16  Q.  Well, I would like to know more about that.  And just to

17  be clear, I'm not trying to suggest that you committed a crime

18  here or something.  What I want to know is more specifics

19  about what you're claiming happened there.  When was this

20  conversation with Keith Parnell where you told him that you

21  would hurt him if he ever sexually molested your daughter?

22  A.  It was whenever Serenity was a baby.

23  Q.  So at that time it had occurred to you that your daughter

24  might be in danger?

25  A.  No.  She was never in danger.

1  Q.  Then why did you say what you said to Mr. Parnell if she

2  was not in danger?

3  A.  Because if he could do it to his own biological daughter,

4  he could do it to anybody.

5  Q.  And you then would testify here today that it was on your

6  mind, the fact that you had been abused by your father, when

7  he was spending time with Serenity; is that accurate?

8  A.  It was always on my mind.  It was always in the back of my

9  head what he did to us.

10  Q.  I would like to have you rewind a few years to the

11  incident you described where you claim you confronted Keith

12  Parnell and threatened him if he ever continued to abuse or

13  again abuse your sister that you would go to police.  Do you

14  recall that?

15  A.  Yes.

16  Q.  Let me take a step back.  It was your testimony today that

17  you told him that you would tell someone if he abused your

18  twin sister Kelsey Blaylock again; is that right?

19  A.  Yes.  They're both correct.

20  Q.  Okay.  But more specifically in your statement that you

21  wrote for the Pryor Police Department you did say that you

22  would go to police; is that right?

23  A.  Yes.

24  Q.  So you knew at that point that going to police was an

25  option; is that accurate?

1  A.  I knew that I could but I didn't know if anything would be

2  done.

3  Q.  At what age did that happen?  And when I say "that," this

4  incident that you claim you told Keith Parnell if he harmed

5  your sister again you would go to police?  When did that

6  happen?

7  A.  Between 12 and 14 years old.

8  Q.  Ages are going to matter.  Can you give us the best guess

9  of what the precise age and the precise year was that this

10  happened?

11  A.  I would have to sit and calculate.  That's why in my

12  report I wrote "about."

13  Q.  You've referred to the report -- you're referring to the

14  report that -- when you refer to the report, you're talking

15  about the statement that you gave to Pryor Police Department

16  at the end of August 2020; is that right?

17  A.  Yes.

18  Q.  The one that you referred to here while you were sitting

19  on the stand earlier; is that correct?

20  A.  Yes.

21  Q.  Do you still have that in front of you?

22  A.  Yes.

23  Q.  Can you turn to page 2 of Plaintiff's Exhibit 11?

24  A.  Page 2?

25  Q.  It will be marked in red as 33.

1   A.   Okay.

2   Q.   Please take a look at the bottom of the page and see if

3   you can refresh your recollection using that, and once you're

4   ready, I would like to ask you again precisely what age we're

5   talking about.

6   A.   In regards to?

7   Q.   The story that you shared today that you confronted Keith

8   Parnell and said that if he ever touched your sister again,

9   you would tell the police.

10  A.   I didn't state what age I was whenever I made that

11  comment.

12  Q.   Okay.  But it was -- you feel like it's 12 to 14 and --

13  A.   In my statement I put about 12 to -- I'm sorry, maybe 12

14  to 13.  12 or 13.

15  Q.   It looks like that was maybe in reference to something

16  else but you think it still might be the same time period?

17  A.   It was in the same house.

18  Q.   Okay.  Do you know what grade you were in when that

19  happened?

20  A.   I don't know exactly the grade, I just know we lived in

21  that house.

22  Q.   Now, I have Defendant's Exhibit 23 being shown on the

23  screen right now.  This is one of the ones that you just went

24  over.  If you could, just please again identify who is in that

25  photo.

1  A.   Kayla, my dad, and myself.

2  Q.   And again what year do you think that was?

3  A.   I believe it was 2015, 2016.

4  Q.   Okay.  This -- this was -- if I'm not mistaken, this was

5  Rhema lights?

6  A.   Uh-huh.

7  Q.   What was this event that this photo was taken at?

8  A.   It's in Tulsa and it's where everyone goes and looks at

9  Christmas lights.

10  Q.   This happens every year; is that right?

11  A.   Yes.

12  Q.   You went other years other than this year with Keith

13  Parnell; is that right?

14  A.   I don't recall what years we went together.  Honestly this

15  is the only year that I really remember going with him.

16  Q.   The one we have the photo from is the only one you ever

17  remember going, is that --

18  A.   That's the one I can recall, yes.  I remember going to

19  Rhema lights before with my boyfriend, but that's the only one

20  I recall with him.

21  Q.   Okay.  So then in your view this was not a tradition for

22  your family to go to Rhema lights?  It's something you did

23  more than once?

24  A.   I believe that was about the year that we started saying

25  we wanted to go on Thanksgiving.

1  Q.  I would like us to rewind all of the way back to the first

2  incident that you described in your testimony.  In the

3  first -- it was your -- correct me if I'm wrong, your

4  testimony was at house Number 1, the blue house that when

5  photographed was white, one incident happened between you and

6  Keith Parnell; is that correct?

7  A.  Which house was it?

8  Q.  The first house you were shown today, Prosecution's

9  Exhibit 1.  I'll go ahead and show you again.  You recognize

10  this house?

11  A.  Yes.

12  Q.  This is the house that you testified looks a little

13  different.  It used to have a different color; is that right?

14  A.  I recall it being blue or -- yeah.

15  Q.  You were five years old in this house?

16  A.  Yes.

17  Q.  I believe you said it was kindergarten?

18  A.  Yes.

19  Q.  Your testimony was that Keith Parnell showed you

20  pornography while you were at that house; is that correct?

21  A.  Yes.

22  Q.  And you have a very specific recollection of the content

23  of that pornography?

24  A.  Yes.

25  Q.  It was also your testimony that there were no other

1  incidents of sexual abuse at that house; is that right?

2  A.  Aside from him kissing me, no.  Not for me, no.

3  Q.  That -- and there was no incident at that house where your

4  sister Kelsey Blaylock was present; is that correct?

5  A.  She had walked in.

6  Q.  Well, now that sounds like a -- let's talk about that.

7  It's your testimony now that when this incident that you

8  described to the prosecutor happened, there was someone else

9  present, your sister Kelsey Blaylock?

10  A.  As I stated before, I remember her walking in and he

11  stopped.

12  Q.  This incident, and pardon me if I'm getting mixed up, this

13  is the same incident during which you claim Keith Parnell was

14  showing you pornography; is that correct?

15  A.  Yes.

16  Q.  So to just be clear, there was one incident at this house;

17  is that right?

18  A.  Yes.

19  Q.  And there was another person present for that incident; is

20  that right?

21  A.  She walked in after he had done it.

22  Q.  And when you say "she," it was Kelsey Blaylock?

23  A.  Yes.

24  Q.  I am looking now at the statement that you made to police.

25  You never disclosed that before in that statement, did you?

1    A.   No.   That's the thing about trauma, after you talk about

2    it over and over, it's been two years, things start

3    resurfacing and you start remembering more and more about the

4    events that occurred.

5    Q.   Ms. Parnell, at the time you wrote this statement, you

6    provided all the information that you remembered at that time;

7    is that correct?

8    A.   Yes.

9    Q.   But today on the stand you remember that your sister

10   Kelsey Blaylock was there too and had walked in?

11   A.   It wasn't today that I remembered it.

12   Q.   When did you remember this?

13   A.   I don't have a date.   It's been two years since we started

14   this process.

15   Q.   And you understand that law enforcement, when they had

16   meetings with you, they either record it or copied down the

17   statements that you made in those interviews.   You understand

18   that?

19   A.   Yes.   They took copies of our statements.

20   Q.   Okay.   Since you remembered this detail sometime after you

21   wrote this statement, did you ever share that with another law

22   enforcement agent, be it Pryor PD or anyone else?

23   A.   No.

24   Q.   So you didn't remember it today but you're sharing it with

25   all of us for the first time today; is that accurate?

1    A.  Yes.

2    Q.  I see.  The next incident that you spoke about, you made a

3    comment -- let me take a step back for clarity.

4        The next incident that you described, Ms. Parnell,

5    occurred at this location, Government's Exhibit 2.  Your

6    testimony was that the second time that you were abused by

7    Keith Parnell it happened here; is that accurate?

8    A.  No.

9    Q.  Where did it happen?

10   A.  The next house.  I disclosed that nothing happened to me

11   in this house.

12   Q.  Thank you for clarifying.

13       I'm showing you Government's Exhibit 3.  This is the

14   house where the next incident happened; is that correct?

15   A.  Yes.

16   Q.  Okay.  Thank you.  In explaining why you did not try to

17   get him to stop, you testified that Keith Parnell, your

18   father, "had been grooming me since age five."  Do you recall

19   saying that?

20   A.  Yes.

21   Q.  You also stated "he usually asked us if it felt good."

22   A.  And I didn't mean to say "us."  I meant me because I can

23   only speak for myself.

24   Q.  Okay.  Well, here is a case you were able to jump right to

25   where I was going.  Again, please let's -- let me try and

1  finish my question before you jump in, but, that's right, you

2  misspoke.  When you say "us," you meant "me"?

3  A.  Yes.

4  Q.  Okay.  As part of your testimony you were discussing the

5  boyfriends that you had dated and you said that Mr. Parnell

6  didn't like your boyfriend Isidro; is that correct?

7  A.  He didn't like any of my boyfriends.

8  Q.  My question was, he didn't like Isidro; is that correct?

9  A.  Correct.  There for a while he didn't.  He tolerated

10  him.

11  Q.  Thank you.  While you gave what you thought was your

12  explanation for why he didn't like Isidro --

13  A.  I didn't give an explanation.

14          THE COURT:  Give him a chance to finish his

15  question; okay?

16          THE WITNESS:  Sorry.

17  Q.  (BY MR. HASSE) Is it possible that as you say your

18  boyfriend at the time was in high school, a sophomore, and you

19  were, by your estimation, in seventh, eighth grade, is it

20  possible that Keith Parnell didn't like you having that

21  boyfriend because he was so much older than you?

22  A.  No.  Isidro was maybe two to three years older.  He didn't

23  like him because he was a Mexican.

24  Q.  Is it possible that he did not like you dating in seventh

25  to eighth grade?

1  A.  He didn't like me dating at all.

2  Q.  But he -- you were in the seventh to eighth grade by your

3  estimation and he did not like you dating this boy who was in

4  high school; is that accurate?

5  A.  Correct.

6  Q.  Okay.

7  A.  I also was held back in first grade though, so...

8  Q.  There was a point in time where the prosecutor was asking

9  you to clarify during one of the incidents what happened first

10 and what happened after.  At that time I believe you had in

11 front of you a copy of your statement and you looked down and

12 paused for quite a while.  When you were looking down, were

13 you reading from your statement?

14 A.  No.

15 Q.  When you were looking down, what were you doing?

16 A.  I went to look at it but then I kind of just zoned out and

17 started remembering it again.

18 Q.  I see.  I was sitting over here in the room, so it's your

19 testimony that that period of time while you were looking

20 down, you were not reading, you were "zoning out" in your

21 words?

22 A.  I did read it a little bit at first and then I zoned out,

23 yes.

24 Q.  I see.  I want to clarify testimony with regards to the

25 house your father was at in Exhibit 5.  It's your testimony

1  that you never once stayed overnight in that house with your

2  father; is that accurate?

3  A.  I don't recall staying the night, no.

4  Q.  If any of your siblings remembered you staying overnight

5  in that house, they would be mistaken?

6  A.  What I recall is that I didn't stay the night.  I can't

7  speak for them.

8  Q.  You say it's your recollection, but you feel certain it

9  didn't happen?

10  A.  I don't recall it, no.

11  Q.  When was the last time that you lived with the defendant,

12  your father, Keith Parnell?

13  A.  I think maybe my boyfriend and I, we stayed with my mom

14  and my dad for a month.

15  Q.  Well, you say your boyfriend and you would stay with

16  your -- sorry, let's take a step back.

17      Can you put a date to that?  Any of those times that you

18  and your boyfriend stayed with Keith Parnell and your mom

19  Jennifer Parnell?

20  A.  We moved out of our apartment and we were waiting on our

21  new house, for the lease for it.

22  Q.  When did you move out of that apartment that you were

23  waiting for a new house?

24  A.  I would have to sit and think about it.

25  Q.  Is it accurate to say that the boyfriend that you're

252

1    referring to is the boyfriend who is the father of your first

2    child Serenity?

3    A.  Yes.

4    Q.  You had Serenity in your senior year of high school; is

5    that accurate?

6    A.  Yes.

7    Q.  That was in 2012?

8    A.  Uh-huh.

9    Q.  During that time you were living with that boyfriend; is

10   that right?

11   A.  Yes.

12   Q.  So in fact the last time you lived with Keith Parnell was

13   not when you were in high school, it was sometime after high

14   school; is that correct?

15   A.  Yeah.  Whenever I left when I was 17, I didn't move back

16   in with them, and then our lease was up on our apartment

17   because it was a one-year lease and we were about to get

18   another house and so we stayed there with my -- I stayed there

19   because of my mom but my dad was there also, yes.

20   Q.  So if someone got the impression that after you moved out

21   of living with Keith Parnell, you never lived with him again,

22   that would be the wrong impression because you did live with

23   Keith Parnell again?

24   A.  We stayed with them for the month.

25   Q.  And when you say "we," you mean you, your boyfriend and

1  your daughter Serenity; is that correct?

2  A.  Yes.  It was --

3  Q.  The three of you -- the three of you lived with Keith

4  Parnell after high school and after the incidents that you

5  described in high school; is that true?

6  A.  Yes.

7        THE COURT:  Why don't we look for an hour off.  Get

8  everybody back together at 1:00.

9     (RECESS WAS HAD)

10    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

11  OUTSIDE THE PRESENCE AND HEARING OF THE JURY:)

12        MS. REININGER:  Judge, would you like me to have the

13  witness brought in before the jury?

14        THE COURT:  Oh, yeah, sure.  Thank you very much.

15    Ms. Parnell, I remind you you remain under oath.  Okay?

16        THE WITNESS:  Yes.

17        THE COURT:  Thanks.

18    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

19  THE PRESENCE AND HEARING OF THE JURY:)

20        DEPUTY COURT CLERK:  Back on the record in case

21  21-Cr-439, United States of America versus Keith Duane

22  Parnell.

23  Q.  (BY MR. HASSE) Ms. Parnell, first I would like to clarify

24  testimony about trips you took with Keith Parnell after you

25  had moved out with him, moved out from his home after high

1   school.

2        You mention in your testimony there was one time that you

3   drove with him to get a truck out of state; is that right?

4   A.   Yes.

5   Q.   That time you drove with him out of state to pick up a

6   truck, was that to Missouri?

7   A.   Yes.

8   Q.   Was there anybody else with you?

9   A.   Serenity.

10  Q.   On the car ride back, isn't it true, that Serenity rode

11  along with Keith Parnell in the new vehicle and you followed

12  in your car?

13  A.   Yes.  I was directly behind them.

14  Q.   There was another time that you drove to Arkansas with

15  Mr. Parnell though; is that right?

16  A.   What incident are you talking about?

17  Q.   Did you ever as an adult drive with Mr. Parnell to

18  Arkansas while he was driving his truck as part of his work?

19  A.   No.  Not as an adult.

20  Q.   Did you ever before you were an adult?

21  A.   Yes, one time.

22  Q.   How old were you when that happened?

23  A.   Probably about 13, 14.

24  Q.   Can you recall which house you were living in?

25  A.   Yes.

1  Q.  Which one?

2  A.  I thought -- oh, I'm sorry, I thought you were bringing up

3  a picture.

4  Q.  Oh, I would be happy to if you could just describe which

5  house it was you were living in.

6  A.  It was the one on 430 Road.

7  Q.  I'm showing you right now Government's Exhibit Number 4.

8  Is that the house you were living in when you went on the trip

9  with your father to Arkansas?

10  A.  Yes.

11  Q.  Okay.  You didn't have to go on that trip; is that right?

12  A.  No.

13  Q.  In fact each of you and your four other siblings got the

14  opportunity to go on a road trip with dad to see what his work

15  as a trucker was like; is that accurate?

16  A.  Yes.

17  Q.  Now, you gave some testimony about your experience with

18  social media.  When I refer to social media, you understand me

19  to be talking about Facebook, Instagram, TikTok, and sites

20  like that; is that fair?

21  A.  Yes.

22  Q.  By the way, which of those -- which of those apps or

23  websites do you use?

24  A.  All three.

25  Q.  Did you start out by using Facebook before you joined

1  TikTok and Instagram?

2  A.  Yeah.

3  Q.  Now, just roughly do you have any idea when you may have

4  joined Facebook?

5  A.  No.

6  Q.  What about Instagram?

7  A.  I couldn't tell you when.

8  Q.  Well, I had shown you earlier Exhibit Number 1, which I'm

9  publishing now to the jury.  Exhibit Number 1, does that

10  appear to you to be from the Instagram account?

11  A.  Yes.  I've had that account for a while.

12  Q.  Okay.  That's -- above the photograph that's your name;

13  right?

14  A.  Yes.

15  Q.  And that indicates that you posted that photo?

16  A.  Yes.

17  Q.  It looks like there's a date of 2012 on there.  That's the

18  same year your first child was born; is that correct?

19  A.  Yes.

20  Q.  And same year you graduated from high school that year?

21  Is that accurate?

22  A.  Yes.

23  Q.  So you at least had the Instagram account since 2012?

24  A.  Yes.

25  Q.  You could have had the Facebook account maybe a little

1  earlier than that?

2  A.  Yes.  Probably junior high.

3  Q.  When you went on Facebook, you would post pictures, for

4  example, is that something you would do?

5  A.  Yes.

6  Q.  You would post maybe information or stories or short

7  blocks of text too; is that accurate?

8  A.  Yes.

9  Q.  Did you sometimes comment on other people's posts?

10  A.  I'm sure.

11  Q.  Was that a regular way that you were interacting with

12  family members?

13  A.  I interact with everyone, yes.

14  Q.  Well, so, that's interesting because on Facebook you have

15  to be -- in order to interact with people, you have to be

16  connected to them as friends; is that correct?

17  A.  No, you don't have to unless it's -- if it's public, you

18  don't have to.

19  Q.  So you can make postings on Facebook that are public and

20  not just for friends, is what you're saying?

21  A.  Yes, other people can see it.

22  Q.  Is that the way you typically use Facebook, interacting

23  with strangers?

24  A.  No.

25  Q.  Typically on Facebook you're interacting with family

1  members and friends, people you actually know?

2  A.  I interact with everyone.

3  Q.  And by "everyone," you mean everybody you're connected to

4  but also strangers?  I'm just trying to clarify how you're

5  using Facebook in the years after you moved out.

6  A.  Family, friends, people.

7  Q.  Okay.  So -- but you did also interact with family

8  members; is that true?

9  A.  Yes.

10  Q.  You did interact with your father Keith Parnell on

11  Facebook as well; right?

12  A.  Yes.

13  Q.  When you interacted with Keith Parnell, that happened on a

14  pretty regular basis, didn't it?

15  A.  Yes, for a while.

16  Q.  You say for a while because there was some point where you

17  say you cut off contact with Keith Parnell; is that what

18  you're saying?

19  A.  Yes.

20  Q.  And that was in 2020?

21  A.  Yes.

22  Q.  But from 2012 when your first daughter was born while you

23  were a senior in high school and 2020, you were interacting

24  pretty regularly with Keith Parnell on Facebook?

25  A.  I suppose so, yes.

1   Q.   As we go through the many posts that there are from

2   Facebook, would there have been posts where you were telling

3   Keith Parnell that you love him?

4   A.   Probably.

5   Q.   Wishing him happy birthday?

6   A.   Probably.

7   Q.   Wishing him Happy Father's Day?

8   A.   Yes.

9   Q.   Since I'm on the subject of birthdays, you didn't just

10  interact with Keith Parnell on Facebook on his birthday but

11  you actually hosted his birthday party; isn't that right?

12  A.   Can you clarify what you're talking about?

13  Q.   Between 2012 and 2020, did you ever host a birthday party

14  for Keith Parnell, your father?

15  A.   At the moment I don't recall that.

16  Q.   There was never one year that you had a birthday party for

17  Keith Parnell at the home?

18  A.   At the moment I don't recall that.

19  Q.   Right now your testimony is you don't recall ever having

20  had a birthday party for Keith Parnell at your home?

21        MS. REININGER:   Your Honor, it's been asked and

22  answered.

23        THE COURT:   I'll take an answer and then we'll move

24  on.

25  A.   At this moment in time I can't remember.

1  Q.  (BY MR. HASSE) Do you recall Keith Parnell posting on June

2  12th of 2014 that he had had a bad day at work and you

3  commenting to encourage him and tell him that you love him?

4  A.  I don't recall it but I'm sure I did.

5  Q.  And the same -- the same thing on October 23rd of 2015,

6  again him expressing a bad day at work, you offering him

7  encouragement and telling him you love him publicly on

8  Facebook, that would not surprise you for us to show you that;

9  right?

10  A.  Yeah.  I'm sure I did.

11  Q.  Did Keith Parnell ever post happy birthday wishes to you

12  and your sister?

13  A.  I'm sure he did.

14  Q.  Did you ever interact with those posts?

15  A.  I'm sure I did.

16  Q.  Now, in the time leading up to 2020 it sounds like -- is

17  it fair to say that your relationship with your dad Keith

18  Parnell was getting more strained?

19  A.  Yeah.  The older Serenity got, the more strained it got.

20  The more I saw myself at that age and wondering how somebody

21  could do that.  I couldn't imagine my child going through that

22  and I couldn't imagine doing that to my child.

23  Q.  So in 2019 how did you celebrate Keith Parnell's

24  birthday?

25  A.  When?

1  Q.  In 2019 how did you celebrate Keith Parnell's birthday?

2  A.  I literally don't remember.  We have birthday parties at

3  my house, Kayla's house, Kelsey's house.

4  Q.  Is it possible that you bought him tickets for you and him

5  to a rock concert with Motley Crue, a band that he likes, and

6  took him there as a birthday present?

7  A.  What year was that?

8  Q.  2019?

9  A.  No, that wasn't in 2019.

10  Q.  What year do you believe that was?

11  A.  I think 2015, 2016.

12  Q.  Right now I'm showing you Defendant's Exhibit 24.  Can you

13  identify the people in that photo?

14  A.  Serenity and my dad.

15  Q.  Where was that taken?

16  A.  I couldn't tell you.  I don't know.

17  Q.  Serenity is very young in this photo.  Is it possible that

18  that could have been taken at your home?

19  A.  It's possible.

20  Q.  So leading up to 2020 you started posting more frequently

21  on both TikTok and Instagram; is that correct?

22  A.  I started using those more, yes.

23  Q.  That was around the time that you had developed some

24  enthusiasm for sort of a new hobby, tattoo art; is that fair?

25  A.  I can't remember when I got my first tattoo but it's 2019,

1    2020 maybe.

2    Q.  Well, like a lot of young people you were feeling

3    enthusiastic about it, you started posting about tattoos that

4    you liked, tattoos that you got and that sort of thing; is

5    that accurate?

6    A.  Yes.  I like tattoos.

7    Q.  You were increasingly interacting with people on Instagram

8    and TikTok that were strangers, people that you didn't know;

9    is that true?

10   A.  Yes.

11   Q.  So about the same period of time where you were posting on

12   these websites more often, your relationship was getting more

13   strained with Keith Parnell?

14   A.  That doesn't go hand-in-hand.  It has nothing to do with

15   one or the other.

16   Q.  Okay.  I understand it's your testimony that those two

17   things are related, but the time periods are the same time

18   period; is that true?

19   A.  Can you repeat the question?

20   Q.  Yes.  About the same time period where you were posting

21   more and interacting with people on TikTok and Instagram, that

22   was about the time period where you and your father were

23   drifting apart, getting into 2020?

24   A.  I've always interacted with people on social media.

25   Q.  So your social media activity didn't change whatsoever

1   from 2018, 2019 and 2020?  Is that your testimony?

2   A.  I mean it's grown.  The more tattoos I've gotten, it's

3   grown.  The more I've shared about my fitness journey it's

4   grown.

5   Q.  Sure.  You were interacting with people on the internet

6   with about other topics other than tattoos.  Fitness for

7   example; is that right?

8   A.  Yeah.

9   Q.  You're into boxing; is that true?

10  A.  Yes.

11  Q.  And you share with people on TikTok about the boxing and

12  how you -- and fitness, that sort of thing?

13  A.  Yes.  It's an outlet.

14  Q.  Sure.  And over that period of time your posts about these

15  types of things were increasing in 2019; is that true?

16  A.  I just started my boxing in -- a year ago.

17  Q.  Okay.  You also were posting about application of makeup

18  and these types of things; is that true?

19  A.  I'm sure.  I post a lot of things.

20  Q.  Sure.  Wasn't just for family and friends but it was for

21  just the public in general, for people that might be

22  interested?

23  A.  Social media, yes.

24  Q.  Thank you.  Now, at some point in 2020, in fact in August

25  of 2020, you told Kelsey that your father Keith Parnell raped

1  you; is that true?

2  A.  I don't remember the exact month, but, yes, in 2020 is

3  when I told her.

4  Q.  And it was not long before she posted on Facebook claiming

5  that Keith Parnell had abused her too; is that right?

6  A.  Yes.  That is probably a couple of days or a week before.

7  Q.  Did you ever see that post on Facebook?

8  A.  My boyfriend told me to go look at it.  I only read maybe

9  a few lines of it before I already knew what it was about.

10 Q.  Right.  Did you ever visit the post later and read the

11 whole thing?

12 A.  I don't recall reading the whole thing, no.

13 Q.  You do recall what happened after the Facebook post

14 happened, people were getting in contact with you; is that

15 true?

16 A.  Yes.

17 Q.  People were expressing -- sorry, let me take that back.

18      You were getting tagged on that post, meaning that people

19 were indicating that you were related to that post.  So when

20 you would log on Facebook, you would get notifications

21 relating to that post; is that true?

22 A.  I don't remember being tagged.

23 Q.  Were you getting notifications about any of this?

24 A.  I don't remember getting notifications about it.

25 Q.  When you met with law enforcement sometime later, they had

1   asked you not to share any information about the ongoing case

2   with others, including social media; is that true?

3   A.  Later in the case, yes, they said do not share details.

4   Q.  But you did share some information about the ongoing case

5   on social media; is that true?

6   A.  Yes, but I didn't share details about what was in the

7   case.

8   Q.  When you started posting on -- let me take a step back.

9   Did you ever post on TikTok about your case?

10   A.  About having a trial, yes, and about being sexually

11   abused, yes.

12   Q.  Before any of those posts you were -- and you were

13   sometimes posting about tattoos, sometimes posting about

14   makeup, sometimes posting about other things before that; is

15   that correct?

16   A.  A lot of things, yes.

17   Q.  On TikTok you can see the number of times your videos have

18   been viewed; is that true?

19   A.  Yes.

20   Q.  You can see the number of times that it's been liked or

21   approved of; is that right?

22   A.  Yes.

23   Q.  And thank you for waiting for me to finish.

24      Now, you mentioned that you made a post on TikTok about

25   going to trial?

1    A.   Yes.

2    Q.   Okay.  How many views did that video get?

3    A.   What video are you talking about?

4    Q.   The video that you just mentioned, the video on TikTok

5    about going to trial.

6              MS. REININGER:   Objection, Your Honor, relevance.

7              THE COURT:   What's the relevance?

8              MR. HASSE:   Sidebar?

9              THE COURT:   Sure.

10       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

11   THE PRESENCE AND HEARING OF THE JURY:)

12             MR. HASSE:   So, the relevance is it's been brought

13   into the case how there's no reason that they would ever make

14   those claims because it's so painful to go through this

15   process.  In fact she in a -- what I briefly wanted to get to

16   is that she's got a ton of positive feedback as was stated by

17   the twin sister.

18             THE COURT:   Yeah.  I understand.

19        Anything else?

20             MS. REININGER:   No.

21             THE COURT:   I'll overrule the objection and allow

22   the testimony.

23       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

24   THE PRESENCE AND HEARING OF THE JURY:)

25   Q.   (BY MR. HASSE) Do you need me to repeat the question?

1  A.  Yes.

2  Q.  Sure.  The posts that we were discussing -- well, let me

3  make sure we're talking about --

4         MR. HASSE:  Will you publish that to the jury?

5         DEPUTY COURT CLERK:  Which exhibit?

6         MR. HASSE:  Exhibit 20.

7  Q.  (BY MR. HASSE) Okay.  Do you -- I'm showing you now just a

8  pause point in Defendant's Exhibit 20.  Can you tell me what

9  that is?

10  A.  Yes.  I made a video about how we've been slandered, about

11  how our family has turned against us.

12         MR. HASSE:   Move to strike.  That wasn't my

13  question.

14  Q.  (BY MR. HASSE) Do you recognize that?  Is that you?

15  A.  Yes.

16  Q.  Okay.  How many views did this video get?

17  A.  A lot.

18  Q.  When you say "a lot," you mean more than two million; is

19  that right?

20  A.  I don't know exactly how many.  I know it was really,

21  really high, yes.

22  Q.  You've -- well, you shared with other people how many it

23  had got, isn't that true?

24  A.  Yeah.  But then the numbers change so I don't know.

25  Q.  But when the number changes, it only goes up; isn't that

1   true?

2   A.   Right.   But at the time I don't remember exactly how many.

3   It was probably one or two million views.

4   Q.   Millions of views.   Now, that's not the same as likes, I

5   understand, so how many likes on this video last you had

6   checked?

7   A.   I don't know.

8   Q.   Hundreds of thousands; isn't that true?

9   A.   I literally don't know how many likes or comments are on

10  there.   I can't tell you how many times it was shared.   I

11  can't tell you how many times it was viewed.   I can't give you

12  an accurate answer.

13  Q.   In all of the hundreds of videos that you had posted

14  before you posted this one, none of them exceeded 1,000 views;

15  isn't that true?

16  A.   That's not true.

17  Q.   Some of them exceeded 1,000 views?

18  A.   Yes.   I've had videos go 21,000 views, 17,000 views.   I've

19  had multiple.

20  Q.   And you know that because you check the number of views

21  that you get on your videos; is that true?

22  A.   At the time I saw the numbers.

23  Q.   Thank you.

24  A.   Just like at the time I saw the numbers on this one.

25  Q.   So is it fair to say that you've gotten a lot of positive

1  feedback for these posts that you put up talking about what

2  happened to you?

3  A.    Yes.

4  Q.  Okay.

5         MS. REININGER:  You can leave that up.

6                    REDIRECT EXAMINATION

7  BY MS. REININGER:

8  Q.    Jasmine, counsel had asked you why you made this video,

9  and I don't recall if you were able to fully answer so I'm

10  going to ask you now for the jury.  Can you explain to this

11  jury why you made this TikTok video that is depicted in, I

12  believe, Defense Exhibit Number 20?

13  A.  Is there any way to play the video?

14         MS. REININGER:  Your Honor, at this time I would

15  move to publish the Defense Exhibit 20 in its entirety if the

16  Court will allow.

17     Do you have that available?

18         MR. HASSE:   Yeah.  I -- so --

19     (OFF THE RECORD DISCUSSION WAS HAD)

20         THE COURT:  All right.  So it's offered in its

21  entirety.  Any objection?

22         MR. HASSE:   No objection, Your Honor.

23         THE COURT:  I'll admit it.  We'll clean up later how

24  to make a record.

25         MS. REININGER:  Okay.  Thank you.

1          (DEFENDANT'S EXHIBIT 20 PLAYED FOR THE JURY)

2    Q.   (BY MS. REININGER) So I'll ask you again, Jasmine, can you

3    explain to the jury why you made this TikTok video?

4    A.   When I came across that sound, it felt extremely

5    empowering to me because we've had so much family turn against

6    us for speaking on this.  Our names have been slandered.

7    We've been called liars.  Our brothers and sisters have turned

8    against us.  My kids have even suffered because they don't get

9    to see their cousins anymore and they used to be really close.

10   Q.   So why make the video?

11   A.   I wanted to share it.  I felt like I was speaking about

12   what happened to me.  In a way it was kind of like taking my

13   power back because I'm not silenced anymore.

14   Q.   And people saw the video?

15   A.   Yes.

16   Q.   And it sounds like there were quite a few people that saw

17   the video.

18   A.   Yes.

19   Q.   Jasmine, did you post this video so that you could be a

20   TikTok star?

21   A.   No.  I had no idea it would go viral.  I didn't know that

22   there were so many people that went through the same things

23   that we went through.

24   Q.   Did you post this video or create this video so that you

25   could get attention?

271

1    A.   No.

2            MR. HASSE:   Objection, leading.

3            THE COURT:   I'll ask that you ask open-ended

4    questions.   I'll leave the answer in but a yes or a no

5    question, not so much.

6    Q.   (BY MS. REININGER)  The statements that are in this video,

7    did you write them?

8    A.   Yes.

9            MS. REININGER:   I'll pass the witness.

10                        RECROSS-EXAMINATION

11   BY MR. HASSE:

12   Q.   You didn't just write the statements, Ms. Parnell, you

13   generated the video, you created this video; correct?

14   A.   Yes.  You have to put in like typing.

15   Q.   So, yes, you attached the video that you made that you

16   shot to the music; is that true?

17   A.   I can't --

18   Q.   Nobody else did that?

19   A.   I'm sorry?

20   Q.   Nobody else did that?  It was you personally, there wasn't

21   somebody else who came in and produced this video?

22   A.   No.  I made the video.

23   Q.   And as you just stated, you attached the words, those are

24   your words that you wrote; is that right?

25   A.   Yes.

1  Q.  You say in those words that you attached to the video that

2  you produced that your life has been threatened.  But it's not

3  true, nobody threatened your life over this?

4  A.  I didn't put that anybody threatened my life.

5  Q.  Thank you for clarifying.

6  A.  Threatening to ruin my life and threatening my life are

7  two completely different things.

8  Q.  I understand.  So it's your contention that you've had --

9  "they," is -- somebody is threatening to ruin your life?

10  A.  Yes.

11          MR. HASSE:  Thank you.  Nothing further.

12          MS. REININGER:  I ask that she be excused, Your

13  Honor.

14          THE COURT:  You can step down.  Thank you for coming

15  in.

16          MS. DIAL:  The government calls Jennifer Parnell,

17  Your Honor.

18          DEPUTY COURT CLERK:  Ms. Parnell, if you'll come

19  forward right here, I'll swear you in.  Thank you.

20      Would you please raise your right hand.

21      (WITNESS SWORN)

22          DEPUTY COURT CLERK:  Thank you.  You can go ahead

23  and have a seat in that chair right over there and you can

24  adjust the microphone.

25          THE COURT:  Good afternoon.  Thank you for coming

1    in.  There's some water there for you if you need it.

2             THE WITNESS:  Okay.

3                        JENNIFER PARNELL,

4    having been called as a witness, after being first duly sworn,

5    testified as follows:

6                        DIRECT EXAMINATION

7    BY MS. DIAL:

8    Q.  Good afternoon.

9    A.  Hello.

10   Q.  Could you please state your name and spell your last for

11   the record.

12   A.  Jennifer Parnell, P-a-r-n-e-l-l.

13   Q.  Ms. Parnell, I would like to go over your background to

14   start off.  So first off, can you tell us where you're from?

15   A.  Pryor, Oklahoma.

16   Q.  Have you lived there your whole life?

17   A.  Most of my life, yes.

18   Q.  Where else have you lived?

19   A.  Tahlequah, Peggs.  We've moved around.

20   Q.  Did you go to school?

21   A.  Yes.

22   Q.  Where did you go to school?

23   A.  Pryor High School and Antlers High School.

24   Q.  You're here to testify today in the United States' case

25   against Keith Parnell; correct?

1  A.  Yes.

2  Q.  How do you know Keith Parnell?

3  A.  He's my ex-husband.

4  Q.  When did you meet him?

5  A.  January of '91.

6  Q.  Where did you meet him?

7  A.  A friend introduced me to him.

8  Q.  Did you two start dating right away?

9  A.  Yes.

10  Q.  And did you -- how long after that did you get married?

11  A.  June of 1997.

12  Q.  Did you have any children with him?

13  A.  Five.

14  Q.  Can you tell us their names and their ages?  Or let's go

15  with the year they were born.

16  A.  Yeah.  That's a lot.  Kelsey Blaylock 1/28/93.  Jasmine

17  Parnell, 1/28/93.

18  Q.  Those two are twins; right?

19  A.  Yes.

20     Kayla Parnell, 12/20/93.  Branden Parnell, 12/22/96.  And

21  Brice Parnell, 9/6/95.

22  Q.  '95 you said?

23  A.  Yes.

24  Q.  Brice was '95 and Branden was?

25  A.  '96.

1    Q.   And then you two were married in '97?

2    A.   '97, yes.

3    Q.   So when were you done having children?

4    A.   '95.

5    Q.   '95, '96?

6    A.   '96.  I'm sorry.

7    Q.   Was there any particular reason you were done having

8    children?

9    A.   I was having medical problems.

10   Q.   Can you tell us what those were?

11   A.   I was having a lot of -- well, it wasn't until 2000.  I

12   had a hysterectomy.

13   Q.   When did you have a hysterectomy?

14   A.   September of 2000.

15   Q.   Did the hysterectomy impact your relationship with the

16   defendant?

17   A.   Yes.

18   Q.   How?

19   A.   I had a total hysterectomy so I had no hormones.  I

20   already had fibromyalgia and I have thyroid problems, I've got

21   Hashimoto's hypothyroidism, so all of it caused problems.  The

22   reason for my hysterectomy was I had cancer cells.

23   Q.   So you said the hysterectomy impacted your relationship

24   with the defendant?

25   A.   Yes.

1    Q.   You had no hormones.

2    A.   Right.

3    Q.   So how did it impact your relationship with him?

4    A.   A lot of fighting.  There was no sexual relationship much

5    anymore.

6    Q.   "No sexual relationship much anymore."  How often do you

7    think that you would have sex?

8              MR. HASSE:  Pardon me.  I'm going to object on

9    relevance.

10             THE COURT:  Why don't we meet at the side.

11       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

12   THE PRESENCE AND HEARING OF THE JURY:)

13             THE COURT:  What's the line of questioning going to

14   take us to?

15             MS. DIAL:  Just getting to the breakdown of their

16   relationship.  She starts working outside the home and they're

17   not having sex.  He's -- and this is about the time that he

18   begins sexually abusing the girls.

19             THE COURT:  What was the year of the first

20   alleged -- I don't remember the year of the first alleged --

21             MS. REININGER:  1998.

22             THE COURT:  19 --

23             MS. REININGER:  '98.

24             THE COURT:  -- '98.  Your --

25             MS. DIAL:  I can move on.  I'm not planning to

1    spending much more time on this, Your Honor.

2           THE COURT:  Because we've all been trying to keep

3    their marital trouble out of the case.

4           MS. DIAL:  We're not going to get into the affair.

5    The point was she just stopped having -- their sexual

6    relationship declined as his abuse of the girls began and then

7    it stopped, their relationship stopped in 2000, then he was

8    abusing the girls consistently at that point.  But I'm going

9    to move on.

10           THE COURT:  Okay.  Fair enough.  Thanks.

11        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

12    THE PRESENCE AND HEARING OF THE JURY:)

13    Q.  (BY MS. DIAL) Let's talk about -- you said that the

14    relationship wasn't great, there was some fighting; right?

15    A.  Right.

16    Q.  Did the fighting occur around the children?

17    A.  Yes.

18    Q.  I want to talk about the houses that you-all lived in.  Do

19    you remember the first house that you lived in with the

20    defendant?

21    A.  When we had the kids?

22    Q.  Yeah.

23    A.  I'm not sure.

24    Q.  Okay.  How about -- I'm going to direct your attention to

25    Government's Exhibit Number 1 which has been previously

1    admitted.

2              MS. DIAL:  If we could publish that.

3    Q.  (BY MS. DIAL) Do you recognize the house in this photo?

4    A.  Yes.

5    Q.  How do you recognize it?

6    A.  We lived in that house.  Do you need the address?

7    Q.  Yes, if you know the address.

8    A.  I believe it was 902 Southeast 22nd.

9    Q.  Okay.  Give me just a second.  Does 904 sound correct?

10   A.  It was 902 or 904.

11   Q.  And what city is this in?

12   A.  Pryor.

13   Q.  Do you know what year you moved into this house?

14   A.  I want to say '99.  I'm pretty sure.

15   Q.  You think '99?

16   A.  Yes.

17   Q.  How many rooms were in this house?

18   A.  Three bedroom.

19   Q.  Where did you and the defendant sleep?  Did you share a

20   room?

21   A.  Yes.  Yes.

22   Q.  So how did you split up the other two rooms?

23   A.  The boys were in one room and the girls were in the other

24   room.

25   Q.  Do you recall how long you lived at this 9 -- or at this

1    residence on 22nd Street?

2    A.   Maybe a year.

3    Q.   I'm showing you what's been previously admitted as

4    Government's Exhibit Number 2.  Do you recognize this?

5    A.   Yes.

6    Q.   What is this?

7    A.   It's a house in Pryor, 501 North Taylor, Lot 135.

8    Q.   Is this a house you lived in with the defendant?

9    A.   Yes.

10   Q.   Did your five children live here too?

11   A.   Yes.

12   Q.   Do you recall how many bedrooms were in this?

13   A.   Two.

14   Q.   Do you recall what years you lived here?

15   A.   2001.

16   Q.   Was there actually another residence in between the one

17   and two?

18   A.   Yes.

19   Q.   So we have house Number 1 that you lived in approximately

20   1999 for about a year; is that right?

21   A.   I think so.  Pretty close to a year, yes.

22   Q.   Then you moved to a different house?

23   A.   Uh-huh.

24   Q.   And then moved to Government's Exhibit Number 2?

25   A.   Yes.

1   Q.   And you think that was approximately 2001?

2   A.   It was.

3   Q.   It was.   You're pretty sure about that?

4   A.   Yes.

5   Q.   Why do you recall living there in 2001?

6   A.   I had a sinus surgery when we lived there.

7   Q.   So you lived there in 2001.   Do you remember how long

8   you-all lived there?

9   A.   Maybe a year.

10  Q.   Two bedrooms?

11  A.   Yes.

12  Q.   So where would the kids all sleep?

13  A.   They all slept in one room together.

14  Q.   Did you guys have a living room in this house?

15  A.   Yes.

16  Q.   With a couch?

17  A.   Yes.

18  Q.   Did the children ever sleep on the couch?

19  A.   Yes.

20  Q.   Who would sleep on the couch?   One in particular?

21  A.   They would take turns.   Kelsey would, the boys would.

22  Q.   When they were in their bedroom, what were they sleeping

23  on?

24  A.   The floor.

25  Q.   Do you remember when you moved out of this residence?

1   A.   2002.

2   Q.   So you lived here 2001 to about 2002.  I'm showing you

3   what's been previously admitted as Government's Exhibit Number

4   3.  Do you recognize the photograph or the house in this

5   photograph?

6   A.   Yes.

7   Q.   Is this another house that you lived at?

8   A.   Yes.

9   Q.   Do you know the address?

10  A.   214 South Indianola.

11  Q.   Is this also in Pryor?

12  A.   Yes.

13  Q.   Could it have been 116?

14  A.   It might have been.  That's been a lot of years ago.

15  Q.   Okay.  So you don't recall the house number on this one,

16  but you just know it was on South Indianola?

17  A.   It was either 116 or 114.

18  Q.   Okay.  Do you remember when you moved into this one?

19  A.   We moved out of it from the one you showed before so...

20  Q.   About 2002?

21  A.   Yes.

22  Q.   How many bedrooms were in this house?

23  A.   Two.

24  Q.   Did the kids all share again?

25  A.   Yes.

1   Q.  Did you have a couch in this house?

2   A.  Yes.

3   Q.  Did the kids ever sleep on the couch?

4   A.  I'm sure they did.  They slept in the floor too so...

5   Kids.

6   Q.  All five -- all five kids?

7   A.  Yes.

8   Q.  Slept on the floor?  Sorry.  Is that what you said?

9   A.  Yes.

10  Q.  So they were allowed to sleep on the couch?  That was

11  fine?

12  A.  Yeah.  Yes.

13  Q.  Do you recall how long you lived in the Government's

14  Exhibit 3, that house?

15  A.  It was close to a year.

16  Q.  And you moved out of that one; right?

17  A.  Yes.

18  Q.  I'm showing you what's been marked as Government's Exhibit

19  Number 4.  Do you recognize this?

20  A.  Yes.

21  Q.  Is this the next house that you moved into?

22  A.  There was a friend we stayed with between then, because

23  this last house we rented, they had rented it out already

24  because we gave our notice because we bought this house.  So

25  we had to stay with her for maybe a month until it was all --

1  Q.  You said the last house you rented, is that Government's

2  Exhibit 3?

3  A.  Yes.

4  Q.  So you were renting 3 and then buying Government's Exhibit

5  4?

6  A.  Yes.

7  Q.  What year did you buy the house in Government's Exhibit

8  4?

9  A.  2003.

10 Q.  Do you remember the address for this residence?

11 A.  729 East 460, Pryor.

12 Q.  And how many rooms were in this house?

13 A.  Three.

14 Q.  So how did you-all divide up the rooms?

15 A.  The boys had a room and the girls had a room.

16 Q.  Was there a master bedroom in this --

17 A.  Yes.

18 Q.  -- house?

19     Okay.  Were you in the master bedroom the whole time or

20 did people ever rotate rooms?

21 A.  No, we were in the master bedroom.

22 Q.  You were in there the whole time?

23 A.  Yes.

24 Q.  The three girls never got the master bedroom?

25 A.  I had tried that but not that I can remember.  It was a

1  problem to let them have that room.

2  Q.  So you let them have it for a little bit?

3  A.  I don't remember.

4  Q.  Okay.  You said you tried it and it was a problem?

5  A.  Yes.

6  Q.  So then you took it back?

7  A.  Yes.

8  Q.  At some point while you were all living here did you kick

9  the defendant out of the house?

10  A.  Yes.

11  Q.  He left and you and the kids stayed at this house?

12  A.  Yes.

13  Q.  Would the kids sometimes go visit him at his other

14  place?

15  A.  Yes.

16  Q.  And then sometime later you let the defendant move back

17  into this house; is that right?

18  A.  Yes.

19  Q.  Do you remember how long you-all lived -- that you and the

20  children lived at the 729 East --

21  A.  We had to move.

22  Q.  When did you have to move?

23  A.  Well -- actually let me back up.  We lived there -- it's

24  hard for me to remember dates.  I want to say maybe a month

25  before he moved back in.

 1  Q.  Maybe a month before he moved back in what?

 2  A.  I'm sorry, I didn't hear you.

 3  Q.  I think we're a little bit confused.

 4  A.  Okay.

 5  Q.  So let me see if I can clarify.

 6  A.  Yes.

 7  Q.  I think I'm confused. Let me clarify this.

 8      So when did you and the children move out of Number 4,

 9  this picture?

10  A.  I moved out with them first.  There was a couple of

11  times.

12  Q.  Okay.

13  A.  And then I came back and then he moved out later.

14  Q.  So at what point -- do you recall the year that the whole

15  family moved out of this house and did not come back?

16  A.  2008.

17  Q.  Thank you.  So it sounds like from 2003 to 2008 people

18  are -- you and the defendant are kind of moving in and out?

19  A.  Yes.

20  Q.  All right.  But this remained the family residence where

21  the children were during that time period?

22  A.  Right.

23  Q.  Thank you.  I'm showing you Government's admitted Exhibit

24  Number 5.  Do you recognize this?

25  A.  Yes.

1  Q.  What is this one?

2  A.  His house he rented.  I don't know the address.

3  Q.  You don't know the address.  Is this the house that when

4  you kicked him out, he moved into?

5  A.  Yes.

6  Q.  Thank you.  Now, showing you Government's admitted Exhibit

7  Number 6.  Do you recognize this one?

8  A.  Yes.

9  Q.  Is this one of the houses that you lived in?

10  A.  Yes, 321 North Mayes.

11  Q.  Is that -- what city is that in?

12  A.  In Pryor.

13  Q.  Who all lived at this residence?

14  A.  All of us.

15  Q.  Who do you mean by "all of us"?

16  A.  Me and him and the kids.

17  Q.  All five kids?

18  A.  Yes.

19  Q.  Do you remember how many rooms were in this house?

20  A.  Three.

21  Q.  Is this one the one you moved into after you left the

22  prior one in 2008?

23  A.  Yes.

24  Q.  So did you move into this one about 2008?

25  A.  Yes.

1   Q.  Do you recall how long you lived in this house?

2   A.  Maybe two years I think.

3   Q.  There's one other thing I wanted -- I meant to clarify

4   with you on these houses and then we're going to backtrack in

5   time a bit.

6       So going back to Number 4, was there a lake near this

7   house.

8   A.  A what?

9   Q.  A lake.

10  A.  Yes.

11  Q.  What lake was near this house?

12  A.  Hudson.

13  Q.  Did you-all go out to the lake very often?

14  A.  Yes.

15  Q.  How often would you try to go out there?

16  A.  We would try to go every weekend.

17  Q.  About how far was the lake?

18  A.  Three miles.

19  Q.  How long did it take you to get out there?

20  A.  Twenty minutes maybe.

21  Q.  You would all go out as a family or something else?

22  A.  A lot of times the girls didn't want to go.  They were

23  junior high so they didn't want to do that but they would go

24  sometimes.

25  Q.  When you-all would go to the lake, what types of

```
 1   activities would you do?
 2   A.  We would fish and like eat.
 3   Q.  Do you remember ever going out on a boat or going fishing
 4   or swimming or anything like that?
 5   A.  No, not then.
 6   Q.  Could the family have done that when maybe you were at
 7   work?
 8           MR. HASSE:  Objection, leading.
 9   A.  Yes, they could have.
10           THE COURT:  Sorry.
11           MS. DIAL:  Wait just a minute.
12           THE COURT:  I'll allow the question.
13   A.  Oh, my mom and stepdad had a pontoon boat and we did go
14   out on it with them, but we didn't have a boat then, not at
15   this house.
16   Q.  (BY MS. DIAL) Understood.  So other family members had a
17   boat?
18   A.  Yes.
19   Q.  Thank you for correcting me.
20       All right.  Now that we've kind of gone over all of the
21   houses, I want to step back just a little bit.  So let's go
22   back to Government's Exhibit 1, the first house that we're
23   talking about here.  Do you remember what grade Kelsey and
24   Jasmine were in when you-all lived in this house?
25   A.  First.  Kindergarten or first.  I'm pretty sure
```

1   kindergarten.

2   Q.   Did Kelsey and Jasmine -- did anything ever happen at

3   school that kind of messed up their grades?  Like messed up

4   their progression in moving on to the next grade?

5   A.   They were held back in first grade.

6   Q.   When they were held back in first grade, did that mean

7   they were in the same grade as any other siblings?

8   A.   Yes, Kayla.

9   Q.   So Kayla, Kelsey and Jasmine were all in the same grade?

10  A.   Yes.

11  Q.   When you were living in this house, do you -- were you

12  working at this time?

13  A.   Yes.

14  Q.   Do you remember where you were working?

15  A.   I had a paper route.  I worked at Walmart and I had the

16  Tulsa World paper route.

17  Q.   What time was your paper route?

18  A.   One was in the afternoon and one was in the middle of the

19  night.

20  Q.   So what time would you leave for the paper route in the

21  middle of the night?

22  A.   It had to be around 1:00 or 2:00 is when they would come

23  out.

24  Q.   That's when you would leave?

25  A.   Uh-huh.

1    Q.  What time would you usually get home?

2    A.  Probably 5:00.

3    Q.  And then you said you had a paper route during the day?

4    A.  Yes.

5    Q.  When would you do that one?

6    A.  In the afternoon.

7    Q.  Approximately what times?

8    A.  2:00 or 3:00.

9    Q.  Until about when?

10   A.  5:00.  A couple of hours.

11   Q.  You said you also worked at Walmart?

12   A.  Yes.

13   Q.  What did you do at Walmart?

14   A.  I was a cashier.

15   Q.  Do you recall the hours you worked at Walmart?

16   A.  It was in the morning, like 7:00 to -- sometimes it was

17   6:00 to 1:00 or 2:00.

18   Q.  When you would be gone at work, where were the five

19   kids?

20   A.  Home.

21   Q.  Who was watching them?

22   A.  He was.

23   Q.  Who is "he"?

24   A.  Keith.

25   Q.  You actually kind of pointed with your face I think to the

1    side of me.  Do you see Keith here in the courtroom today?

2    A.  Yes.

3    Q.  Where is he?

4    A.  He's sitting over there.

5    Q.  Can you describe an article of clothing that he's wearing?

6    A.  A black shirt.  I can't see that far hardly so it's --

7              MS. DIAL:  If the record could reflect she's

8    identified the defendant.

9              THE COURT:  Correct.

10   Q.  (BY MS. DIAL) While we're talking about him, do you know

11   the defendant's date of birth?

12   A.  5/27/72.

13   Q.  Thank you.  So while you were gone working these three

14   jobs, the kids would stay home with the defendant; right?

15   A.  Yes.

16   Q.  During the course of your relationship did you -- was it

17   common for you to work multiple jobs?

18   A.  Yes.  The Tulsa World paper route didn't last very long

19   because it was too hard for me to do three jobs.

20   Q.  Which one was the Tulsa World one?

21   A.  Overnight.

22   Q.  How long do you think you probably did that one?

23   A.  I probably did it for probably six months.

24   Q.  Then when you had other jobs in the future, did you ever

25   leave the kids, did you get a babysitter?

1    A.   No, they stayed with Keith.

2    Q.   The kids always stayed with Keith?

3    A.   Uh-huh.

4    Q.   At some point he got a job too; right?

5    A.   Yes.

6    Q.   And would you two just alternate working and watching the

7    kids?

8    A.   He worked shift work so, yes.  Or I took the kids with

9    me.

10   Q.   You would take the kid with you where?

11   A.   On the paper route.

12   Q.   Do you recall -- so I want to direct your attention to --

13   I'm going to back up.

14        You and the defendant shared a room, that's what you

15   said?

16   A.   Yes.

17   Q.   Do you recall ever waking up and the defendant not being

18   in bed?

19   A.   Yes.

20   Q.   Can you tell us about that time?

21   A.   I would wake up and he wouldn't be in bed so I would get

22   up and go in the living room and Kelsey was laying on the bed

23   or the couch and he was down on the floor beside her.  And I

24   asked him what he was doing.  I kind of was hateful because I

25   said, "she's got to go to school tomorrow," and he said he was

1    just talking to her.

2    Q.  Was that just one time or did it happen more than one

3    time?

4    A.  It was more than one time.

5    Q.  That you would walk out and he would be with Kelsey or

6    other places?

7    A.  Kelsey.

8    Q.  Was she always asleep on the couch or --

9    A.  Not always.  She would be asleep on the couch and then it

10   was just her.

11   Q.  Okay.  Did you think anything was going on?

12   A.  No.

13   Q.  What would the defendant say when you would say "leave her

14   alone, she's got school?"

15   A.  "Okay.  I was just talking to her."

16   Q.  And would he come right back to bed then normally?

17   A.  A few minutes later.

18   Q.  So you would leave and go back to bed?

19   A.  Yes.

20   Q.  You left him there with her?

21   A.  Yes.

22   Q.  And then he would come back?

23   A.  Yes.

24   Q.  You said more than one time.  How many times approximately

25   do you think?

1    A.   Two or three.

2    Q.   Do you recall the time period when this was happening?

3    A.   No.

4    Q.   Do you remember which house?

5    A.   Mayes Street.

6    Q.   You know these houses a lot better than I do so I'm

7    looking at my list again for which one is Mayes Street.  Are

8    you talking about Government's Exhibit 6?

9    A.   Yes.

10   Q.   Okay.  So it was here that you recall coming out a few

11   times?

12   A.   Yes.

13   Q.   I think at that point you said that there were three

14   bedrooms in that house?

15   A.   Yes.

16   Q.   But Kelsey would still sometimes sleep on the couch?

17   A.   Yes.

18   Q.   Why would she do that?

19   A.   I have no idea.

20   Q.   Okay.  Do you recall -- were there any other times where

21   you were suspicious that anything -- that something was going

22   on?

23   A.   With any of the kids?

24   Q.   I want you to focus on Jasmine and Kelsey.

25           MR. HASSE:  I just object, vague.

1            THE COURT:  What's that?

2            MR. HASSE:  Object.  Objection, vague.  If we could

3   clarify what we're talking about here.

4            THE COURT:  I'm sorry?

5            MR. HASSE:  Anything.  It's very broad.

6            THE COURT:  Why don't we start with a new

7   question.

8            MS. DIAL:  Yes.

9   Q.  (BY MS. DIAL) Jasmine and Kelsey lived with you up until

10  their late teens; right?

11  A.  Yes.

12  Q.  During the time period that they were living with you, did

13  you ever have any concerns that the defendant was sexually

14  abusing Jasmine or Kelsey?

15  A.  No.

16  Q.  You woke up and he would be gone, he would be with them?

17  A.  Yes.

18  Q.  And you weren't concerned anything was happening?

19  A.  No.  I believed he was talking to her.

20  Q.  Now, at some point Kelsey told you what was going on,

21  didn't she?

22  A.  This was after we were split up.

23     Do I keep going or --

24            THE COURT:  I think you answered the question.

25            MS. DIAL:  Yes.

1    Q.   (BY MS. DIAL) Do you remember how old Kelsey was?

2    A.   Sixteen.

3    Q.   What did Kelsey tell you?

4    A.   She told me he stuck his hand down her panties and --

5    Q.   What did you do?

6    A.   When she told me that, I went straight to his house and I

7    asked him about it.

8    Q.   And what did he say?

9    A.   He said he thought it was me, that he didn't mean to, and

10   he started crying.

11   Q.   You just testified that you had split up, you two weren't

12   living together?

13   A.   Right.

14   Q.   So you said that he thought it was you.  Did you believe

15   him?

16   A.   Yes.

17   Q.   You weren't living together; correct?

18   A.   No, we were not living together.  She was talking about

19   before when we were living together is when that happened.

20   Q.   Okay.  And you testified earlier that you and the

21   defendant didn't have much of a sexual relationship after your

22   hysterectomy?

23   A.   Yes.

24   Q.   So was it common for him to put his hands down your pants?

25   A.   No.

1  Q.  But he told you that he thought it was you he was doing

2  that to and you believed him?

3  A.  Yes.

4  Q.  Did you report that to the police?

5  A.  No.  When Kelsey told me, she begged me to not.

6  Q.  How old was Kelsey?

7  A.  She was 16 when she told me that.

8  Q.  Your 16-year-old daughter told you that the defendant had

9  sexually abused her?  Is that a yes?

10 A.  Yes.  I'm sorry.

11 Q.  And you confronted the defendant?

12 A.  Yes.

13 Q.  And he said he had?

14 A.  Yes, on accident.

15 Q.  He said he thought it was you?

16 A.  Yes.

17 Q.  But you knew that you two weren't having a sexual

18 relationship?

19 A.  Right, yes.

20 Q.  And you believed him?

21 A.  Yes.  Because she came back and said it didn't happen.

22 Q.  She was a child and you believed him?

23 A.  Yes.  When she told me, she said, "please don't go over

24 there, it will start a bunch of trouble."

25      And she had told me that her aunt told her he would go to

1    jail and we wouldn't see him.

2    Q.  So you're split up at that point?

3    A.  Yes.

4    Q.  Did you let him move back in after that?

5    A.  No.

6    Q.  Did you two end up living together again after that?

7    A.  Honestly I don't remember.

8    Q.  Well, Kelsey is 16.  After that time period did you and

9    the defendant ever live together again?

10   A.  Yes, we did.  I -- I have to think about it.  There's been

11   so many houses.

12   Q.  So you let him move back in?

13   A.  Yes.

14   Q.  After he admitted to sexually abusing your child?

15   A.  Yes.

16   Q.  Did you let him be around your other children again?

17   A.  Yes.

18   Q.  Did you let him be around grandkids?

19   A.  There wasn't any at the time.

20   Q.  All right.  When there were grandkids, did you babysit any

21   of the grandkids?

22   A.  Yes.

23   Q.  Who would you babysit?

24   A.  Serenity.

25   Q.  Who is Serenity?

 1   A.   Jasmine's daughter.

 2   Q.   When you were babysitting Serenity, where was the

 3   defendant?

 4   A.   He would be around.

 5   Q.   So you let him be around the grandkids when you were

 6   taking care of them?

 7   A.   He would be outside or whatever, yes.

 8   Q.   At some point when you were living in the Mayes Street

 9   house, did you find out that Jasmine was sexually active?

10   A.   Yes.

11   Q.   Did the defendant?

12   A.   Yes.

13   Q.   Were you there when he found out that Jasmine was sexually

14   active?

15   A.   Yes.

16   Q.   And how did he respond?

17   A.   He got very angry and was screaming at her.  She -- she

18   tried to jump out the window and I pulled her back and he

19   slammed her up against the wall and choked her, held her up

20   against the wall.

21   Q.   How did he choke her?

22   A.   He had his hands on her and then he put his arm against

23   her.

24   Q.   Where were the other kids?

25   A.   Standing in the doorway.

1  Q.  Did they stay there the whole time or did someone shut the

2  door?

3  A.  They came in there screaming and I pushed them back and

4  told them to get back and I was telling him to quit.

5  Q.  You were telling him to quit.  Did you grab him?

6  A.  No.

7  Q.  Did you call the police?

8  A.  No.

9  Q.  How old was Jasmine?

10  A.  Sixteen.

11  Q.  And you said he was -- did you say he was choking her?

12  A.  Yes.

13  Q.  How did she appear?

14  A.  She was crying and screaming.

15  Q.  Did you ever see any bruises on her afterwards?

16  A.  I didn't see them.  She moved out then.

17  Q.  So how did the -- how did the choking stop?

18  A.  I was screaming at him to stop and the kids were

19  screaming.

20  Q.  And so then he eventually did stop?

21  A.  Yes.

22  Q.  What did you-all do afterwards?

23  A.  I kicked him out and -- I think a couple of days later.

24  Q.  You kicked him out but you didn't just kick him out, did

25  you?

1   A.   No.

2   Q.   Who else did you kick out?

3   A.   He told me he was taking Kayla with him, their sister.

4   Q.   What about Kelsey?

5   A.   Kelsey wanted to go with him and he said no.  And I just

6   told her to go to his sister's.

7   Q.   So you kicked Kelsey out too?

8   A.   Yeah.

9   Q.   So you didn't call the police when he strangled her?

10  A.   No.

11  Q.   You believed him over Kelsey when she told you what he had

12  done?

13  A.   Be -- yes.

14  Q.   You kicked three of your daughters out when they were all

15  under 18?

16  A.   I didn't kick Jasmine out, she left.

17  Q.   She left because you hadn't called the police to protect

18  her after he strangled her.  So you completely failed to

19  protect your daughters, didn't you?

20  A.   Yes.

21          MS. DIAL:  No other questions, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. HASSE:

24  Q.   Ms. Parnell, you were blessed with five children before

25  you had your hysterectomy; is that right?

1    A.   Yes.

2    Q.   You went through a number of houses that you lived in

3    during their childhood.  In each of those houses, except for

4    the one where your ex-husband Keith Parnell lived alone, each

5    of those other houses there were seven people in those houses;

6    right?

7    A.   Yes.

8    Q.   Because there's one, two, three, four, your five kids, you

9    and Keith?

10   A.   Yes.

11   Q.   Each of those houses were two bedrooms or three bedrooms;

12   is that accurate?

13   A.   Yes.

14   Q.   It's your testimony that you never saw any of your

15   daughters sexually molested by Keith Parnell; is that correct?

16   A.   No, I didn't see them.

17   Q.   So the answer is --

18   A.   Yes.

19   Q.   -- you never saw them molested by Keith Parnell?

20   A.   No, I did not.

21   Q.   If you saw them molested by Keith Parnell, you would have

22   called the police; is that true?

23   A.   Yes.

24   Q.   Jasmine Parnell never claimed to you to have ever been

25   sexually molested by Keith Parnell; is that true?

1    A.   Yes.  Not when they were kids, no.

2    Q.   So Jasmine -- just to be clear, your twins Jasmine Parnell

3    and Kelsey Blaylock, now Kelsey Blaylock after she's married.

4    A.   Yes.

5    Q.   Jasmine Parnell never said anything to you about being

6    molested while she lived with you?

7    A.   No.

8    Q.   Today you testified that at that some point Kelsey

9    Blaylock, your daughter, said something to you about Keith

10   Parnell putting his hands down her panties?

11   A.   Yes.

12   Q.   Okay.  You were interviewed by Pryor Police.  They

13   contacted you after a Facebook posting; is that true?

14   A.   My posting?

15   Q.   No, somebody -- well, your daughter Kelsey Blaylock posted

16   something to Facebook, later you were contacted by --

17   A.   Yes.

18   Q.   If I could just -- I know you know where I'm going but if

19   I could just finish.

20        After Kelsey Blaylock made a posting in 2020 alleging

21   that she was sexually abused, is it true that you were

22   contacted by Pryor PD --

23   A.   Yes.

24   Q.   -- in relation to that?

25   A.   Yes.

1   Q.   Okay.   You were interviewed by a detective there; is that

2   right?

3   A.   Yes.

4   Q.   Do you remember which detective it was?

5   A.   Justin Allen.

6   Q.   That was recorded, wasn't it?

7   A.   Yes.

8   Q.   In that interview -- isn't it true that in that interview

9   you didn't disclose that Kelsey had told you while she was

10  living with you?

11  A.   She was not living with me when she told me.

12  Q.   Okay.   But this -- thank you.

13       Let's be specific.   Can we talk about where she was

14  living when you say she told you about this?   She was living

15  with Stephanie Hendrickson; is that right?

16  A.   Yes.

17  Q.   Who is Stephanie Hendrickson?

18  A.   Keith's sister.

19  Q.   Okay.   So that's Kelsey Blaylock's aunt?

20  A.   Yes.

21  Q.   You said in your testimony that your recollection is that

22  she told you, she being Kelsey Blaylock, that Stephanie

23  Hendrickson told Kelsey Blaylock that your ex-husband Keith

24  Parnell would go to jail if they reported it?

25  A.   Yes.

1   Q.  So your recollection is that Kelsey Blaylock was 16 when

2   this happened; is that right?

3   A.  When she told me, yes.

4   Q.  She was living with Stephanie Hendrickson?

5   A.  Yes.

6   Q.  And your recollection is Stephanie Hendrickson essentially

7   discouraged her from reporting it?

8   A.  Yes.

9   Q.  Your recollection is that she -- that Kelsey Blaylock told

10  you Stephanie Hendrickson discouraged her from reporting the

11  abuse to the police?

12  A.  Yes.

13  Q.  Now, again going back to -- fast-forwarding to 2020, that

14  didn't come up in -- that didn't come up in your interview

15  with the Pryor PD, did it?

16  A.  I don't know.  I don't remember.

17  Q.  Okay.  If I told you it was not in the interview, would

18  that surprise you?

19  A.  I don't know.

20  Q.  Now, during your testimony just a moment ago you said that

21  two to three times you remember Keith Parnell being in the

22  living room somewhere near one of your daughters?

23  A.  Yes.

24  Q.  By them?

25  A.  Yes.

1    Q.   More than once you said?

2    A.   Yes.

3    Q.   Which daughter?

4    A.   Kelsey.

5    Q.   In each instance it was Kelsey?

6    A.   Yes.

7    Q.   You were very specific about where that happened.  That

8    was at that house in Exhibit 6.  If I recall correctly, the

9    house in Exhibit 4 you had until 2008 so it was sometime after

10   2008; is that right?

11   A.   Yes.

12   Q.   They would have been in high school?

13   A.   Yes.

14   Q.   It would have been when Kelsey had moved back in after

15   staying with Stephanie Hendrickson?

16   A.   No.

17   Q.   It was before she moved out with Stephanie Hendrickson?

18   A.   Yes.

19   Q.   So she would have been 15 or 16?

20   A.   Yes.

21   Q.   Do you remember an incident at the lake where your son

22   Brice struck your ex-husband Keith Parnell with a can cutting

23   his face?

24   A.   Yes.

25   Q.   Okay.  Who else was there that day?

1    A.   My mom, my stepdad, me and the kids and Keith.

2    Q.   Do you recall anything else unusual about that day?

3    A.   No.

4    Q.   Did -- I think I know the answer to this but let me ask

5    for clarity.  Was there ever any day over breakfast that your

6    ex-husband Keith Parnell confessed to you that he had been

7    sexually intimate with any of your daughters?

8    A.   No.

9    Q.   You would probably remember if that happened; right?

10   A.   Yes.

11   Q.   On any of the properties that you lived on were there any

12   livestock or horses?

13   A.   No.  There was a house listed -- let me back up.  There

14   was a house -- yes, there was a house when they were smaller.

15   We lived in, I want to say it was Lane or Farris, Oklahoma,

16   down by where my dad lived.  There were horses around the

17   trailer we were living in.

18   Q.   Okay.  And just to clarify, nobody else in all of those

19   years, from 1993 all the way to your daughter's graduation in

20   2012, no one came to you and -- other than that one incident

21   that you say happened with Kelsey, nobody else came to you and

22   said that they believed your children were being abused by

23   your ex-husband?

24   A.   No.

25   Q.   Now, Keith Parnell is --

1    A.   Not Kelsey and Jasmine.

2    Q.   Not Kelsey, not Jasmine.  Was there anybody else that ever

3    indicated to you that something was happening?

4    A.   His sister and his mom thought him and Kayla had a weird

5    relationship and their high school friends would ask them what

6    was going on between them.

7    Q.   Okay.  I finally -- the last thing I want to turn to is

8    just very briefly when is the last time you saw Keith Parnell

9    in person?

10   A.   Over a year ago.

11   Q.   Okay.  Is it fair to say you're not on good terms with

12   Keith Parnell?

13   A.   No.

14   Q.   That's not fair to say?

15   A.   Yes.  That's fair.  No, I'm not on good terms with him.

16   Q.   You are not on good terms?  You are not happy --

17   A.   No.

18   Q.   -- with Keith Parnell?

19        No, you are not happy?

20   A.   No, I am not.

21   Q.   Yes.  Okay.

22        MR. HASSE:   Thank you.  Nothing further.

23        MS. DIAL:  We have nothing else, Your Honor.

24        THE COURT:  Thank you.  Appreciate your coming in.

25   You may step down.

1            THE WITNESS:  Thank you.

2            MS. DIAL:  Could we also release this witness from

3  her subpoena, Your Honor?

4            THE COURT:  Yes.  Does either side -- anybody need

5  her back?

6            MR. HASSE:   No.

7            THE COURT:  No.

8            MS. DIAL:  The government calls Stephanie

9  Hendrickson.

10            DEPUTY COURT CLERK:  Ms. Hendrickson, if you'll come

11  around to your right.  Right here.  And I'll swear you in.

12  Thank you.

13      Would you please raise your right hand.

14      (WITNESS SWORN)

15            THE COURT:  Thank you.

16            DEPUTY COURT CLERK:  Thank you.  You can go ahead

17  and sit in the witness seat.

18            THE COURT:  Good afternoon.  Thank you for coming

19  in.

20                    STEPHANIE HENDRICKSON,

21  having been called as a witness, after being first duly sworn,

22  testified as follows:

23                    DIRECT EXAMINATION

24  BY MS. DIAL:

25  Q.  Good afternoon, ma'am.  Could you please state your name

 1  and spell your last for the record.

 2  A.  Stephanie Hendrickson, H-e-n-d-r-i-c-k-s-o-n.

 3  Q.  Where are you from, Ms. Hendrickson?

 4  A.  Locust Grove.

 5  Q.  Have you lived there your whole life?

 6  A.  I've lived there for about 23 years.

 7  Q.  And where were you at before Locust Grove?

 8  A.  I lived in Skiatook for a little while but I was raised in

 9  Salina, Oklahoma.

10  Q.  How do you know Jasmine Parnell and Kelsey Blaylock?

11  A.  They're both my nieces.

12  Q.  How are they related to you then?

13  A.  They're my brother's daughters.

14  Q.  The defendant?

15  A.  Yes.

16  Q.  Do you see him here today?

17  A.  Yes, ma'am.

18  Q.  Could you tell me something he's wearing?

19  A.  He's wearing a blackish gray shirt with a tie, a checkered

20  tie.

21  Q.  Thank you.  Do you know your brother's date of birth?

22  A.  Yes.  May the -- May the 27th, and I think it's 1974.  I'm

23  pretty sure.  That's close.

24  Q.  Is he older or younger than you?

25  A.  He's younger.

1    Q.   How much younger?

2    A.   Seven years.

3    Q.   Are there any other siblings between you?

4    A.   Yes, ma'am.

5    Q.   How many siblings do you-all have?

6    A.   We just have one more.  We have a half sister and a half

7    brother but he -- I just have two full brothers.

8    Q.   So your nuclear family is you and then a brother in

9    between and then --

10   A.   There's -- I'm the oldest and then I have one more

11   brother, he's right under me, and then Keith is the baby.

12   Q.   All right.  So -- so you were seven when Keith was born?

13   A.   Yes, ma'am.

14   Q.   And were you close growing up?

15   A.   Yes.

16   Q.   What -- how were you close?

17   A.   He was my baby brother.  My mom worked and we lived with

18   my grandparents on and off and he just -- I mean we're just as

19   a brother and a sister.  We just had a brother-sister

20   relationship.

21   Q.   Do you feel like you're about as close to him as your

22   other brother or do you feel a little closer to Keith?

23   A.   About the same.

24   Q.   All about the same?

25   A.   Yes.

1   Q.   But I think you said Keith was your baby brother?

2   A.   He was the baby brother.

3   Q.   Did you take care of him as the baby brother?

4   A.   Yes.  I mean, I helped.

5   Q.   So I guess you guys wouldn't have been in high school

6   together; right?

7   A.   That's right.

8   Q.   But did you live near each other as you got older and you

9   as you moved out?

10  A.   I actually graduated from Skiatook and he lived with my

11  parents and I stayed up there and finished out school with a

12  friend, so we were together all through the years except for

13  maybe a couple of years when I lived up there.  And my parents

14  lived up there and they actually moved and then I stayed with

15  a friend to finish out school.

16  Q.   Would you see your family during that time?

17  A.   Yes.

18  Q.   What types of things did you like to do with your younger

19  brothers?

20  A.   Actually Keith was so much younger than me, we were close

21  but, I mean, we didn't play together.

22  Q.   Did you play with him when he was little?

23  A.   Yes.

24  Q.   And then just as he got older --

25  A.   Yes.

1  Q.  -- you guys did separate things?

2  A.  Yes.

3  Q.  Would you take him out to go do things when you could

4  drive?

5  A.  Not really.

6  Q.  Okay.

7  A.  By that time I moved out and moved -- was going to college

8  and he was with my parents.

9  Q.  Where did you go to college?

10  A.  RSU.

11  Q.  I'm not from around here so --

12  A.  I'm sorry.

13  Q.  -- you have to tell me.

14  A.  It was actually in Claremore, Oklahoma.

15  Q.  All right.  So still nearby?

16  A.  Yes.

17  Q.  And you got to see your family during that time?

18  A.  Yes.

19  Q.  Are you married?

20  A.  Yes, I am.

21  Q.  And do you have any children?

22  A.  I do.

23  Q.  How many children do you have?

24  A.  Three girls.

25  Q.  Can you tell us their ages?

1  A.  I have Brittany, she's 37 I think.  She was born in 1987.

2  I have Brandy and she is 33 and she was born in 1990.  And

3  then I have Rebecca and she is 27.  She was born in '94.

4  Q.  So you and your brother had kids kind of close in age;

5  right?

6  A.  Yes, ma'am.

7  Q.  Would your daughters play with Jasmine and Kelsey and

8  Kayla and the others?

9  A.  Yes.

10  Q.  Did you guys get together and play often?

11  A.  I'm not sure.  What do you -- what do you mean?

12  Q.  Like did you see each other every Sunday --

13  A.  No.

14  Q.  -- like for a family dinner?  Or just --

15  A.  No.

16  Q.  Or just occasionally?

17  A.  Just occasionally.

18  Q.  So how many children does your brother have?

19  A.  Five.

20  Q.  Can you tell us who they are?

21  A.  Jasmine, Kelsey, Kayla, Brice and Branden.

22  Q.  And when your brother's children were growing up, do you

23  recall, did you ever go visit them at their home?

24  A.  Yes.

25  Q.  Did they live in a lot of different places?

1    A.   Yes.

2    Q.   Did you visit them in all the different houses?

3    A.   Not -- probably not all of the houses but I -- I did  -- I

4    did go to quite, you know, I kept tabs on them.  They were my

5    nieces and nephews.

6    Q.   How often do you think your brother and his family moved?

7    A.   I don't know.  I'm not real sure.

8    Q.   Would it be fair to say every couple of years or --

9    A.   I hate to say because I really don't -- I'm not real sure.

10   I know they moved quite a bit but I don't know if it was every

11   year or every other year or every four years.  I can't put an

12   exact timeframe on it.

13   Q.   At some point do some of your brother's kids move in with

14   you?

15   A.   Yes.

16   Q.   Who moved in with you?

17   A.   I had Kelsey move in with me and Jasmine moved in with me

18   for a couple of weeks, maybe three, four weeks at the most.

19   Q.   Let's start with Kelsey.

20   A.   Okay.

21   Q.   When did Kelsey move in with you?

22   A.   I think Kelsey was a junior in high school.  It's been so

23   long ago I can't exactly tell you the exact timing, but it was

24   around her junior year of high school.

25   Q.   Do you know why she moved in with you?

1   A.   Yes.  She called me and told me that her mother kicked her

2   out.

3   Q.   And you let her move in?

4   A.   Yes.

5   Q.   How big was your --

6   A.   I lived in a mobile home, three bedroom.  We took one of

7   the walls out and because we had all girls so it actually was

8   two bedrooms.

9   Q.   So did you and your husband share a room?

10  A.   Yes.

11  Q.   And then your three girls shared a room?

12  A.   Yes.

13  Q.   And did Kelsey share a room with them?

14  A.   Yes.

15  Q.   So the four girls in a room?

16  A.   Yes.

17  Q.   A little bit crowded?

18  A.   Yes.

19  Q.   But the six --

20  A.   Yes.

21  Q.   The six of you living in there?

22  A.   The mobile home was big.  It was like a 16 by 80 but it --

23  I mean we -- we did some modifications of it because, like I

24  said, the -- my girls were chick- -- little scaredy cats

25  sometimes so they always felt more comfortable with their

1  sisters so...

2  Q.  So Kelsey moved in with you when she was about a junior in

3  high school?

4  A.  It was approximately that time.

5  Q.  And do you know about how long she lived with you?

6  A.  Well, she went -- she left when she was a senior because

7  she wanted to go home.  She just left and she said she wanted

8  to go home.

9  Q.  Did you kick her out?

10  A.  No.  No.  I sure did not.

11  Q.  She just left?

12  A.  Well, what happened was she left with a boyfriend one day

13  and I provided a cell phone for Kelsey and I called and called

14  and couldn't figure out what happened to her and then later on

15  the boy called me and told me that she went home, that he took

16  her home, and she wouldn't answer the phone.

17  Q.  And you didn't know why?

18  A.  Nope.  But I got ahold of them later on and she told me

19  that she wanted to go home.

20  Q.  Were you okay with that?

21  A.  She was actually about 18 years old whenever she did it.

22  Q.  So during the time that Kelsey was living with you, was

23  she close with your three daughters?

24  A.  Yes.

25  Q.  What types of things would they do?

1    A.   Becky, my youngest daughter, they were the closest because

2    they were the closest to age and they -- they would go to

3    get -- like my daughter Becky would play basketball, she was a

4    cheerleader and she played softball, so Kelsey actually -- we

5    traveled around quite a bit with Becky so we did a lot of

6    sports and she was with -- she was actually -- that's pretty

7    much what we did.

8    Q.   You -- and Kelsey would go with you-all when you traveled?

9    A.   Yes.

10   Q.   And did the girls ever have friends over to the trailer?

11   A.   Yes.

12   Q.   And what would the girls and the friends all do when they

13   would come hang out?

14   A.   Watch TV, listen to music, tell secrets, what normal girls

15   do.

16   Q.   Ever any drinking?

17   A.   Nope.  I don't drink.  No.

18   Q.   There was never any --

19   A.   No.

20   Q.   If you'll let me finish because the court reporter is

21   trying --

22   A.   That's fine, I'm sorry.

23   Q.   It's okay.  When we both talk at the same time --

24   A.   I'm sorry, yes.

25   Q.   -- we really mess her up.

1    A.   Yes.

2    Q.   So your testimony is no alcohol in the house?

3    A.   There was no alcohol in -- I'm not a drinker and I -- that

4    was one of the things when Kelsey came to live with me, Kelsey

5    told me that she had been drinking whenever she came to live

6    with me and I told her she wasn't going to do it at my

7    house.

8    Q.   What about your daughters?

9    A.   No.

10   Q.   What would you have done if any of them -- if Kelsey or

11   any of your daughters had shown up drunk?

12   A.   They would have been in trouble.  It actually -- that did

13   happen.

14   Q.   How -- what happened if they were in trouble?  Like did

15   you ground them?

16   A.   Yes.

17   Q.   Okay.

18   A.   Take phones away, take cars away.

19   Q.   So you were really serious about --

20   A.   Yes.

21   Q.   -- no drinking?

22   A.   Yes.

23   Q.   Again --

24   A.   I'm sorry.

25   Q.   No, you're okay.  You're totally fine, it's just really

320

1    hard for the court reporter.

2         So you take phones away, they would get in trouble.  Your

3    testimony is there was no alcohol --

4    A.   There was no --

5    Q.   -- in the house?

6    A.   I don't believe in drinking.

7    Q.   No parties?

8    A.   Nope.

9    Q.   Do you recall a time -- I'm going to show you Government's

10   Exhibit Number 1.

11   A.   Okay.

12   Q.   Do you recognize the residence in this photo?

13   A.   I do but I'm not real sure where exactly that house is.

14   Q.   Is that a house that your brother and his family lived

15   in?

16   A.   I think so.

17   Q.   Do you recall a time when they were living in this house

18   that Kelsey told you and her mom that the defendant had been

19   licking her ears?

20   A.   No.  Are you talking -- can you rephrase that?

21   Q.   Sure.  When Kelsey was about five or six, do you ever

22   remember a time where she told you and her mom that her dad

23   had been licking her ears?

24   A.   No.

25   Q.   Do you remember a time where your brother came out and

1    explained it was just a wet willie?

2    A.   Not at five or six.

3    Q.   Was there a time when your brother came out and told you

4    it was just a wet willie?

5    A.   I don't remember it, no.

6    Q.   So you don't recall a time where your brother --

7    A.   Not with my -- no.

8    Q.   Okay.  When Kelsey was living with you, did she disclose

9    any sexual abuse by your brother?

10   A.   What do you mean?

11   Q.   Did Kelsey tell you that your brother had sexually abused

12   her?

13   A.   No.  She told me he molested her so I guess, well -- she

14   told me he molested her.

15   Q.   Well, I appreciate you clarifying that.  So I had said

16   sexual abuse, your clarification is molestation?  That's what

17   Kelsey said?

18   A.   Yes.

19   Q.   When did Kelsey tell you that?

20   A.   When Kelsey came to live with me, she -- she had been,

21   like I said, she had told me that she had been drinking a lot.

22   And I told her that she wasn't going to do that at my house

23   and she -- her and my daughter Becky had went to a friend's

24   house in Salina and they came back and Kelsey, she was -- she

25   just was saying all kinds of stuff about her mother.

1       She never ever told me anything about her dad and then
2   she came in that night when she had been drinking -- actually
3   she didn't come in that night, I went to pick her up because
4   my daughter called me and told me that they -- that Kelsey was
5   drunk over there, so I went over there to pick her up and I
6   took her back to my house and that's when she told me that --
7   that he had molested her.
8   Q.  Do you remember what she said?
9   A.  She just said she was -- that he had molested her.  And so
10  I asked her -- I tried to talk to her and find out what she
11  meant by that, and all she told me was that he come in her
12  room at night, flipped on the light switch, jumped in bed with
13  her and asked her if she wanted a wet willie and stuck his
14  tongue in her ear.
15  Q.  She told you that --
16  A.  Yes.
17  Q.  Sorry.  Let me finish.
18  A.  Sorry.
19  Q.  She told you that all that night?
20  A.  Yes.
21  Q.  What did you do?
22  A.  Well, I actually laughed at her at first and I told her,
23  "Well, I hope that you washed your nasty ears." And then I
24  said "Can you tell me what -- what do you mean by
25  molestation?"  And that's all she ever -- that's all she ever

1  told me.

2  Q.  How --

3  A.  She didn't talk to me.

4  Q.  How did Kelsey seem to you during that time?

5  A.  Well, she had been drinking so she kind of was just kind

6  of acting loopy and silly.

7  Q.  Sure.  So she's drunk?

8  A.  Uh-huh.

9  Q.  Loopy, silly, saying she was molested?

10 A.  Uh-huh.

11 Q.  Your testimony is that she just said a wet willie?

12 A.  Yes.

13 Q.  Did you follow up with her the next morning?

14 A.  Yes.

15 Q.  And so the next morning she's now sober?

16 A.  Uh-huh.

17 Q.  And what did she tell you the next morning?

18 A.  She told me that's all that -- that's all she would tell

19 me.  She wouldn't ever tell me anything else, that he gave her

20 a wet willie.  That's it.

21 Q.  The next morning did she still say that he had molested

22 her?

23 A.  Not really.  We just kind of -- she just kind of dropped

24 it and wouldn't talk about it.  And I kept questioning her and

25 talking to her and trying to get her to tell me something

1  because I was afraid that something might have really

2  happened.

3      And so I -- Kelsey had told me a lot of stuff, though,

4  about her mother and I was -- I was just really worried about

5  Kelsey.  I didn't really know what all was going on with

6  Kelsey so I took Kelsey -- I had actually -- when she come to

7  live with me, I enrolled her in the school because I told her

8  she needed to finish high school.  I enrolled her in the

9  school and I talked to her teacher and they supposedly was

10  going to get her a counselor.

11 Q.  Was this after she told you that she had been molested?

12 A.  Yes.

13 Q.  So Kelsey actually described you as a like second mom to

14 her.

15 A.  Yes.

16 Q.  Is that how you would describe yourself?

17 A.  Yes.

18 Q.  And so she told you that she had been she molested, right,

19 and so you helped her get a counselor even?

20 A.  I actually called -- I talked to her teacher because I

21 thought if I went to the police department, they would laugh

22 me clear out of the face of the moon by telling them that she

23 told me that he gave her a wet willie, so I told the teacher

24 and the teacher -- I talked to her about it and they were

25 going to get her a counselor.

1   Q.  So you didn't call the police?

2   A.  No.

3   Q.  Who else did you tell about this?

4   A.  No -- we just -- not -- nobody really, I just talked to

5   her teacher and I confronted my brother.  Me and him kind of

6   went round and round about it a little bit but I wouldn't let

7   him come over.

8   Q.  Well, you said that all she said happened was a wet willie

9   but you still confronted your brother?

10  A.  I did.

11  Q.  So you believed that there was something more?

12  A.  I wasn't sure.

13  Q.  Well, you confronted him; right?

14  A.  Yes, I did.

15  Q.  And did you confront him about a wet willie or about

16  something else?

17  A.  I just asked him what has been going on.

18  Q.  What did he say?

19  A.  He didn't seem to know what she was talking about.

20  Q.  So back in -- is this about 2011 or 2010?  Does that sound

21  about right?

22  A.  Probably.

23  Q.  All right.  So back in 2010, 2011, Kelsey has told you

24  that he's molested her?

25  A.  Yes.

1    Q.   You were really worried?

2    A.   Yes.

3    Q.   You got her in counseling?

4    A.   Yes.

5    Q.   You confronted your brother?

6    A.   Yes.

7    Q.   Your testimony today is that she just said a wet willie?

8    A.   Yes.

9    Q.   But back then you were very worried that it was something

10   else?

11   A.   I wasn't sure.

12   Q.   Did you report it to police?

13   A.   I reported it to the school.  I didn't figure that you

14   would report a wet willie to the police department.

15   Q.   Did you tell any other friends?

16   A.   Not really.  I mean my daughters were there.  They heard

17   it.

18   Q.   Are you aware that there was a DHS report made?

19   A.   There was supposed to have been.  I was hoping so.

20            MR. HASSE:   Objection.  Assumes facts not in

21   evidence.

22            THE COURT:  Why don't we --

23       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

24   THE PRESENCE AND HEARING OF THE JURY:)

25            MS. DIAL:  If I can have just a moment.

1          THE COURT:  Yes.

2      Is this admissible?

3          MS. DIAL:  I'll withdraw the question and ask her if

4  she made a report to DHS.

5          THE COURT:  She said she talked to the school.

6          MS. DIAL:  Okay.

7          THE COURT:  Is there any reason to think she would

8  say, yes, she spoke to DHS?

9          MS. DIAL:  There's a DHS report that a relative of

10  the children said that there were sexual acts, so I was trying

11  to find out if she had done that.  She hasn't talked to us

12  before.

13          THE COURT:  I'm worried it's going to create a

14  fiction here.  There's no reason to think --

15          MS. DIAL:  I can withdraw the question.

16          THE COURT:  Let's do that.

17          MR. HASSE:   I'm not sure we can put the toothpaste

18  back in the tube, Your Honor.  I mean here we are, we're

19  introducing something about a DHS -- I don't believe that the

20  government can bring in this DHS report through her.

21          THE COURT:  What would you like me to do?

22          MR. HASSE:   Well, I would like to find out, are we

23  going to address this later.  Is there going to be an

24  opportunity, because now we have it out in front of the jury

25  there's a DHS report and they don't know what the result is.

1          MS. DIAL:  I'm going to withdraw the question and

2    the result of the DHS report isn't relevant.  The girls have

3    already said there was no investigation, there was no police,

4    nothing happened.

5          THE COURT:  Would you like some kind of instruction?

6          MR. HASSE:   I -- I would like us to take this up

7    after her direct.  We also need to address whether or not she

8    can testify to a number of times that Kelsey Parnell came to

9    her and stated -- Kelsey Blaylock, excuse me, came to her and

10   stated that she had been sexually assaulted.  Because it's

11   relevant to how seriously she took it.  She's taking a beating

12   right now for not taking it serious enough.

13        It's relevant to the fact that Kelsey Blaylock came home

14   from school more than once and said that she had been sexually

15   assaulted.  I would like to revisit that, Your Honor, and like

16   an opportunity to consider how we correct this.

17         THE COURT:  Let's just -- we'll take a break.  We'll

18   speak -- you guys can talk if you like over the break and

19   we'll take this issue up before the jury comes back in at

20   3:00.  Okay?

21        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

22   THE PRESENCE AND HEARING OF THE JURY:)

23         THE COURT:  I think everybody is ready for a break.

24   I know I am.  We'll get back together at 3:00.  Okay.

25        All right.  See you in ten minutes.

1    (RECESS WAS HAD)

2    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

3    OUTSIDE THE PRESENCE AND HEARING OF THE JURY:)

4         THE COURT:  All right.  Have a seat.  Here is where

5    we are.  As I understand the state of play, we've kind of

6    stumbled into testimony about a report to DHS, which I take it

7    is the Department of Human Services which is the state --

8    Oklahoma State Agency that has amongst its responsibilities of

9    the child protective services; is that right?  That's what I

10   figured.

11       And the testimony so far has been that Kelsey Parnell,

12   now Blaylock, told Stephanie Blaylock who told somebody at the

13   school about the molestation, and along this chain, a report

14   was generated to the Department of Human Services.

15       If I were to guess, it would be someone at the school who

16   takes their responsibilities as a mandatory reporter seriously

17   and probably picked up the phone, but like all DHS --

18   generally child protective complaints are anonymous and this

19   one has been, as I understand, appears as an anonymous

20   complaint.

21       Even if was signed and sworn to by a known person, it

22   would be hearsay.  So there's an objection to this and the

23   government is prepared to back down off this issue, and really

24   the question is what the defense would like me to do.

25       I'm happy to simply move on without further questions and

1    testimony, happy to offer you a curative instruction stating

2    that any report to a third party such as the Department of

3    Human Services is outside the bounds of our case.

4        Why don't I hear first from the defense as to what you

5    would like to do and then give the government a chance.

6            MR. HASSE:  Thank you, Your Honor, that's an

7    extremely accurate summary.  My concern is that if we're to

8    give an instruction, we don't want to give the impression to

9    the jury that we're trying to hide something.

10           THE COURT:  Sure.

11           MR. HASSE:  In fact, there's not much to hide.  The

12   result of the DHS investigation was, you know, it didn't

13   conclude that something had happened, that there needed to be

14   some, you know, action taken.  So the dilemma for us is we

15   drop it or do we have to get into something that is otherwise

16   inadmissible to try and resolve it.

17       I think what we came to was, I believe, that the

18   prosecution intends to just move on.  We don't want to request

19   an instruction to the jury, we don't want to call attention to

20   it or look like we're trying to hide something, but if

21   necessary on my cross-examination of the Pryor PD Detective

22   Allen that I would at least be allowed to have the leeway to

23   clean this up by checking to make sure that he never found

24   there was any DHS investigation that concluded there was some

25   wrongdoing.

1              THE COURT:  Okay.  Why don't we wait until he

2     testifies.  I hear your point.

3              MR. HASSE:  Right.

4              THE COURT:  But let's, you know, don't make me make

5     a ruling before something happens, but if that's where you

6     would like to go, you'll mention it and the government will be

7     fine with it or not.  Fair enough?

8              MR. HASSE:  Fair enough, Your Honor.  So we're not

9     requesting an instruction.

10        The second matter that I brought up with regards to the

11    possibility that Stephanie Hendrickson --

12             MS. DIAL:  Does this need to be in her presence?

13             MR. HASSE:  I was going to phrase this

14    appropriately so that it -- in fact -- well, if you'll allow

15    me the leeway to just go ahead and say it.

16        Out of an abundance of caution why don't we have her step

17    out.

18             THE COURT:  Why don't we excuse you for a minute,

19    Ms. Hendrickson.

20             MR. HASSE:  So already on direct examination the

21    government has gotten into whether Stephanie Hendrickson

22    reacted appropriately to what she heard from Kelsey Blaylock.

23        I believe, as I proffered earlier, based on my

24    interactions with Stephanie Hendrickson that she may respond

25    to some questions stating that, well, this wasn't the first

1   time that Kelsey Blaylock came home and said that something

2   had happened to her.  And specifically that Kelsey Blaylock

3   had come to her more than once and said "I was sexually

4   assaulted or sexually abused."

5       And if your prior ruling that we couldn't get into it

6   with Kelsey Blaylock extended beyond that, then I needed --

7   then I need to make sure to instruct Stephanie Hendrickson

8   before her cross-examination that we're not going to go there.

9   I could inadvertently trigger that response.

10      I believe it would be relevant but I most importantly

11  want to get clarity from the Court so that if you don't want

12  us to go there, I can let her know not to mention it.

13          THE COURT:  I'm sorry.  I'm a little -- not entirely

14  with you.

15          MR. HASSE:   Okay.  So --

16          THE COURT:  She's testified already that the only

17  incident that she is aware of when Kelsey Blaylock complained

18  to her was the one after the night of drinking; right?

19          MR. HASSE:   That's right, with regards to Keith

20  Parnell, but --

21          THE COURT:  Oh, you mean as to other -- to a boy at

22  the high school?

23          MR. HASSE:   Right.

24          THE COURT:  I'm -- now I understand what you're

25  saying.

1          MR. HASSE:   I'm sorry that wasn't clear.

2          THE COURT:  Okay.

3          MR. HASSE:   But she may be in a position where

4  she's saying this was an individual who came at me with all

5  kinds of -- to speak globally, all kinds of wild allegations

6  and I wouldn't be sure -- I tried to take it very seriously

7  when she said something, tried to delve in, find out what was

8  going on, but she said this boyfriend raped her and the other

9  boyfriend raped her.

10          THE COURT:  Got it.

11          MR. HASSE:  If -- I want to make sure I don't want

12  to run afoul of this court where there's a misunderstanding.

13  I do need to instruct her not to get into that because that is

14  the direction that my questions to her in private have gone.

15          THE COURT:  Oh, I see.  And she would -- if pressed,

16  she would say that she had a heart-to-heart with Kelsey

17  Blaylock about conduct -- sexual conduct by boys at the high

18  school?

19          MR. HASSE:   Right.  And just to sort of bring it

20  back to where we started this morning.

21          THE COURT:  Right.

22          MR. HASSE:   I felt like it was relevant with regard

23  to Kelsey Blaylock for a different reason.  The Court ruled

24  that we were not going to bring it up there.

25          THE COURT:  Right.

1          MR. HASSE:   Here it may come up again, but it's

2   relevant for a different reason here.  I want to know if we

3   can go that direction.  If we can't go that direction, I would

4   like just a moment to instruct her not to bring it up.

5          THE COURT:  Fair enough.

6       Is the government -- the first question, you're content

7   just to move on from the DHS report issue without further

8   questions?

9          MS. DIAL:  Yes, Your Honor.

10          THE COURT:  All right.  And you're content with that

11   resolution as the best one under the circumstances?

12          MR. HASSE:  Yes, Your Honor.  Again, though, this

13   may come up right before the detective.

14          THE COURT:  Are there --

15          MR. HASSE:   We may want to clean it up there.

16          THE COURT:  And she's your witness, at least you

17   called her.  The -- what's your view as you pressed her a

18   little bit about not responding aggressively to Kelsey's

19   disclosure, is -- do you have a problem with if she answers

20   that this is not the first time that the young -- that the

21   girl had come to her with sexual assault type complaints?

22          MS. DIAL:  Yes, Your Honor, the government does have

23   a problem with that because it's frankly not relevant.  And I

24   think more of our pressing was, as the Court has said, she's

25   our witness because we called her.

335

1           THE COURT:  Right.

2           MS. DIAL:  She hasn't met with us.  This was news to

3  us in many ways, that is, she was going to insist that the

4  only allegation was a wet willie when Kelsey disclosed as a

5  late teenager.  So I wanted to confirm with her that that's

6  what she was saying today, and then she has said how she

7  responded.  She says -- her testimony is that it was just a

8  wet willie.

9           THE COURT:  Right.

10          MS. DIAL:  And so she wouldn't need to respond in

11  the way that she would have to respond to other sexual abuse

12  allegations, instead she responded, as she said, she called

13  the school, she got her a counselor, she did all of these

14  things.  She has done the steps that -- well, she's done more

15  than you would expect for someone who just heard about a wet

16  willie, but she's insisting that there was no sexual assault

17  allegation, that it was merely a wet willie, so to then go

18  into, well, what about all of the other times that Kelsey was

19  sexually assaulted or she said she was sexual assaulted is

20  hearsay, it's not relevant, and it's not going to show how

21  Stephanie reacted better because she's backing up that she

22  reacted appropriately because there was no sexual assault

23  allegation.

24          THE COURT:  Same ruling.  We'll stay out of it.

25  Okay.  When I say "it," we will all stay out of the question

1  of other complaints by Kelsey to her aunt about boys at the

2  school.

3          MR. HASSE:  I'll go ahead right now, tell her very

4  briefly, and then we can continue.  Is that okay, Your Honor?

5          THE COURT:  Perfect.

6          MR. HASSE:  Shall we call her in?

7          THE COURT:  Yeah.

8      As soon as she gets seated, we can bring in the jury.

9  Perfect.

10     Come on up and have a seat.  You could do me a favor.  If

11 you could, make sure the attorneys stop talking before you

12 start.

13         THE WITNESS:  I'm sorry.

14         THE COURT:  It's okay.  It's very normal.

15         THE WITNESS:  I'm just anxious.

16         THE COURT:  Yeah.  It's totally understandable.

17 But --

18         THE WITNESS:  I understand.

19         THE COURT:  -- give them a chance to finish.

20         THE WITNESS:  Okay.

21     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

22 THE PRESENCE AND HEARING OF THE JURY:)

23         THE COURT:  We'll go to 4:00 and let you guys have

24 it at 4:00.  I've got a little work with the lawyers after

25 that and I don't need to keep you hanging around for that.

1   You can get on with your day.

2       Everybody having good luck not discussing the case with

3   family and friends at home?   They're appropriately curious so

4   you have to kind of keep them at arm's length.   Thanks for

5   observing that.

6       All yours.

7           MS. DIAL:   Thank you, Your Honor.

8   Q.  (BY MS. DIAL) Ms. Hendrickson, I want to go back to when

9   you were talking about picking up Kelsey when she was drunk.

10  A.  Okay.

11  Q.  Do you recall about how old Kelsey was?

12  A.  Yeah, she was about -- I think that was right after she

13  came to live with me so she was around a junior.   Kelsey was

14  probably about 17 years old.

15  Q.  And I believe your testimony was your daughter called and

16  you drove out and picked up Kelsey?

17  A.  Yes.

18  Q.  Who else did you pick up?

19  A.  Becky, my daughter, and there was another girl named

20  Justice Dirtseller.

21  Q.  You picked up all three of them?

22  A.  Yes.

23  Q.  Did you bring all three back to your house?

24  A.  Yes, ma'am.

25  Q.  And then at your house that night while Kelsey is drunk,

338

1  your testimony was she told you that she had been molested?

2  A.  Yes.

3  Q.  Who else was around when she said that?

4  A.  Becky, and my other daughter Brandy, and this girl named

5  Justice Dirtseller.

6  Q.  Anybody else around?

7  A.  No.

8  Q.  Anybody else staying at the house with you?

9  A.  No.  My husband.  I'm sorry.  But he wasn't -- yeah, I

10  think he was there.  It was late.

11  Q.  Was your husband -- you said he was there.  He was there

12  at the house or --

13  A.  Yes, he was at the house.

14  Q.  Okay.  Let me finish.

15  A.  All right.

16  Q.  You're all right.  The court reporter is going to come get

17  me.

18  A.  I'm sorry.

19  Q.  If we don't let her --

20  A.  I'm sorry.

21  Q.  That's okay.  So Becky, Brandy, Justice and Anthony.  Who

22  is your husband?

23  A.  Mark Hendrickson.

24  Q.  Mark.  Okay.  And Mark was asleep or he wasn't there?

25  A.  He was asleep.

1  Q.  So he didn't hear Kelsey?

2  A.  No.

3  Q.  So who heard Kelsey say that night that --

4  A.  Brandy, Becky.  Justice had been drinking so she -- I

5  don't know when she even acknowledged --

6  Q.  And what about the next morning?

7  A.  What do you mean?

8  Q.  I believe your testimony was you followed up with Kelsey

9  the next morning.

10  A.  Yes.

11  Q.  And was anyone around during that time?

12  A.  Brandy and Becky Hendrickson.

13  Q.  Was Justice?

14  A.  She went home.

15  Q.  Any other friends around?

16  A.  No.

17  Q.  Was Carlie Jones there?

18  A.  No.

19  Q.  If Carlie Jones says she was there with your daughters --

20  A.  She was not there.  I don't know why she says that.

21  Carlie was in and out of my house a lot but Carlie was not

22  there then.

23  Q.  So who is Carlie?

24  A.  She's a friend of my daughter Becky's.

25  Q.  And you said she was in and out of the house a lot?

1  A.  She didn't live with me but Carlie was in and out of the

2  house a lot.  She played ball, sports, with my other daughter

3  and she would come and stay with us.

4  Q.  Stay the night?

5  A.  Yes.

6  Q.  Would she stay a couple of days in a row sometimes?

7  A.  Sometimes.

8  Q.  Could she have been there and you just don't remember?

9  A.  No.  She wasn't there.

10  Q.  But she would stay with you at other times?

11  A.  Yes.

12  Q.  And so your testimony today, now, is that Kelsey only told

13  you it was a wet willie?

14  A.  Yes.

15  Q.  Did you ask her what a wet willie was?

16  A.  She told me.

17  Q.  What did she tell you?

18  A.  She told me she he stuck his tongue in her ear and asked

19  her if she wanted a wet willie.

20  Q.  You also just testified that afterwards you confronted the

21  defendant; right?

22  A.  Yes.

23  Q.  Or, I apologize, your brother.  You confronted him; right?

24  A.  Yes.

25  Q.  And you said you went round and round?

1    A.   Yes.

2    Q.   What does that mean?

3    A.   Well, me and my brother a lot of times didn't -- we didn't

4    agree on everything.  We had daughters the same age so there

5    was a lot of other stuff that we also argued about with

6    just -- the kids fighting and sometimes his girls would do

7    stuff to cause my daughter trouble and I -- me and him would

8    get into it.

9    Q.   I want to talk specifically about round and round with

10   these molestation allegations.

11   A.   I didn't -- I meant that we went round and round.  I told

12   him that he needed to stay away until I figured out what was

13   going on.

14   Q.   How long did you have him stay away?

15   A.   I'm not real sure really.  It's been a long time ago, but

16   he was gone for a while.  I didn't let him come back around

17   for a while.  It wasn't literally because I just -- after a

18   while everything just kind of -- nothing else was ever said.

19   Q.   How long is "a while"?

20   A.   Well, I'm guessing until probably Kelsey went home.

21   Q.   So you were concerned enough and believed Kelsey enough

22   that you kept your brother away from her?

23   A.   Of course.

24   Q.   Did you keep him away from your kids?

25   A.   He didn't come to my house.  I didn't see him.

1   Q.  Because you didn't let him?

2   A.  We just didn't talk.  Just -- we just didn't.

3   Q.  Did you tell him "you aren't allowed to come over?"

4   A.  I did.

5   Q.  Because you believed her?

6   A.  I didn't really know who I believed at that point.

7   Q.  Well, you didn't let him come over.

8   A.  That's right.

9   Q.  You cut off communication with him?

10  A.  Yes.

11  Q.  So is it fair to say you believed her?

12  A.  Kelsey told me a lot of stuff.

13  Q.  My question was, is it fair to say that you believed

14  her?

15  A.  I'm not real sure.

16          MR. HASSE:   Objection.  This is leading.

17          THE COURT:  I'll sustain the objection.

18  Q.  (BY MS. DIAL) At some point Jasmine came and lived with

19  you; right?

20  A.  Yes.

21  Q.  When was that?

22  A.  Kelsey had been there for a while and Jasmine kept trying

23  to come get Kelsey and wanted her to leave.  She didn't want

24  her there with me, so Kelsey convinced her to come stay with

25  me.  And it was probably -- I'm not real sure, somewhere in

1  that time that Kelsey was there.  Maybe months or two or three

2  months or somewhere in that time frame.

3  Q.  And how long did Jasmine stay with you?

4  A.  Not very long.  A couple of weeks maybe.  Two weeks, three

5  weeks.

6  Q.  And I believe you had said Kelsey came to live with you

7  because her mom had kicked her out?

8  A.  Yes.

9  Q.  Was Jasmine kicked out too?

10  A.  I think -- I'm not real sure.  I think that -- I think so.

11  Q.  But Jasmine didn't come live with you then?

12  A.  No.

13  Q.  You know Jasmine left the house though?

14  A.  Yes.

15  Q.  What about your brother, did his wife kick him out?

16  A.  I don't know.

17  Q.  During the time that Kelsey came to live with you, do you

18  know if your brother went to live somewhere else?

19  A.  I think so.

20  Q.  Where did Kayla live during that time?

21  A.  Well, at one point in time Kayla was with her mother

22  because I took Kelsey over there to see her mother and her

23  mother grabbed her by the shirttail and threw her out and told

24  her she wasn't a part of the family no more and Kayla was

25  there at that time.  So I don't know.

344

1    Q.   When Kelsey came to live with you, did Kayla come to live

2    with you?

3    A.   No.

4    Q.   Did Kayla go and live with her dad?

5    A.   I'm not sure.

6    Q.   At some point Kelsey posted a disclosure on Facebook;

7    right?

8    A.   Yes.

9    Q.   Did you see that post?

10   A.   It was brung to my attention.

11   Q.   And what did you think when you saw that post?

12   A.   My heart sank.

13   Q.   Why?

14   A.   I love -- I love my nieces regardless.

15   Q.   Were you sad that these things had happened to Kelsey?

16   A.   No.  I wasn't for sure.  I didn't know what to think.

17   Q.   So why did your heart sink?

18   A.   Kelsey called me and asked me to be on her side and I told

19   her that I couldn't be on her side because I didn't -- I

20   didn't believe her.

21   Q.   When you saw that post, how did you feel about your

22   brother?

23   A.   It was a lot of things.  Mad, sad, angry.

24   Q.   Why were you angry at him?

25   A.   I don't know, I just didn't -- I wasn't sure what was

1    going on.

2    Q.  But you saw Kelsey's post and you were mad at your

3    brother?

4    A.  I was mad at the whole world.

5    Q.  Were you mad at your brother?

6    A.  I don't know.  I was mad at all of them.

7    Q.  Do you recall talking to an FBI agent in October of

8    2021?

9    A.  Yes.

10   Q.  And do you recall talking to her about the Facebook

11   post?

12   A.  Not really.

13   Q.  Do you recall telling her that you were mad at your

14   brother when you saw that Facebook post?

15   A.  I don't remember.

16   Q.  When was the last time you saw Jasmine?

17   A.  She was at a family function at my mom's house.

18   Q.  A couple of years ago?

19   A.  Probably, yes.

20   Q.  When was the last time you saw Kelsey?

21   A.  Just right around that same time.

22   Q.  Was that about the time that you talked to them last,

23   too?

24   A.  Well, we've fought back and forth over this over Facebook

25   and said mean things to each other.  But other than that,

1    yeah.

2    Q.  Some of these mean things -- what were some of the mean

3    things you said to them?

4    A.  I told them they needed to stop their nonsense, that I

5    have an 83-year-old mom and that she's just totally -- I don't

6    want to lose my mom over all this.

7    Q.  So you told them to stop talking about it?

8    A.  I told them to stop.  I did.

9    Q.  When was the last time you talked to your brother Keith?

10   A.  Well, I see -- I talked to him, I mean, I talked to him --

11   I said hi to him yesterday.

12   Q.  After the Facebook post, did you talk to him?

13   A.  I -- I'm sure I did.

14   Q.  Have you stayed in touch, in contact, with your brother

15   since Kelsey and Jasmine came forward?

16   A.  I -- not a whole lot but, yes, I have -- I have talked to

17   Keith.

18   Q.  So when Kelsey made her post, you haven't talked to her

19   except to tell her to stop sharing --

20   A.  No, I sent her a message and told her I loved her also.

21   Q.  But that she needed to stop?

22   A.  Yes.

23   Q.  And you have talked to the defendant since then?

24   A.  Keith?

25   Q.  Yes.

1              MR. HASSE:  Objection.  Asked and answered and

2     leading.

3              THE COURT:  I'll sustain the objection.  One time is

4     plenty.

5     Q.  (BY MS. DIAL) When was the last time you saw Kayla?

6     A.  I just seen her.  I've -- I've seen Kayla.  Today.

7     Q.  So you still see Kayla and the defendant?

8     A.  Yes.

9     Q.  And still spend time with them?

10    A.  The defendant?

11    Q.  Your brother.

12    A.  No, I haven't really spent any time with Keith.

13    Q.  Do you love your brother?

14    A.  Yes.  But I also love Jasmine and Kelsey.

15    Q.  You believed Jasmine and Kelsey, though, up until it meant

16    your brother was getting in trouble?

17             MR. HASSE:  Objection.  Mischaracterizes prior

18    testimony.

19             THE COURT:  I'll sustain the objection.

20             MS. DIAL:  Nothing further, Your Honor.

21             THE COURT:  Thanks.

22                           CROSS-EXAMINATION

23    BY MR. HASSE:

24    Q.  Ms. Hendrickson, the night that you picked up Kelsey

25    Blaylock and brought her home drunk, that was a memorable

1   night to you; is that true?

2   A.   Yes.

3   Q.   Why was that memorable?

4   A.   She was -- she was drunk and she came to me and told me

5   that.  I just -- I mean --

6   Q.   How did you feel when she told you that?

7   A.   Well, my heart -- just like I said before, I love Kelsey.

8   My --

9   Q.   Is it fair to say you were -- you were alarmed to hear her

10   say something sexual had happened to her at her home?

11   A.   Yes.

12   Q.   And you took action immediately to try and find out what

13   was going on; is that true?

14   A.   Yes.

15   Q.   You let her sober up overnight?

16   A.   Yes.

17   Q.   Now, it was your testimony you did try and find out more

18   that night?

19   A.   Yes.

20   Q.   That's right?

21   A.   Yes.

22   Q.   And the only thing is she told you that night was about a

23   wet willie; is that right?

24   A.   Yes.

25   Q.   At that point did you just blow it off and say, oh, this

1  is nothing?

2  A.   No.

3  Q.   What did you do?

4  A.   I talked to Kelsey the next day and then I believe the

5  following day was school and I contacted her teacher and I let

6  her know what Kelsey had told me.

7  Q.   At the point which she said it was a wet willie, you felt

8  like maybe there's nothing to this.  Is that fair to say?

9  A.   When she first told me about a wet willie, I laughed, and

10 I know Kelsey was drunk and I told her, I said, "a wet

11 willie" -- I said "I hope that you washed your ears."

12      So then -- but my dad, as we were kids, used to come in

13 the room and he would constantly give us wet willies, so it

14 just -- it made me -- I laughed about it and then I got --

15 then I got to thinking about it and I was, you know, I just

16 was like "what do you mean a wet willie?"

17 Q.   So as soon as she mentioned the word, you said, molested,

18 red flags went off --

19 A.   Yes.

20 Q.   And you're going to have to let me finish.

21      Sort of everything went off and you wanted to make sure

22 that you got straight what happened; is that fair to say?

23 A.   Yes.

24 Q.   Is it fair to say that out of an abundance of caution you

25 wanted to make sure that you didn't let this slide if there

1  was something that was going on?

2  A.  Yes.

3  Q.  Is that why you went ahead and contacted the school?

4  A.  Yes.

5  Q.  How did you think the school was going to help?

6  A.  I knew that they would have -- they would figure out --

7  they could get Kelsey a counselor.  I was pretty much in close

8  contact with Kelsey's teacher.  She was a -- she was an

9  alternative ed teacher at the school.

10  Q.  So you had a relationship with that individual --

11  A.  Yes.

12  Q.  -- at the school?

13  A.  Yes.

14  Q.  You believed that she would be able to connect Kelsey

15  Blaylock with counseling?

16  A.  Yes.

17  Q.  To your knowledge did that happen?

18  A.  I never heard nothing else about it.  To my knowledge I

19  thought it did.

20  Q.  Okay.

21  A.  Yes, they --

22  Q.  But it -- you have three daughters --

23  A.  Yes.

24  Q.  -- is what you testified; is that correct?

25  A.  Yes.

1    Q.   So in taking this seriously, although the night that it

2    happened it didn't sound like anything happened, you wanted to

3    make sure that you didn't miss anything?

4    A.   Yes.

5    Q.   If Kelsey Blaylock had told you that night or the next

6    morning that something else had happened, would you have gone

7    to the police?

8    A.   Yes.

9    Q.   Did you ever tell Kelsey Blaylock not to report it to

10   police?

11   A.   No.  I took it to the school.  I knew that they would do

12   something.

13   Q.   Did you ever tell Kelsey Blaylock that there would be

14   consequences if she reported to police?

15   A.   No.

16   Q.   Did you ever tell Kelsey Blaylock that it was too late to

17   report it to police?

18   A.   No.

19   Q.   Did you ever tell Kelsey Blaylock that if she reported it

20   to police that Keith Parnell would go to jail?

21   A.   No.

22   Q.   Did you ever kick Kelsey Blaylock out of your home?

23   A.   No.  I love Kelsey.  I still love Kelsey.  I want what's

24   best for Kelsey.  I was like her second mother.

25   Q.   So this isn't the first time that you've been questioned

1  by federal officials about this case; is that right?

2  A.   That's right.

3  Q.   You received a letter last year from the U.S. Attorney's

4  Office; is that true?

5  A.   Yes.

6  Q.   Can you tell me what that letter said?

7  A.   I wasn't real sure.  Whenever they handed it to me, I

8  thought it was just a subpoena for all this, but then when I

9  got to reading it, it was actually them trying to say that I

10  guess that I was an accomplishment (sic.) in this.

11  Q.   Did the letter from the U.S. Attorney's Office --

12          MS. DIAL:  Objection.  Can we approach, Your Honor?

13      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

14  THE PRESENCE AND HEARING OF THE JURY:)

15          THE COURT:  What went on?

16          MS. DIAL:  So only defense counsel -- or defense

17  counsel -- sorry, another AUSA did send a target letter.

18          THE COURT:  A target letter to this lady?

19          MS. DIAL:  Yes, Your Honor.

20          THE COURT:  This is a wild state.  It was neither of

21  you; right?

22          MS. REININGER:  No.

23          MS. DIAL:  No.

24          THE COURT:  And what was the crime that was

25  suspected?

1          MS. DIAL:  I think it was -- I think the call was to

2    get her an attorney because she hadn't agreed to come in and

3    talk to them.  I wasn't part of it.

4          THE COURT:  It happened.  I know you weren't there.

5          MS. DIAL:  It happened.  She never went into grand

6    jury.  They got her an attorney.  There were no charges.  We

7    have not addressed that with her and in fact we confirmed with

8    the prior attorney he was no longer representing her before we

9    ever even tried to reach out to her, so I guess --

10          THE COURT:  She's been told that she's not a target?

11          MS. REININGER:  Right.  She has not been contacted.

12    We haven't --

13          MS. DIAL:  She --

14          MR. HASSE:  To my knowledge she hasn't been informed

15    that she wasn't a target.  Your Honor, what I think happened

16    is they were trying to squeeze a confession out of her because

17    they think that she was key and I think that instead they, you

18    know, just established the fact that, you know, she is

19    absolutely telling the truth.  She was facing possible

20    criminal prosecution.  They were trying to --

21          THE COURT:  Okay.

22          MR. HASSE:  You know, I would like to establish that

23    she's very credible at this point.

24          MS. DIAL:  Except I think the problem is, is at that

25    meeting, which I wasn't at, neither of us were at, I believe

1   she was told -- she got an attorney and was told she wasn't

2   under investigation.  We're getting into like a whole --

3          MR. HASSE:  She paid for an attorney.

4          THE COURT:  I'm happy to hear testimony about motive

5   or -- or intent or state of mind if it's relevant, but the

6   fact that -- I don't understand the fact that -- and I'm --

7   I'm a little shocked that, as I understand the facts, that she

8   would be told that she was going to be prosecuted by the U.S.

9   Attorney's Office, but whatever.  But I don't understand today

10  what that has to do with the credibility of her testimony.

11         MR. HASSE:  Your Honor, my view is, and the reason

12  I raised it, I thought it was relevant.  I think -- I think it

13  backfired on the government.  In fact -- the fact that she was

14  threatened with possible prosecution and stuck with this

15  story --

16         THE COURT:  Right.

17         MR. HASSE:  -- indicates that she's more credible.

18  My -- I don't -- my plan was not to follow this down much

19  further, but to just to elicit the testimony that she thought

20  she was the target of an investigation because she was told

21  she was the target of the investigation and she spoke and she

22  told the same story.

23         MS. DIAL:  I think that issue then goes to her

24  credibility and why she would -- or it creates an issue

25  because then we've got that she's -- she thinks she's a target

1    so now she has a reason to lie, now she has a reason to cover

2    up why she didn't report it.  It creates a larger issue by

3    getting into this whole target letter.

4            THE COURT:  I don't see that it's -- I hear the --

5    the extended logic but I think on the whole that it's

6    irrelevant and I'm always a little reluctant to go to Rule

7    403, I mean, it's part of the consideration.

8        I think the prejudicial downside of getting into who gets

9    charged and who gets target letters, particularly when it was

10   unusual in its application in this case, is going to be far

11   more confusing than prejudicial to the jury, than helpful, so

12   I think, you know, the relevance is very slight and the

13   confusion that it creates is very great.  We would have to

14   give them a short course on, you know, principles of federal

15   prosecution.

16           MR. HASSE:  Okay.

17           THE COURT:  Fair enough.

18      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

19   THE PRESENCE AND HEARING OF THE JURY:)

20   Q.  (BY MR. HASSE) It's fair to say that you understand that

21   there could be consequences for lying under oath?

22   A.  Yes.

23   Q.  And you would not do that?

24   A.  No.

25           MR. HASSE:  No further questions.

1          THE COURT:  All right.

2                    REDIRECT EXAMINATION

3    BY MS. DIAL:

4    Q.   In preparation for your testimony today, how many times

5    did you talk with defense counsel?

6    A.   I haven't -- I've spoke with him but I haven't talked to

7    anybody.

8    Q.   Have you talked with Mr. Hasse more than one time?

9    A.   No.

10   Q.   You've met with him before?

11   A.   Yes.

12          MS. DIAL:  No other questions, Your Honor.

13          THE COURT:  All right.  I think we can excuse you.

14          THE WITNESS:  Okay.

15          THE COURT:  Why don't we call --

16          MS. REININGER:  Judge, being cautious of the time, I

17   know the Court's intentions, I believe our next witness will

18   be very brief.

19          THE COURT:  That's what I was going to ask.  Let's

20   bring him in.

21          MS. REININGER:  At this time the government calls

22   Carlie Jones.

23          DEPUTY COURT CLERK:  Ms. Jones, would you raise your

24   right hand, please.

25          (WITNESS SWORN)

1          DEPUTY COURT CLERK:  Thank you.  Go ahead and have a

2    seat and you can adjust the microphone if you need to.

3          THE COURT:  Good afternoon.  Thanks for coming in.

4    I appreciate it.

5          MS. REININGER:  May I proceed?

6        Thank you, Your Honor.

7                         CARLIE JONES,

8    having been called as a witness, after being first duly sworn,

9    testified as follows:

10                     DIRECT EXAMINATION

11   BY MS. REININGER:

12   Q.  Can you state your name for the record?

13   A.  Carlie Jones.

14   Q.  J-o-n-e-s?

15   A.  Yes, ma'am.

16   Q.  Ms. Jones, where were you raised?  Where did you grow up?

17   A.  Locust Grove.

18   Q.  Where did you go to high school?

19   A.  Locust Grove.

20   Q.  Do you know an individual by the name of Stephanie

21   Hendrickson?

22   A.  Yes.

23   Q.  How do you know Stephanie?

24   A.  It was my best friend's mom.

25   Q.  Who is your best friend?

358

1    A.   Becky Hendrickson.

2    Q.   How old are you?

3    A.   Twenty-seven.

4    Q.   Is Becky 27 as well?

5    A.   Yes.

6    Q.   Did you guys attend high school together?

7    A.   Yes.

8    Q.   I want to take you back to about the time that you were in

9    high school.  Did you spend a lot of time over at Becky's

10   house?

11   A.   Yes.

12   Q.   Where did she live?

13   A.   On the corner in a trailer across from Hogan Cemetery.

14   Q.   And did Becky live with her parents?

15   A.   Yes.

16   Q.   Who -- do you remember her dad's name?

17   A.   Mark Hendrickson.

18   Q.   And did she live with anyone else besides her mom and her

19   dad?

20   A.   Brandy Hendrickson.

21   Q.   Who is Brandy?

22   A.   A sister with her two twins at the time.

23   Q.   Is Brandy older or younger than Becky?

24   A.   Older.

25   Q.   And did you remember anyone else living in that house?

1   A.   Kelsey moved in for a short period of time and so did

2   Jasmine.

3   Q.   How much older is Brandy than you and Becky?

4   A.   Four, five years.

5   Q.   Okay.

6   A.   Somewhere close.   Sorry.

7   Q.   And about how much older do you know Kelsey and Jasmine to

8   be than you and Becky?

9   A.   A year or two, give or take.

10  Q.   So these were all older girls that were kind of in and out

11  of the house as well?

12  A.   Yes.

13  Q.   About how often were you over at that house?

14  A.   It was like my second home so almost every night.

15  Q.   Did you guys play sports?

16  A.   Yes.

17  Q.   What sport did you play?

18  A.   Softball and track and basketball.

19  Q.   Did Becky also participate in those sports?

20  A.   Yes.

21  Q.   Were you guys just together all the time?

22  A.   Pretty much.

23  Q.   When you would be over at the house, was there ever any

24  alcohol around?

25  A.   I know there was in the shop before and there was some in

1  the fridge, I just don't know whether it was the older sister

2  or whose it was.

3  Q.  Okay.  Did you ever see any of the older girls drinking in

4  the house?

5  A.  Yes.

6  Q.  Who did you ever see drinking?

7  A.  Brittany.

8  Q.  And did you ever consume alcohol over at Stephanie's

9  house?

10  A.  Yes.

11  Q.  Was this around the time you were in high school?

12  A.  No.  We had graduated.

13  Q.  Okay.  When you guys would be over at the house, where --

14  where would people hang out?

15  A.  Either in the front living room, there was two, so when

16  you walked in, there was one area there or one to the left.

17  We were always in there or in the bedroom to the right.

18  Q.  Was there an outside place to the trailer?

19  A.  Yes.  An outside patio.

20  Q.  And did people ever congregate out there as well?

21  A.  Yes.

22  Q.  Was this kind of a social house?

23  A.  Yes.

24  Q.  And when you would be over at the house, how -- how

25  frequently would people be over at the house as well?

1   A.   Every night.

2   Q.   Okay.  I want to direct your attention to a specific time

3   where Kelsey was at the house.  Do you remember when Kelsey

4   moved in to live with Stephanie?

5   A.   Yes.

6   Q.   When do you recall that happening?

7   A.   It was whenever I was in high school.

8   Q.   Do you remember what grade you were in?

9   A.   I want to say a freshman.

10  Q.   And do you remember what grade Kelsey would have been

11  in?

12  A.   A sophomore or junior.  Sorry.

13  Q.   Do you know why Kelsey moved into the house?

14  A.   It was an argument with her parents, one of them.

15  Q.   And at some point do you -- was there a time where you

16  were at the house where something happened with Kelsey?  And

17  let me rephrase that.  That was a bad question.

18      Was there something that happened at Stephanie's house

19  where -- with Kelsey?

20  A.   Whenever -- sorry.

21  Q.   Do you remember a time being at Stephanie's house where

22  Kelsey had said something that kind of caused people to get

23  excited?

24  A.   Yes.

25  Q.   Okay.  Can you explain to me what you remember happening

1   about that time?

2   A.  We were all in the social area inside the home and she had

3   said that her father was molesting her.  And -- sorry.  I'm

4   sorry.

5           THE COURT:  Take your time.  You can have a glass of

6   water too if you like.

7   Q.  (BY MS. REININGER) Let me ask you, Carlie, who do you

8   remember being at the house at that time?

9   A.  Stephanie, Kelsey, myself, Becky, and I'm not a hundred

10  percent positive on the other two that I feel like were

11  there.

12  Q.  And you said that you guys were in kind of the front

13  gathering room, does that sound right?

14  A.  Yes.

15  Q.  And Kelsey said that her dad was molesting her?

16  A.  Yes.

17  Q.  What happened or how did that even come up in

18  conversation?

19  A.  It was discussed because we were -- not we, Stephanie was

20  trying to figure out where the altercations, like the

21  arguments were coming from and she was in such a frantic to

22  move into her Aunt Stephanie's house.  And so that is what

23  geared that conversation, and Kelsey finally just blurted it

24  out.

25  Q.  And when Kelsey made that statement that her father was

1   molesting her, what did you think?

2   A.   I -- it was like mixed.  Because on one side we were

3   always told that's just who the girls were, but once she went

4   further into the story, my heart broke.

5   Q.   Did she tell about specific instances or times that things

6   happened?

7   A.   Yes.

8   Q.   And was everyone that you've just testified to, were they

9   around that time?

10  A.   Yes.

11  Q.   Do you remember seeing Aunt Stephanie's reaction?

12  A.   Yes.

13  Q.   Can you describe how she reacted?

14  A.   When it -- when it was first said, she acted like any aunt

15  and parent should react.

16  Q.   And what do you mean by that?

17  A.   It was like she was instantly infuriated and emotional

18  about the situation.

19  Q.   So what did she do in response to what Stephanie said?

20  A.   They went --

21  Q.   I'm sorry, in response to what Kelsey said.  I apologize.

22  A.   Will you reask that?  Sorry.

23  Q.   What did Stephanie do in response to what Kelsey had said?

24  A.   I know she said that she wanted to make sure -- she wanted

25  Kelsey to clarify what she meant by her father molesting her,

1   and then they stepped into the right-side bedroom which at

2   that time was the kids' room.

3   Q.   Okay.  Who went into that bedroom?

4   A.   Stephanie and Kelsey at first and then we all made our way

5   that way.

6   Q.   How long were Stephanie and Kelsey in that bedroom by

7   themselves before you guys made your way?

8   A.   At least 20 to 30 minutes.

9   Q.   Did you hear any conversation going on when you were

10  outside of that bedroom?

11  A.   Not during that timeframe.

12  Q.   Okay.  And then at some point you guys make your way back

13  to that bedroom?

14  A.   Yes.

15  Q.   What happens when you make your way back into that

16  bedroom?

17  A.   Kelsey had been clearly crying and upset.  And Stephanie

18  was saying that she was going to make sure the situation was

19  handled properly, but that Kelsey needed to understand the

20  repercussions if Stephanie moved forward and that the cops

21  would have to get involved and they would most likely be taken

22  away and not have their family.

23  Q.   And so did you see how Kelsey's behavior was in response

24  to what Stephanie was telling her?

25  A.   It was one of those -- I don't know how -- like could you

1  see all of the hope left her where she thought she was about

2  to be able to have somebody help her and then she was put in a

3  situation of losing everybody and splitting her sisters and

4  brothers up in two separate homes.

5  Q.  So what did Kelsey do?

6  A.  Kelsey said "never mind" she didn't want to go forward

7  with the cops.

8  Q.  And was that the end of the conversation?

9  A.  No.

10  Q.  What happened next?

11  A.  Stephanie I guess verified that but she said that Keith

12  would no longer be invited to like the family functions and

13  any kind of gathering along those lines.

14  Q.  Did you maintain your relationship with Becky after Kelsey

15  had made her statements that evening?

16  A.  Yes.

17  Q.  Did you stay in contact with the family and make visits to

18  the -- their home as you had prior?

19  A.  Yes.

20  Q.  To your knowledge did you ever see Keith coming over to

21  Stephanie's house after that evening?

22  A.  He did but it was two-and-a-half, three years after.  Like

23  for birthdays and everything else he did not.

24  Q.  I want to talk about that evening when the conversation

25  was going on.  What had you guys been doing that day or that

1  night?

2  A.  I don't know.  Probably -- honestly we ran through the

3  cemetery at nighttime.  So it was just a typical social night

4  at the house.  It was nothing abnormal.

5  Q.  Do you recall there being alcohol around?

6  A.  Not that night.  I didn't see it.

7  Q.  Do you recall Kelsey being intoxicated that night?

8  A.  I know it was brought up but I never -- I did not see her

9  take a drink of alcohol.

10  Q.  Did you -- based on your observations of her did she

11  appear to be under the influence of drugs or alcohol?

12  A.  I would say no.

13  Q.  You said that Becky was a friend of yours.  Were you

14  friends with Kelsey?

15  A.  Whenever she was at Stephanie's we talked and she hung out

16  with all of us.  We didn't hang out -- whenever she moved out,

17  we didn't text or call or hang out.

18  Q.  Have you communicated with Kelsey since she moved out of

19  Stephanie's home?

20  A.  Only in person.  Like if we see each other, we do

21  communicate.

22  Q.  Do you see each other in person often?

23  A.  Not unless it's at Walmart.  Not really.

24  Q.  Okay.  But you guys aren't social friends with one another

25  and -- just friendly if you see each other in passing?

1  A.  Yeah.  We're friends on -- or we were friends on Facebook

2  and I would like her kids' pictures, but that's about it.

3  Q.  As a result of your willingness to come to court, has it

4  affected your relationship with Becky?

5  A.  Yes.

6  Q.  How so?

7  A.  We don't -- we don't talk.

8  Q.  Why do you not talk?

9  A.  Because I know they know what was said that night and they

10 knew that I was coming to tell the truth and they want no part

11 of me coming forward.

12 Q.  Have you been approached about your testimony today in

13 court?

14 A.  By them?

15 Q.  By Stephanie.

16 A.  No.  They -- they had messaged a couple of times to come

17 over and hang out since they found out I was coming to court

18 but nothing about that was brought up and I did not go.

19 Q.  Has Becky talked to you about your testimony here in court

20 today?

21 A.  No.

22          MS. REININGER:  I have no further questions.  I'll

23 pass the witness.

24          THE COURT:  Okay.  We'll stay a few minutes later if

25 you guys don't mind.

1                    CROSS-EXAMINATION

2   BY MR. HASSE:

3   Q.  Ms. Jones, you were interviewed by Pryor PD in relation to

4   these allegations; is that right?

5   A.  Correct.

6   Q.  You know that that interview with police was recorded; is

7   that right?

8   A.  Uh-huh.  Yes.  Sorry.

9   Q.  Is it fair to say that what you told police is not the

10  same thing that you told the court here today?

11  A.  Not to my knowledge.  I know since all of this has come to

12  light and more thinking on it there has been more times coming

13  up to the -- I've reached out to attorneys and talked to them

14  and Pryor PD, and they advised me to come to the attorneys to

15  speak with them.

16  Q.  Which attorneys did you speak to?

17  A.  These two right here.

18  Q.  When did you speak to these two attorneys?

19  A.  I don't have an actual date.

20  Q.  Was it this year?

21  A.  Yes.

22  Q.  So that would be either January or February; right?

23  A.  Correct.

24  Q.  You met with these attorneys and at that time did you tell

25  them that you had more to add that you hadn't disclosed to

1    police before?

2    A.   I told them that after time thinking about the situation

3    more was coming to my mind and light into the situation.

4    Q.   I see.  How long -- how many years ago was it that this

5    night happened that we've been talking about?

6    A.   If I was a freshman or sophomore, I mean, I graduated in

7    2013 so -- I was 15, 16.  I don't have an exact date for you.

8    Q.   It was at least ten years ago; right?

9    A.   Correct.

10   Q.   Okay.  And it's your testimony today that your

11   recollection of that night has improved since you talked to

12   the Pryor Police in 2020?

13   A.   Can you rephrase?  What do you mean, like, by improved?

14   Q.   Well, in 2020 that was -- at the time it was less than a

15   couple years ago.  That was closer to the event.  My question

16   is, is it your testimony you remember better right now what

17   happened than when you talked to the Pryor PD?

18   A.   Yes.  I mean it was a couple of months after speaking with

19   the Pryor PD.  When you start talking about the instances that

20   happened, more starts coming to light.

21   Q.   So it's your testimony that you're just remembering more,

22   you're not remembering differently than what you told the

23   Pryor PD?

24   A.   Correct.

25   Q.   Did you tell the Pryor PD that Stephanie had said she was

1    going to call the police and report it and Kelsey did beg her

2    not to at that time?

3    A.   That's what I answered awhile ago.

4    Q.   But your testimony right now was in fact that -- here in

5    court you said that Stephanie Hendrickson told Kelsey Blaylock

6    that if they reported it to police that there would be serious

7    consequences.

8    A.   That was also told to the Pryor PD.

9    Q.   When?

10   A.   The very first time I went in.

11   Q.   So --

12   A.   That was a whole -- the whole reason was the whole

13   recanting their statement.  And when I was asked why did they

14   take back their statement to Stephanie, I told them because

15   they were told that the police would have to come and that

16   would split up their family.  That was told to the detective I

17   spoke to.

18   Q.   But -- okay.  So it's your -- how many times did you talk

19   to Pryor PD?

20   A.   Once in person and once or twice on the phone.

21   Q.   Do you remember the approximate dates when these calls

22   were with Pryor PD?

23   A.   No, I don't.

24   Q.   Okay.  You do recall meeting with a Pryor Police

25   Department detective in person that was recorded?

1  A.  Correct.

2  Q.  Okay.  And everything you said in that meeting was

3  accurate and true; is that fair to say?

4  A.  Correct.

5  Q.  You understood at that time that you needed to tell the

6  truth and that was your intent was to tell the truth to the

7  Pryor PD with regard to what happened that night?

8  A.  Correct.

9  Q.  Okay.  And so you can tell us here today that anything

10  that you said there, that's true, and you'll stand by it here

11  in court; is that right?

12  A.  Correct.

13  Q.  Do you recall Detective Allen asking you if you think that

14  Stephanie talked to someone law enforcement wise?  Do you

15  remember him asking you that question?

16  A.  Yeah.

17  Q.  Do you remember how you responded?

18  A.  Not word for word.  I would have -- I mean I wasn't there

19  if she spoke to law enforcement.

20  Q.  Well, how would you answer it today?

21  A.  The same way I just -- I was not there in the home.  If

22  she did talk to law enforcement, I was not there.

23  Q.  But that it was possible she may have contacted law

24  enforcement?

25  A.  I mean it was possible.  I wasn't there to know that.

1  Q.  Okay.  And it was your testimony both -- it was your

2  testimony today that Stephanie first said that she was going

3  to call the police?  Is that right?  I'm -- if I have that

4  wrong, please clarify for me.

5      Kelsey and Stephanie, according to your testimony, went

6  into a separate room together.

7  A.  Uh-huh.

8  Q.  And they came out and you said Kelsey Blaylock had been

9  crying.  And is it true that Stephanie had said that she was

10  going to call the police and report it and Kelsey begged her

11  not to?

12  A.  Whenever that was stated, it was stated before -- after

13  that is whenever.  Before that -- sorry.

14      It was told to Kelsey that if the police were called,

15  then they -- their families would be getting split up.  That

16  is when Kelsey was begging them not to call.

17      And I let the detective know that the first day I met

18  with him.

19  Q.  All right.

20          MR. HASSE:  Your Honor, may we have a sidebar?

21      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUTSIDE

22  THE PRESENCE AND HEARING OF THE JURY:)

23          MR. HASSE:  So I'm surprised -- I'm surprised by her

24  testimony.  It's -- it cannot be reconciled with the only

25  transcript that I have.  I have a recording of that I would

1   like to be able to play to her and play to the jury.  I would

2   ask that we be adjourned and in the morning complete her

3   cross-examination.

4       I would like to inquire with the U.S. Attorneys to make

5   sure this -- that there isn't anything that has not been

6   disclosed.  Just to be clear, what can't be reconciled is that

7   Carlie Jones, when she met with Pryor PD, she gave a different

8   account, and now all of a sudden the account harmonizes with

9   Kelsey Blaylock's story, which it never did.

10          MS. DIAL:  Sorry, what specifically?  Because we're

11  not sure what statements you're saying that it's

12  inconsistent.

13          MR. HASSE:  Okay.  The testimony that was surprising

14  to me was that she came up and said that Stephanie Hendrickson

15  said in front of her and said to Kelsey Blaylock that if we

16  call police, there's going to be consequences and so

17  discouraged her from that.

18      The opposite -- if I may just finish.  The opposite seems

19  to be true here where Carlie -- Carlie Jones is telling

20  specifically that her account before was Stephanie was saying

21  "I'm going to call the police" and Kelsey said "don't," was

22  begging her don't do that.

23          MS. DIAL:  If you go on two more lines, she told

24  police "what I remember is that she did not want to call the

25  police due to the fact that it was going to ruin her family

1    and make a lot of people mad."

2         I think her testimony is consistent with her prior

3    reports.

4              MR. HASSE:  I think in context it's not because

5    where her testimony today on the stand is that Stephanie is

6    saying, do you really want to go there, we don't want to call

7    police.  It goes on to the question, do you think that

8    Stephanie talked to someone from law enforcement wise.  If it

9    was consistent, she said no, and instead she says I want to

10   say she did but I don't know.

11             THE COURT:  All right.  You can certainly impeach

12   her tomorrow with a prior inconsistent statement.  It's hard

13   for me without reading it to know whether it's consistent or

14   not, but it will be apparent once it comes out in the -- in

15   the testimony.

16        I'm going to let the jury go.  She's not far away.  She

17   can come back tomorrow.

18             MS. REININGER:  She's not what?

19             THE COURT:  She doesn't live far away.

20             MS. REININGER:  They all live about 40, 45

21   minutes.

22             THE COURT:  Yeah.  So if she'll return at 8:30,

23   we'll finish up with her then.  Okay.

24        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

25   THE PRESENCE AND HEARING OF THE JURY:)

1           THE COURT:  All right.  We're going to call it a

2    day.  I'll resume with your testimony at 8:30 tomorrow.

3        Okay.  We'll let you guys go and thanks.  I'll just

4    repeat my request that you keep what you've seen and heard

5    here today to yourselves and wait until you're in the jury

6    room to -- at the end of the case to discuss it fully amongst

7    the 12 of you.

8        (RECESS HAD)

9        (JURY INSTRUCTION CONFERENCE WAS HAD BUT NOT DESIGNATED

10   AS PART OF THIS RECORD.)

11

12                    **REPORTER'S CERTIFICATION**

13       I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

14   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15

16              CERTIFIED:    S/Laura Griffin
                              Laura Griffin, RPR, CRR
17                            United States Court Reporter
                              333 W. 4th Street, RM 411
18                            Tulsa, OK  74301
                              (918) 699-4879
19                            laura_griffin@oknd.uscourts.gov

20

21

22

23

24

25