1    UNITED STATES DISTRICT COURT FOR THE
        NORTHERN DISTRICT OF OKLAHOMA

2

3

UNITED STATES OF AMERICA,          )

4                                  )
                PLAINTIFF,         )

5                                  )
vs.                                )    Case No. 21-CR-439-GWC

6                                  )
                                   )

7  KEITH DUANE PARNELL,            )
                                   )

8                DEFENDANT.        )
                                   )

9

10

11

12          TRANSCRIPT OF PRE-TRIAL HEARING
        BEFORE THE HONORABLE GEOFFREY W. CRAWFORD
            UNITED STATES DISTRICT JUDGE

13                MARCH 7, 2022

14

15

16

17              A P P E A R A N C E S

18

FOR THE PLAINTIFF:

19

REAGAN V. REININGER and CHANTELLE DIAL, Assistant United

20  States Attorneys, 110 West 7th Street, Suite 300, Tulsa, OK
    74119

21

FOR THE DEFENDANT:

22

THEODORE M. HASSE, Wirth Law Office, 500 7th Street, Tulsa, OK

23  74119

24

25  TRANSCRIBED BY:  Laura Griffin, RMR-CRR, LAURA_GRIFFIN@OKND.USCOURTS.GOV.

1                      MARCH 7, 2022

2                  P R O C E E D I N G S

3          THE COURT:  It's a pleasure to be here.  We're all

4   from Vermont so it's a little different but it's also very

5   familiar.  Federal courtrooms kind of run the same all over

6   the country.

7      I put out a brief agenda this morning just to make sure

8   that I covered the things that I wanted to talk with you all

9   about, but maybe you could start by introducing yourselves.

10         MS. REININGER:  Good morning, Your Honor.  My name

11  is Reagan Reininger.  I'm an Assistant United States Attorney

12  for the Northern District of Oklahoma.

13         THE COURT:  Nice to meet you.

14         MS. REININGER:  Nice to meet you.

15         MS. DIAL:  Good morning, Your Honor.  Chantelle Dial

16  for the United States obviously.

17         MR. HASSE:  Good morning, Your Honor.  My name is

18  Ted Hasse.  I'm defense counsel for Keith Parnell.

19         THE COURT:  What's the full name?

20         MR. HASSE:  Ted Hasse, Your Honor.

21         THE COURT:  Great.  And this is Mr. Parnell?

22         DEFENDANT PARNELL:  Yes, sir.  My name is

23  Keith Parnell.

24         THE COURT:  Thank you.  Good to meet you all.

25         DEFENDANT PARNELL:  Yes, you too.

1        THE COURT:  Voir dire, I spoke with the staff here.

2   It runs the same way we do it at home.  We'll bring in the

3   entire panel.

4       How many have we got coming in?

5        DEPUTY COURT CLERK:  Probably about 50, between 40

6   and 50.

7        THE COURT:  40 and 50.  We'll call up 32.  They'll

8   sit in their designated spots so you'll have a seating chart.

9   You'll know everybody's name.

10      I follow the use it or lose it.  We'll start with script.

11  I'll ask in a minute whether anybody has got some improvements

12  to offer on that.  The peremptories, 6 and 10.  Use it or lose

13  it.  In other words if you pass, that extinguishes one of your

14  peremptories.  Is that what you're familiar with here?

15       MS. REININGER:  I've never tried a case where we've

16  done something the same so...

17       THE COURT:  It's different all the time?

18       MS. REININGER:  Every judge is different to me so

19  however the Court -- it will always be new to me.

20       THE COURT:  All right.

21       MR. HASSE:   This is clear enough.

22       THE COURT:  Okay.  Then two passes in a row, meaning

23  one from each side, means that everybody is content and we'll

24  have a jury at that point.

25      But obviously if you pass, you'll extinguish a challenge,

1    but you can continue on with your remaining challenges if

2    something occurs to you.

3        I don't impose any kind of complicated restriction on

4    back striking.  In other words you can -- you can exercise

5    your peremptories against anybody that you like.  Whether you

6    have previously passed and been content with that group makes

7    no difference.  It's too complicated to try and keep track of

8    that.

9        I'll have two alternates.  You'll each get an additional

10   peremptory against them.  That will be a group of four, one

11   peremptory each will result in two.  If you pass on that --

12   I'm not making myself clear.  Number 33 and 34 will be the

13   alternates if nobody exercises a strike against the little

14   subgroup of four alternates.

15       So far so good?

16           MR. HASSE:  So far so good.

17           THE COURT:  Okay.  In light of the content of the

18   case, my experience with cases involving sexual issues is that

19   unfortunately a lot of jurors have family type experience

20   themselves and that they need to speak at sidebar about, so my

21   idea is the three of us will meet here with each juror who

22   indicates that he or she has something that they need to share

23   and speak privately with that juror.

24       I generally don't include the defendant in those

25   conversations.  I suppose if you insist, we'll have to deal

1   with it.  What's your feeling about that?

2              MR. HASSE:  That's fine, Your Honor, just counsel.

3              THE COURT:  Just counsel.  It's been a while -- I

4   was a state court judge.  We did this regularly then.  It's

5   been a while for me but my experience is three-quarters of the

6   jurors are going to have something to share that we need to

7   talk about.

8        Witness list, I wanted to thank the government for that

9   memo.  I've been through it a couple of times.  It was an

10  excellent introduction.  It has a witness list.

11       Did you have anything to update or shall I read that?

12             MS. REININGER:  I believe, Your Honor, the witness

13  list that I sent earlier last week is a shorter list that

14  might be a little bit more concise.

15             THE COURT:  Oh, okay.  I don't know that I have

16  that.  I do now.

17             MS. REININGER:  And, Judge, I believe it's -- we

18  have eight witnesses that have been endorsed for testimony.

19             THE COURT:  Got it.

20       Mr. Hasse, I'm always super sensitive about never

21  suggesting that the defense has any obligation to call a

22  witness of course, so I what I usually do is read all of these

23  names as a witness list from counsel generally.  That work for

24  you?

25             MR. HASSE:  Yes, Your Honor.

1          THE COURT:  Did you want to add anybody to that

2     list?  No obligation, of course, but if you -- somebody that

3     might be a neighbor or something, this would be the time to

4     say.

5          MR. HASSE:  Your Honor, we have submitted a witness

6     list for trial.  There's some overlap between the two.  I

7     believe there's two names that are not -- sorry.

8          THE COURT:  That's what I was going to ask.  Which

9     ones?

10          MR. HASSE:   The two names that are not already on

11     the government's witness list are Anthony Parnell and Branden

12     Parnell, and of course Defendant Keith Parnell.

13          THE COURT:  You want me to read his name too?

14          MR. HASSE:   I don't think that will be necessary.

15     I think we'll be able to confirm with the jury whether or not

16     they know Keith Parnell right up front.

17          THE COURT:  All right.

18          MR. HASSE:   But, yeah, Just Anthony Parnell and

19     Branden Parnell are the two names we would ask be added to the

20     list of possible witnesses to read to the jury.

21          THE COURT:  Perfect.  So I'll do that.  I'll read

22     all 10 as a combined potential witness list so as not to step

23     on any plans that you have.

24          MR. HASSE:   Thank you, Your Honor.

25          THE COURT:  Good.  Okay.  Additional questions?  I

1  tried to hit the highlights.  I'm glad to add more.  I had

2  not -- my understanding is the culture in this building is

3  that typically lawyers do not participate directly in voir

4  dire so I'm glad to cover everything on my script and add

5  anything that either side wants.

6       Anything further that the government wanted to add?

7            MS. REININGER:  Your Honor, the only thing I would

8  ask is -- and I think it's really going to depend on the

9  Court's ruling on the 404(b).

10           THE COURT:  Right.

11           MS. REININGER:  But if there's going to be testimony

12  regarding physical abuse, I would ask if the Court could

13  inquire, not specifically with just sexual abuse, but also

14  sexual and physical abuse.

15      I don't know if that's going to open up just a floodgate

16  but I know that that will be testimony that the government is

17  going to attempt to elicit from one of the victims.

18           THE COURT:  The physical abuse meaning neglect type

19  abuse or -- or like disciplinary hitting type abuse?

20           MS. REININGER:  I wouldn't say disciplinary hitting,

21  I would say -- I anticipate that there's going to be testimony

22  that the victim -- what caused the victim to leave was an

23  altercation that occurred with her -- with the defendant that

24  caused her to leave the home permanently.  And it was an

25  incident involving strangulation.

1           THE COURT:  Oh, I see.  As you say, once we open

2    that box, we're going to hear a lot -- that doesn't sound like

3    the centerpiece of the case obviously.

4           MS. REININGER:  Sure.

5           THE COURT:  Do you think we could safely pass on

6    that?

7           MS. REININGER:  Whatever the Court wishes to do.

8           THE COURT:  That's my inclination because it's not

9    really a case about physical assault.

10          MS. REININGER:  Sure.

11          THE COURT:  Yeah.  Thanks.

12      Anything more that you had in mind to kind of cover it?

13    I think the hot-button issue will be the prior experience with

14    sex abuse.

15          MS. REININGER:  I'm good with what the Court has

16    proposed.

17          THE COURT:  Mr. Hasse, how about from your side?

18          MR. HASSE:   Your Honor, if I may add something

19    related to what was just discussed here.  We of course would

20    have objected to the government eliciting testimony about the

21    one incident, an alleged choking incident.  It sounds like

22    we're not going to do testimony about that because it would

23    potentially create issues.

24      The other --

25          THE COURT:  We're certainly not going to do voir

1    dire about that and hear about jurors' experiences.

2            MR. HASSE:    Then I misunderstood.   Yeah, I think

3    we'll then -- judge, we would like to move that that testimony

4    be excluded.   We can I guess address that when the Court is

5    ready.

6            THE COURT:   Yep.

7            MR. HASSE:    But there is -- the government has

8    signaled that they intend to elicit testimony specifically

9    about neglect type abuse, and in reference to the notice that

10   was filed by the government, one of the specific items was

11   that they -- that the children were flea bitten or covered in

12   fleas or something along those lines.

13           THE COURT:   Right.

14           MR. HASSE:   If that testimony is going to be

15   elicited, I would say we may need to ask the jurors about

16   whether or not they can fairly judge a case where that's one

17   of the issues or one of the factors.

18       Additionally when we're talking about what else might be

19   covered by -- in voir dire, jury selection questions, Judge,

20   we would -- we would just ask that in addition to asking the

21   jurors whether the issue of sexual misconduct ever impacted

22   their life or the life of someone close to you, I would ask --

23   because the sensitive nature of these types of accusations, I

24   would ask that the jury just be asked that for even those

25   people who are not going to want to hold their hand up and

1   say, yes, it's impacted my family, if they could be asked

2   whether or not they could fairly judge a case and keep an open

3   mind despite such allegations.

4           THE COURT:  Sure, that's fine.

5           MR. HASSE:  And that's all we would add to the jury

6   selection questions, Your Honor.

7           THE COURT:  All right.  I have a little further down

8   a note to make a plan to deal with the res gestae 404(b)

9   issues more formally.  I think we're going to need an hour to

10  talk about them.

11      But I did spend time with a subject I'm hearing from the

12  government.  I was not in favor of the neglect type bad acts,

13  you know, the flea stuff.  I saw the sex conduct more clearly

14  as part and parcel of the entire offense, sort of the heart of

15  res gestae.

16      From the government's perspective is it necessary to deal

17  with that issue in voir dire?  Because again if we ask

18  about -- the defense feels that they wish to or need to, it's

19  not the main point of the case.  I would be glad for your

20  thoughts.

21          MS. REININGER:  Your Honor, I think with -- as the

22  Court had earlier stated, with regards to the neglect, I would

23  say it would be the same as the physical abuse.

24          THE COURT:  Right.

25          MS. REININGER:  And if we're not going to mention

1    the physical abuse during voir dire, I think neglect would
2    also kind of fall into that same analysis.
3              THE COURT:  Yeah.  All right.
4         Mr. Hasse?  I mean what is it you want me to ask them
5    exactly?
6              MR. HASSE:  Just if the issue of -- whether the
7    issue of child abuse through neglect has impacted their lives
8    or the life of someone near them and, if so, if that would
9    impact their ability to fairly judge a case where such issues
10   came up.
11        Your Honor, I guess as the Court points out, you know,
12   neither the alleged physical abuse incident nor the neglect is
13   really core to this case.  It's tangential.  If that's the
14   logic for leaving it out of voir dire, we respectfully submit
15   that that should be the logic for excluding that sort of
16   testimony being elicited.
17             THE COURT:  I'm trying my best not to make a ruling
18   on the 404(b) issue until I hear from you, but I will not ask
19   in voir dire about family history of poverty, neglect,
20   inadequate childcare type conditions.  I think we'll -- I
21   don't think that's the focus of the case and I think it's
22   unlikely that that will survive the 404(b) type discussion.
23        I'll hang on to my options with respect to the physical
24   abuse for that final departure from the household, not make a
25   ruling now.  I would like to hear from both of you more, but I

1  think we can get through a voir dire without asking whether

2  anybody has been in a situation in which some household member

3  was subject to physical abuse.  That's going to send us down

4  an alley.

5           MR. HASSE:  Thank you, Your Honor.

6           THE COURT:  All right.  But I will ask for those

7  people who haven't raised their hands in response to the

8  family history or connection with sexual abuse whether they

9  can fairly hear the case given its -- given the type of

10  allegations.

11      All right.  I got a helpful note from our court officer

12  about stipulations and I have -- I think I have a note about

13  those too before we get there.

14      Pseudonyms, did you wish to call the two victims by their

15  full names or by their initials?  I wasn't quite sure.

16           MS. REININGER:  Your Honor, I think we at this time

17  will move to call the victims by their full name and not refer

18  to them as minor victims or MV 1 or 2 or their initials.

19           THE COURT:  They're women in their late twenties?

20           MS. REININGER:  They are now women in their late

21  twenties.  And I would advise the Court that I think both of

22  them have been open and public about their abuse and so I

23  don't think that the need for anonymity is really necessary at

24  this time.

25           THE COURT:  Fair enough.

1          That work for you, Mr. Hasse?

2               MR. HASSE:  Yes, Your Honor.

3               THE COURT:  Okay, thanks.  All right.  The part that

4    is less familiar to a judge from Vermont, the jurisdictional

5    elements.  How did the government plan to handle that?  I know

6    you've been talking about a stip.

7               MS. REININGER:  Your Honor, I think we've signed two

8    stipulations and I don't know what's happened to them.  They

9    might be floating around somewhere.  But we've agreed to

10   stipulate to not only the jurisdictional element that this

11   occurred in Indian Country, but also to the Indian status of

12   the parties.  And so I don't know if the Court wishes to mark

13   those as exhibits or how to proceed.

14              THE COURT:  Sure.  What I think I will do is I'll

15   have a brief colloquy with Mr. Parnell to make certain that

16   he's on board for this and understands it.  We'll mark them as

17   exhibits and I suppose the way to do it is to read them aloud

18   at some point during the trial and I'll have to go back

19   through the jury charge to make sure that the jury fully

20   understands that they don't need to make that decision.

21              MS. REININGER:  Okay.  Thank you, Your Honor.

22              MR. HASSE:  Your Honor, I have here the signed

23   copies of the two stipulations.

24              THE COURT:  Great.

25              MR. HASSE:  Signed by all of the parties in

1   preparation for your colloquy with Mr. Parnell.

2            THE COURT:  If you don't mind handing them up, we'll

3   mark them as Court's Exhibits 1 and 2.

4            DEPUTY COURT CLERK:  Would you like to see those

5   first?

6            THE COURT:  Yes.

7       All right.  Mr. Hasse, with your permission I'll ask

8   Mr. Parnell a couple of questions.  Why don't we place him

9   under oath.

10            DEPUTY COURT CLERK:  Mr. Parnell, would you please

11   raise your right hand.

12       (DEFENDANT SWORN)

13            DEFENDANT PARNELL:  Yes, ma'am.

14            DEPUTY COURT CLERK:  Thank you.

15            THE COURT:  Mr. Parnell, I appreciate your courtesy

16   in speaking with me.  I just want to review these two

17   stipulations.

18       You can have a seat, it's fine.

19       What I'll do is read them aloud and then ask you a couple

20   of questions that are intended to make sure that you've

21   yourself agreed to these stipulations, that they're accurate,

22   had a chance to discuss them with your lawyer, that they're

23   voluntary actions; okay?  That's my only purpose in asking you

24   these questions.

25            DEFENDANT PARNELL:  Yes, sir.

1          THE COURT:  All right.  The first one reads:

2    Stipulation.  Defendant Parnell's Indian status.  The United

3    States of America, represented by Reagan Reininger and

4    Chantelle Dial, Assistant United States Attorneys, and Keith

5    Duane Parnell, represented by Theodore Hasse, hereby stipulate

6    and agree that at all times relevant to the charges in this

7    case Keith Duane Parnell was and is a member of the Cherokee

8    Nation, a federally recognized Indian Tribe, with some quantum

9    of Indian blood and therefore is an Indian person.

10        Therefore because the parties agree that Defendant

11   Parnell is Indian, this element is proven beyond a reasonable

12   doubt for Counts 1 through 10 of the indictment.  The

13   government need not present additional evidence that Defendant

14   Parnell is Indian.

15        I understand, Mr. Parnell, that absent a stipulation or

16   an agreement between the parties that the government would

17   have to prove your status as a member of the Cherokee Nation

18   or in some other ways a person of Indian descent.

19          DEFENDANT PARNELL:  I am.

20          MR. HASSE:  They would have the same burden of

21   proof, beyond a reasonable doubt, that you were in fact an

22   Indian in order to come into court with this type of charge.

23          DEFENDANT PARNELL:  I do understand.  I'm sorry.

24          THE COURT:  Okay.  No, I'm sorry.  It was a long

25   question.

1          So you understand that if you didn't agree to the

2     stipulation, that the government would have the obligation of

3     proving your Indian descent in court.

4              DEFENDANT PARNELL:  Yes, sir.

5              THE COURT:  And is it in fact true that you are a

6     member of the Cherokee Nation with some quantum, some amount,

7     of Indian blood in your descent?

8              DEFENDANT PARNELL:  Yes, sir, that's true.

9              THE COURT:  Okay.  Did you have a chance to talk

10    about privately the legal effect of this stipulation with your

11    attorney before now?

12             DEFENDANT PARNELL:  Yes, sir.

13             THE COURT:  All right.  And is it your voluntary

14    action to stipulate to your Indian status for purposes of our

15    case today?

16             DEFENDANT PARNELL:  Can you repeat that question?

17             THE COURT:  Is it your voluntary decision to

18    stipulate to your Indian descent for purposes of our case

19    today?

20             DEFENDANT PARNELL:  Yes, sir, it is.

21             THE COURT:  All right.  I'll turn to the second

22    stipulation which concerns the location of the alleged

23    offenses and I'll read that aloud.

24         The United States of America, represented by Reagan

25    Reininger and Chantelle Dial, Assistant United States

1    Attorneys, and defendant Keith Duane Parnell, represented by

2    Theodore Hasse, hereby stipulate and agree that at all times

3    relevant to the charges in this case the following addresses

4    were located within the Northern District of Oklahoma and

5    within the Cherokee Nation Indian Reservation and thus Indian

6    Country pursuant to 18 U.S.C., Section 1151.

7        There are six addresses, 904 Southeast 22nd Street,

8    Pryor, Oklahoma; 501 North Taylor Street, Apartment 135 -- or

9    Unit 135, Pryor, Oklahoma.  116 South Indianola Street, Pryor,

10   Oklahoma; 729 East 460 Road, Pryor, Oklahoma; 1925 North 4364

11   Road, Pryor, Oklahoma; 321 North Mayes Street, Pryor,

12   Oklahoma.

13       The stipulation reads further:  Therefore because all

14   parties agree that the above addresses are within Indian

15   Country, this element is proven beyond a reasonable doubt for

16   Counts 1 through 10 of the indictment.  The government need

17   not present evidence the locations of the alleged conduct in

18   Counts 1 through 10 of the indictment were within Indian

19   Country in the Northern District of Oklahoma.

20       Similar questions, Mr. Parnell, you understand that if

21   you did not agree to this stipulation that the government

22   would have the obligation of proving that the six resident

23   addresses were located within the Cherokee Nation Indian

24   reservation?

25            DEFENDANT PARNELL:  I understand.

1          THE COURT:  In other words that would be a legal

2   element of the charge, the charges against you, and the

3   government would have the burden of proof on that question.

4   Do you understand?

5          DEFENDANT PARNELL:  I do understand.

6          THE COURT:  Okay.  And do you understand that by

7   agreeing to the stipulation the government will not be

8   required to put on evidence on the issue, the location of

9   these six addresses, and the jury will be informed that the

10  government has met its burden of proof on the -- on the

11  location element.

12         DEFENDANT PARNELL:  Yes, sir.  I understand.

13         THE COURT:  All right.  And is that -- is it in fact

14  the case true to your knowledge that the six addresses lie

15  within the Cherokee Nation Indian Reservation?

16         DEFENDANT PARNELL:  It's true.

17         THE COURT:  Okay.  And did you reach this

18  stipulation voluntarily?

19         DEFENDANT PARNELL:  Yes, sir.

20         THE COURT:  And did you do so after speaking

21  privately with your lawyer about it?

22         DEFENDANT PARNELL:  Yes, sir.

23         THE COURT:  Okay.  I'll accept both stipulations.

24  We've had a chance to talk and they're voluntary and made with

25  legal representation and advice and that will satisfy the

1  government's burden of proof on these two jurisdictional

2  elements.

3      From the government anything further regarding the

4  stipulations?

5          MS. REININGER:  Nothing, Your Honor.

6          THE COURT:  All right.  Mr. Hasse?

7          MR. HASSE:  Nothing, Your Honor.

8          THE COURT:  All right.  Charge conference.  What I

9  thought we might do is tomorrow afternoon let the jury go

10  early so we don't use up their time, meet at 4:00.  I know

11  that charges always can be improved on and I can count on both

12  of you to do that.  Is there major surgery required or did

13  they look approximately right?

14          MS. REININGER:  I think they look good, Your Honor.

15  There were small changes but nothing that requires too much

16  time.

17          THE COURT:  Good.

18          MR. HASSE:  There may be a couple that are standard

19  in the Tenth Circuit that we might ask but certainly not major

20  changes that we would seek, Your Honor.

21          THE COURT:  Okay.  If you could let me know -- you

22  mean some whole paragraphs of standard model charge type

23  language?

24          MR. HASSE:  Yes.  Tenth Circuit model charge, we may

25  propose one or two additional ones that are fairly standard.

1          THE COURT:  If you can just give me a note, say, by

2   the end of the day today, that will give me a head start on

3   it.

4          MR. HASSE:  Thank you, Your Honor.

5          THE COURT:  And improvements are welcome.  I take no

6   pride of authorship of these things.  My only goal is to get

7   them right so I welcome edits and improvements.

8       And we'll need to find time as we've already said to talk

9   about the res gestae 404(b).  I was thinking the end of the

10  day today.  Can we stay out of those topics for purposes of

11  opening and evidence today or do we need to launch right into

12  it now?

13         MS. REININGER:  Your Honor, I think it -- I would

14  intend to give the jury an idea of the evidence that they are

15  going to hear and so I -- I would ask to do the 404(b) before

16  opening just so that we know what case we're going to be

17  presenting.

18         THE COURT:  Maybe do it now.

19      Taking it up now, Mr. Hasse, does that work for you?

20         MR. HASSE:  Yes, Your Honor.

21         THE COURT:  What time will the jury likely be

22  through with its orientation?

23         DEPUTY COURT CLERK:  Probably 9:20 to 9:30.

24         THE COURT:  All right.  Now would be the time.

25      Anything else we need to address before we take up that

1    substantive issue?

2           MS. REININGER:  I think we can address the exhibits.

3    I think there's been some agreements in reference to

4    preadmission of some exhibits and I think just putting on the

5    record where the parties were with reference to the agreements

6    if the Court wishes to do that now.

7           THE COURT:  You mean to admit some exhibits now by

8    agreement?

9           MS. REININGER:  Yes.

10          THE COURT:  Let's do it.  Which ones are not

11   objected to?

12          MS. REININGER:  It is my understanding that the

13   Government's Exhibits 1 through 7 will be admitted.  We have

14   an agreement for preadmission.  I -- on our exhibit list I

15   also marked 8 through 11.  I marked those just on the

16   precautionary that we need to maybe, you know --

17          THE COURT:  Refresh or something?

18          MS. REININGER:  Refresh a recollection, but we have

19   no intention of actually admitting those unless necessary.

20       With regards to defense counsel's exhibits, I believe

21   it's my understanding, and counsel can correct me if I'm

22   wrong, that we have no objection to the admission of Exhibits

23   Number 1 and Number 2.  That Number 3 was withdrawn.  That

24   Number 4, 5, 6, 7, we would agree to those being preadmitted.

25   And then Defense Exhibits 8, 9, 10, 11, 12, 13, 14 and 15 are

1  social media posts that the victims may have commented on and

2  at this time it's my understanding that those were -- are not

3  going to be offered for admission unless it becomes necessary

4  by the victim's testimony in court.

5         THE COURT:  Oh, you mean as a prior inconsistent?

6         MS. REININGER:  As a prior inconsistent statement.

7         THE COURT:  All right.

8         MS. REININGER:  It's my understanding that Exhibit

9  Number 16 has been withdrawn as well as Exhibit 17, and that

10  Exhibit 18 and 19, if counsel -- I don't recall if that was --

11  if we have an agreement that those were not going to be --

12         MR. HASSE:  Right, subject to the same caveat as to

13  8 through 15.  We're not going to seek to publish to the jury

14  unless it becomes necessary through the testimony.

15         THE COURT:  For the record, why don't we back up and

16  take these a little more formally starting with the

17  Government's 1 through 7.  All photographs.

18      Any objection, Mr. Hasse, To Government's Exhibits 1

19  through 7?

20         MR. HASSE:  We do not object to Government's Exhibit

21  1 through 7.

22         THE COURT:  All admitted.  And 8 through 11 aren't

23  offered at this time?

24         MS. REININGER:  Correct, Your Honor.

25         THE COURT:  So I'll admit 1 through 7 by agreement.

1    Turning to the defendant's exhibits, I appreciate a

2  summary but I kind of lost track of it.  Why don't we take it

3  one at a time.

4    Any objection -- which ones are going to be offered as

5  kind of direct evidence in your case, not -- not for

6  impeachment depending on the testimony?

7         MR. HASSE:  So to keep it simple 1 through 7 are

8  pictures which I believe we have an agreement that the

9  government will stipulate to.

10         THE COURT:  Okay.  1 through 7, excluding 3, which

11  doesn't exist.

12    Any objection?

13         MS. REININGER:  No, Your Honor.

14         THE COURT:  So 1 through 7 are all admitted without

15  objection.

16         MR. HASSE:  8 through 15, as the Assistant U.S.

17  Attorney accurately stated, we're not seeking to admit and

18  publish to the jury at this time and we are planning to only

19  do so if it becomes necessary through the testimony so we

20  don't have an agreement on those.

21    My understanding -- and then the same with 18 and 19.  16

22  and 17 have been withdrawn, Your Honor.  The next one, 19,

23  there is no agreement on.  My understanding is the

24  government -- we offer a video, Defendant's Exhibit 20, That

25  the government would stipulate to at this time, along with 22.

1          THE COURT:  I'm sorry.  So --

2          MR. HASSE:  20 and 22 are stipulated to by the

3  government.  21 the government has not stipulated to.

4          THE COURT:  All right.  So just so I catch up with

5  you, 8 through -- through 19 are not offered at this time.

6  There's no stipulation.  And which are the stipulated videos?

7          MR. HASSE:  Defendant's Exhibits Number 20 and 22.

8          THE COURT:  20 and 22?

9          MR. HASSE:  Correct.

10          THE COURT:  Any objection to 20 and 22?

11          MS. REININGER:  No, Your Honor.

12          THE COURT:  So 20 and 22 are admitted.

13          MR. HASSE:  My understanding is that 23 and 24,

14  Defendant's Exhibits 23 and 24, are stipulated to by the

15  government.

16          MS. REININGER:  Yes, Your Honor.

17          THE COURT:  23 and 24 are admitted.

18          MR. HASSE:  25 and 26 are not.  27 is stipulated by

19  the government.

20          THE COURT:  27 okay?

21          MS. REININGER:  25 I have no objection to.

22          THE COURT:  25 is offered?

23          MS. REININGER:  If that's what counsel --

24          MR. HASSE:  Yes.  I misspoke.

25       Thank you, Counsel.

1    25 as well.

2         THE COURT:  All right.  25 is admitted without

3    objection?

4         MR. HASSE:  Right.  26 is actually withdrawn.

5         THE COURT:  Okay.

6         MR. HASSE:  27 is agreed by the government.  28 and

7    29 will be withdrawn along with Number 30 is withdrawn.

8         THE COURT:  So 27 is admitted both by agreement?

9         MR. HASSE:  Right.

10        MS. DIAL:  Yes, Your Honor.

11        THE COURT:  27 is in.

12        MR. HASSE:  While the government was willing to

13   agree to 30, we will not be using Exhibit 30.

14        THE COURT:  So 30 is withdrawn?

15        MR. HASSE:  That's correct.  And then 31 there is no

16   agreement on that and -- well, there is an agreement to the

17   extent that defendant agrees not to seek to have that

18   published to the jury unless it becomes necessary through the

19   testimony.

20        THE COURT:  All right.

21        MR. HASSE:  And finally, although the government

22   agreed to 32, we will not be offering that.

23        THE COURT:  32 is withdrawn.  All right.  So the

24   only -- the Defendant's Exhibits that have come in by

25   agreement are 1 through 7, all family photos.  20, a video.

1    22, another video.  23, 24, 25, photos, and 27, another

2    photo.

3              MS. REININGER:  Correct, Your Honor.

4              THE COURT:  All right.  Why don't we take time now

5    to talk about the res gestae 404 issues.

6         Ms. Reininger.

7              MS. REININGER:  Your Honor, I would briefly like to

8    make a correction to my notice that was filed specifically on

9    Page 3, Paragraph Number 9.  In the notice I had indicated

10   that towards the end that K. B. will testify that when the --

11   when visiting the defendant she recalled a time when the

12   defendant used his fingers to rub her clitoris while siblings

13   were asleep.

14        That's actually going to be testimony in regards to Count

15   4, so it's not actually 404(b) evidence or 413 evidence, but

16   is actually evidence substantive to the count.

17             THE COURT:  Got it.  What page is that?

18             MS. REININGER:  Page 3, Paragraph Number 9.  Number

19   9 towards the end of that identified paragraph.

20             THE COURT:  Okay.

21             MS. REININGER:  Your Honor, with regards to the 11

22   instances that the government wishes to admit are 11 instances

23   that I think describe for the jury the life that these

24   children were living in their home during the abuse that they

25   endured.

1       I think the evidence gives the jury a complete picture of

2   their testimony and it gives the jury a complete picture of

3   their life that they were living within the family and within

4   the home.

5       The evidence that we are seeking to admit not only is res

6   gestae evidence but it also sets the story and sets the

7   beginning of how the abuse that they endured developed

8   over time.

9       It is clear from the very beginning the evidence that the

10  government is -- is attempting to elicit explains why the

11  victims at young ages did not disclose the abuse that they

12  were subjected to.

13      It starts with, I believe it's Paragraph 1 and Paragraph

14  2, where the victims were -- specifically Kelsey Parnell

15  Blaylock, or K.B., was told when she did tell her mother, her

16  aunt, that something was going on, that the defendant told her

17  that this was their secret and that she wasn't supposed to

18  tell anyone and that if she did talk about it, that she could

19  potentially never see her family again.

20      So these types of instance that developed over this ten

21  years of abuse explained to the jury why they didn't disclose,

22  why they continued to allow the behavior to occur to them by

23  their father, and it gives the jury a total picture that this

24  wasn't just ten isolated incidents that were occurring in

25  their home but there was actually more abuse that was

1  occurring and it really just develops why -- why they did what

2  they did and when they disclosed when they did.

3      So for those reasons and the fact that these are not more

4  prejudicial than probative we would ask the Court to allow the

5  government to seek that testimony.

6      THE COURT:  All right.  Thank you.

7      Mr. Hasse, how do you see it?

8      MR. HASSE:  Your Honor, practically speaking we

9  understand it would be difficult to have the complaining

10  witnesses come and testify without presenting potentially some

11  facts that aren't directly related to the 10 counts in the

12  indictment, and with regards to that testimony and those facts

13  that, you know, are most relevant that may comprise res

14  gestae, we're not going to object to that testimony being

15  elicited from the complaining witnesses.

16      However, as we touched on earlier, Your Honor, there

17  seems to be some testimony identified by the government here

18  which we feel would fall outside of that.  And once again it

19  would be that testimony, specifically with regards to this one

20  incident of physical abuse that's being alleged by one of

21  the -- one or both of the complaining witnesses, that the

22  defendant Keith Parnell allegedly some perhaps 13 years ago,

23  14 years ago, choked one of the complaining witnesses in an

24  argument.

25      That doesn't seem to be at the core of this case.  That

1   seems to be, one, not relevant; and, two, should be excluded.

2   If the Court felt it was relevant, it should be excluded under

3   403 as unfairly prejudicial, outweighing probative value.

4       We would make that objection also with regards to

5   paragraph 4.  And on page 2 -- I should say bullet point 4 on

6   page 2 of the government's notice, that is ECF Document 34,

7   the second -- well, first and second sentences in that bullet

8   4 that the Green Country Mobile Home Park in Pryor, Oklahoma,

9   the trailer was infested with fleas.  K.B. will testify that

10  everyone would be eaten alive by fleas.

11      Here we're getting into allegations of there being

12  neglect, child abuse through neglect.  We think that's not

13  core to the case.  We think it certainly should be excluded

14  under 403.  We think it's not relevant under 401.  We would

15  ask that be excluded.

16      With 5, item 5, here we have allegation that she told the

17  teacher her family did not have enough food to eat at the

18  house.  Again I'm afraid we're getting well beyond what is at

19  the core of these once we're getting into allegations from,

20  you know, 15 years ago that there was, you know, again

21  neglect.

22      We would ask that the government not elicit testimony

23  about physical abuse, Your Honor, and not elicit testimony

24  regarding child abuse through neglect.

25          THE COURT:  All right.  Here is how I'll rule.  The

1   evidence that's summarized in paragraphs 1 through 11,

2   excluding 9, which is now offered as substantive evidence, is

3   offered either as res gestae evidence concerning the full

4   scope and context of the defendant's conduct as it relates to

5   the ten charges or alternatively as 404(b) evidence of

6   defendant's intent, preparation and plan.

7       In assessing the government's proffer the Court looks at

8   the issues of admissibility and relevance from the

9   government's perspective as the proponent of the evidence and

10  describing the evidence as I will in a minute.  In other words

11  the Court makes no judgment itself about the truth of the

12  offered testimony, rather the Court's perspective can be

13  expressed this way and accepted by the jury.  The testimony is

14  potentially relevant on the following issues.

15      So I want to make sure that Mr. Parnell understands that

16  I'm not making any judgment myself about what happened.  It's

17  an evidentiary ruling, not a fact-finding effort.

18      The evidence all comes from the two victims whose names I

19  will now learn, Kelsey Blaylock and Jasmine Parnell, twin

20  sisters.  It concerns their childhood commencing at age five

21  and continuing for a decade or more until in most respects age

22  15.

23      The proffered evidence includes descriptions of the 10

24  acts offered by the government to prove the 10 offenses but it

25  also includes description of other uncharged acts as well as

1    communications between the defendant and the two victims,

2    primarily request that they submit to his conduct and that

3    they tell no one.

4        The testimony also includes some description of the poor

5    living conditions as they described them under which they were

6    raised and it includes a description by Jasmine Parnell of an

7    incident when she was 17, after the charged conduct, which she

8    states the defendant requested sex from her and she declined.

9        The testimony from the two victims about the charged

10   conduct itself is not challenged on grounds of admissibility,

11   rather, as I understand the case, the defendant's perspective

12   is that it's a fabrication, though I don't know that for sure.

13   We'll wait to see as the defense unfolds.  That of course

14   presents a jury question.  It's not -- doesn't raise issues

15   under be 404(b).

16       The testimony about the communications between the

17   defendant and the daughters and the uncharged sexual conduct

18   is admissible and the Court's view is res gestae evidence,

19   it's evidence that's intrinsic to the 10 charges.  It concerns

20   defendant's access to his children, the nature of the

21   relationship and communications with their father, the

22   escalating nature of his sexual demands as these are described

23   in the government's proffer and the reasons the children

24   submitted.

25       It's in short a description of long-running sexual

1  conduct, some charged and some not, but the entire story is

2  admissible because it describes the manner in had which the

3  defendant carried out this series of offenses over a period of

4  about a decade.

5      The Court will exclude one portion of the proposed

6  testimony.  The government offers evidence that the defendant

7  raised the daughters and other children in conditions of

8  poverty and neglect.  There's proposed testimony about

9  flea-ridden bedding and other lack of food, other inadequate

10  care.

11      That testimony is not relevant to the sexual crimes

12  alleged by the government.  The defendant is not charged with

13  neglecting or endangering his children in those ways.

14  Testimony about living conditions in the family's home is not

15  part of the intrinsic res gestae evidence concerning the 10

16  charged offenses and I will exclude it on grounds that it

17  qualifies neither as 404(b), bad act evidence, or of -- as res

18  gestae.  It concerns different issues that are not really

19  related to the sex charges in this case.

20      The Court will permit the testimony about the defendant's

21  conduct in the semi trailer with Jasmine Parnell when she was

22  17.  That testimony further develops and if believed

23  illuminates the sexualized content of his relationship with

24  his daughter as he experienced it and tends to support and

25  confirm her testimony about his conduct when she was younger.

1  So the primary reason for admitting all but a small portion of

2  the Paragraphs 1 through 11 is res gestae.

3      Addressing the 403 balancing test, the Court considers --

4  considered multiple factors on both sides of the test.  These

5  include the following:  A, the uncharged conduct is described

6  through firsthand testimony from live witnesses who will be in

7  court.

8      B, if accepted by the jury, it's highly probative since

9  it supports their account of prolonged sexual abuse by the

10 father.

11     C, it's seriously disputed by the defendant, as I

12 understand the case, who has raised the defense of

13 fabrication.

14     D, it's not the only evidence available since the same

15 victim witnesses can describe the actual conduct comprising

16 the 10 alleged offenses but in its scope and reach it's

17 important evidence that from the government's perspective the

18 witnesses are not making up a story.  There is no alternative

19 way to describe the relationship over the years of their

20 childhood with their father.

21     e, because the uncharged conduct is consistent with the

22 description of charged conduct, it's not likely to result in a

23 verdict based on facts or concerns unrelated to the case.

24     Similarly, F, evidence of uncharged conduct is not likely

25 to distract the jury into considering irrelevant issues such

1    as the family's poverty or the treatment of the other

2    children.  That really was the reason that I excluded the --

3    the flea testimony and the lack of food testimony.

4         G, the testimony is unlikely to require additional court

5    time.

6         And, H, the testimony was highly probative on one

7    particular issue which is the issue of late report or

8    fabrication, the course of the relationship between the

9    defendant and the children, including uncharged conduct and

10   communications may explain to the jury why the victims waited

11   for so many years to make their -- to make the conduct known.

12        So as I balance all of these factors I think that the

13   balance comes down squarely in favor of admissibility with all

14   but the physical abuse testimony.

15        I neglected to mention the Paragraph 10, the

16   strangulation issue.  I think that is part of the res gestae

17   evidence concerning the scope of the defendant's relationship

18   with his daughters and is fairly in the case.

19        To complete this discussion I would also admit the

20   evidence under Rule 404(b), if believed by the jury, the

21   description of uncharged conduct would show the defendant's

22   intent to carry out a long-running course of sexual abuse as

23   well as the progression of this conduct with each of the two

24   children separately and for many years unknown to the other

25   would be admissible to show the full nature of his modus

1   operandi and the similarities of his treatment of each child.

2       The same analysis of the Rule 403 factors applies, and I

3   won't repeat it, but as this discussion indicates the stronger

4   ground for admissibility is the res gestae analysis under Rule

5   401 of the testimony is relevant to the government's

6   description of the crimes.  Rule 401(4) is not proposed as a

7   basis of admissibility so I haven't addressed it.

8       Was there a reason that I overlooked that Rule 401(4)

9   isn't in play?

10          MS. REININGER:  No, Your Honor.

11          THE COURT:  It's just not part of the presentation?

12          MS. REININGER:  Yes, Your Honor.

13          THE COURT:  All right.  Fair enough.

14      So I will admit all of that.  You know the only detail I

15  wanted to make sure I understood, there is reference to an

16  affair with the sister-in-law.  And that may strike a chord

17  with jurors that it's kind of a different issue from the child

18  sex abuse issues.  Is that necessary to get into or is that --

19  I don't know quite how the government saw it.

20          MS. REININGER:  The only reason that I would move to

21  admit that evidence is because it explains that at one point

22  the defendant leaves the home.

23          THE COURT:  Right.

24          MS. REININGER:  That he was kicked out of the home

25  and that then the children were going to visit their father at

1    a different and separate location.  And then at some point mom

2    and dad do reunite and begin living together again in another

3    home.

4         So it just kind of tells, you know, why he left and that

5    the children were now going to, I believe, it's like a seventh

6    home in their childhood.

7              THE COURT:  Right.  Do you have a -- when I raise an

8    issue, I'm always a little worried that I'm making trouble

9    over nothing.  Do you have a view about that?

10             MR. HASSE:  Your Honor, it's the defense's view that

11   it's certainly appropriate to talk about the fact that Keith

12   Parnell was outside of the home, and certainly it's going to

13   come up that there was, you know, spousal strife between

14   Mr. Parnell and his ex-wife.  It doesn't seem necessary from

15   where we're standing to talk about him having allegedly been

16   unfaithful.  It seems unnecessary.

17        We would ask that that testimony not be elicited, that

18   this just be addressed by the fact that Mr. Parnell and his

19   ex-wife were not getting along and he was kicked out.  We

20   don't dispute that.

21             THE COURT:  How about from the government's side?

22   We just say he left as a result of a family dispute?

23             MS. REININGER:  Sure.  Your Honor, I would point out

24   that the entire testimony we're eliciting here is that he was

25   unfaithful to his wife during this time so it's just one party

1    for another really at this point.  I mean he was cheating on

2    his wife with his children, he was cheating on his wife with

3    his sister-in-law.

4            THE COURT:  I know, I'm just trying to focus on what

5    the case is really about.

6            MS. REININGER:  Yes, Your Honor.

7            THE COURT:  So perhaps you could -- who is going to

8    testify about that issue?

9            MS. REININGER:  I believe not only Jennifer Parnell,

10   the wife, but I believe that Kelsey and Jasmine Parnell would

11   also testify to it.  And I'm more than happy to instruct them

12   prior to their testimony that -- to limit their testimony to

13   just that he moved out.

14           THE COURT:  Yeah.  We can say as a result of a

15   family dispute.

16           MS. REININGER:  Sure.

17           THE COURT:  Yeah.  Good.  Thanks.

18        Any more on that issue?  As I kind of, you know, I worked

19   through some of this last night obviously.  As I read it I

20   will -- in light of the testimony about the physical abuse I

21   will ask the jury whether anybody has had that type of

22   experience within their family that would color their thoughts

23   as you had requested, Mr. Hasse.  I think it's in the case now

24   and I don't want to neglect it.

25           MR. HASSE:  Thank you, Your Honor.

1          THE COURT:  All right.

2          MS. REININGER:  Judge, I just would ask -- just to

3     clarify a few things so I can make sure that we stay within

4     your order.

5          THE COURT:  Yes.

6          MS. REININGER:  With regards to the allegation in

7     paragraph 4, I understand we will instruct the witnesses to

8     not discuss the fleas.  But we further will be talking to the

9     victims and I presume other witnesses about sleeping

10    arrangements within the home, where the children slept.  I

11    think that's relevant to -- to how the incidents occurred.

12         Would the government be permitted to inquire of the

13    witnesses -- of the sleeping locations?  I believe there's

14    going to be testimony that at one point all the children, all

15    five children, shared a bed, a mattress, in one of the

16    bedrooms together.

17         You know that's going to appear that they're poor, that

18    they're -- that there's some sort of neglect in the home but I

19    think it's relevant to be able to explain the sleeping

20    arrangements.

21          THE COURT:  Right.

22          MR. HASSE:  If I may, Your Honor, we don't object to

23    testimony being elicited that all of the kids were sleeping

24    together and the sleeping arrangements.  We can see that

25    that's relevant.

1           THE COURT:  That's how I saw it as well.

2           MS. REININGER:  Just so I'm clear as well is the

3   government permitted to inquire of Jasmine Parnell that she

4   had made a report at school that required DHS coming to the

5   home?

6           THE COURT:  I think it just invites trouble because

7   the report was about not enough food in the fridge; right?

8           MS. REININGER:  Yes, but then the reaction by the

9   family was -- specifically the dad is that you can't say what

10  happens in our home or you'll be taken away.  And I think this

11  is what also builds into her disclosure, or lack thereof,

12  because of these earlier occurrences that may not have been

13  related to the sexual abuse but that she -- will play into her

14  mindset as to why she started to keep quiet about things that

15  were happening inside the home.

16          THE COURT:  Yeah, right.

17          MR. HASSE:  Your Honor, based on the complaining

18  witness statements the government is still going to be able to

19  get in that testimony about the defendant allegedly having

20  told them they can't tell anybody.  There's elsewhere in their

21  statements where they claim that -- specifically Kelsey

22  Blaylock claims that she tried to bring up the fact that

23  something had happened and that that specific thing happened.

24  She alleges that defendant Keith Parnell told her, well, you

25  can't say that otherwise daddy will be taken away.

1    So this isn't the only way that they get in that kind of

2  testimony.  They're already getting in that testimony in a

3  way.  Adding this would be potentially cumulative.

4        THE COURT:  In paragraph 2, I think, I saw it

5  there.

6        MS. REININGER:  Yes, Your Honor, as it relates to

7  Kelsey Parnell the other victim.

8        MR. HASSE:  That's right.  It is -- thank you, Your

9  Honor.  It is mentioned here in the government's notice so,

10  yes, this testimony will be elicited.  It's not the only way

11  to get it in and because of the prejudicial manner of the rest

12  that's in item 5 on page 2 of their notice we suggest that

13  this just be left out.

14        MS. REININGER:  And, Your Honor, that goes -- I

15  agree that the government is permitted to get it in through

16  the elicited testimony as identified in paragraph 2, but that

17  goes to Kelsey Parnell, a different victim.  And I think these

18  victims should be treated individually and not as a whole and

19  what happened to one not necessarily does the other victim

20  have any knowledge of that and so I think to be able to

21  discuss her -- Jasmine Parnell's mindset into what she was

22  feeling, what she thought, where her mind was at, we would

23  need to be able to discuss that she had attempted to make some

24  report of some kind at school and that she was met with

25  opposition at her house and was told not to do that again,

1  otherwise she would suffer consequences.

2          THE COURT:  I take your point.  Here is the trouble

3  as I see it from the outside which is that since the jury

4  won't hear about the lack of food incident and since they have

5  heard a lot at this point about sex and incest, they're

6  going -- the logical assumption was that she went to the

7  school nurse and talked about what was happening with her dad

8  and that wouldn't be accurate since it was actually about a

9  different thing.

10      So it's always the problem when we begin to kind of edit

11  the facts and get some portion in.  I think if the complaint

12  about the lack of food doesn't come in, I -- I don't have any

13  real alternative except also to exclude the defendant's

14  statement to her that if she told people what happens in that

15  house, the kids would be taken away.  Because otherwise we

16  risk creating a false impression that there was some early

17  complaint about the sexual conduct, which there wasn't.

18      You see what I mean?

19          MS. REININGER:  I understand.  I will instruct our

20  witnesses accordingly, Your Honor.

21          THE COURT:  Yeah.  Okay.  I appreciate your patience

22  with us.

23      Okay.  Anything else?  We'll get going with voir dire in

24  a few minutes.  I think they're probably through their

25  orientation.

1      Mr. Hasse?

2           MR. HASSE:  Nothing further on this, Your Honor.

3           THE COURT:  From the government?

4           MS. REININGER:  Nothing, Your Honor.

5           THE COURT:  Okay.  Good enough.  Thank you both.

6      (VOIR DIRE PROCEEDINGS WERE HAD BUT NOT DESIGNATED AS

7 PART OF THIS RECORD.)

8

9

10

11                     **REPORTER'S CERTIFICATION**

12      I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

13 TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15                CERTIFIED:    S/Laura Griffin
                               Laura Griffin, RPR, CRR
16                             United States Court Reporter
                               333 W. 4th Street, RM 411
17                             Tulsa, OK  74301
                               (918) 699-4879
18                             laura_griffin@oknd.uscourts.gov

19

20

21

22

23

24

25